## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| JACQUELINE TAYLOR, LISA BROOKS, MICHELE COWAN, TUANA HENRY, MATTIE MCCORKLE, RENEE WILSON, and PEOPLE'S WATER BOARD COALITION, on behalf of themselves and all others similarly situated, | Case No.<br><br>Hon.<br><br>**CLASS ACTION COMPLAINT** |
| Plaintiffs, | **Jury Trial Demanded** |
| v. | |
| CITY OF DETROIT, a Municipal Corporation, through the Detroit Water and Sewerage Department, its Agent; GOVERNOR GRETCHEN WHITMER, in her official capacity; MAYOR MICHAEL DUGGAN, in his official capacity; and GARY BROWN, in his official capacity. | |
| Defendants. | |

Plaintiffs Jacqueline Taylor, Lisa Brooks, Michele Cowan, Tuana Henry, Mattie McCorkle, Renee Wilson, and People's Water Board Coalition, on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), bring this civil rights class action against Defendants City of Detroit ("Detroit"), Governor Gretchen Whitmer, Mayor Michael Duggan, and Director of the Detroit Water and Sewerage Department ("DWSD") Gary Brown for practices related to water service

1

shutoffs and water bill affordability. First, Plaintiffs allege that Defendants have violated their bodily integrity in violation of the Due Process Clause of the 14th Amendment to the U.S. Constitution by exhibiting deliberate indifference to the known risks of living without water service that could, did, and will cause harm to Plaintiffs. Plaintiffs also allege that Defendants Detroit, Duggan, and Brown have violated the Michigan Constitution of 1963 through these actions. Second, Plaintiffs allege that Defendant Detroit has violated the equal protection guarantees of the 14th Amendment to the U.S. Constitution and the Michigan Constitution of 1963 by disconnecting their water service without first determining whether they had the ability to pay. Third, Plaintiffs allege that Defendant Detroit's water shutoff policy violates the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA"), and the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws Ann. § 37.2502 ("ELCRA"), because it has a disproportionate and unjustified impact on Black residents.

## INTRODUCTORY STATEMENT

1.      Water is a human right and a basic necessity, especially in a time of pandemic. Access to safe, affordable water is critical to stop the spread of COVID-19 and other bacterial or viral infections through frequent handwashing and cleaning. In Detroit, however, thousands of residents—who are predominantly and disproportionately Black—have suffered from the lack of water service in their homes for years. These residents, many of whom have had their water service

2

temporarily restored during the pandemic, will risk losing their water service again when Detroit resumes its water shutoff policy. The lack of water places these residents and members of their communities, including schools, workplaces, and other shared spaces, at risk of contracting bodily illnesses, including COVID-19.

2.      Detroit has had a water affordability crisis for decades.[1] While water is generally considered "affordable" when families spend no more than 2% to 2.5% of their household incomes for water services,[2] low-income Detroit residents must pay

---

[1] Detroit's water affordability crisis began in the early 2000s. *See, e.g.*, Jason Amirhadji et al., Geo. Law Hum. Rts. Inst., *Tapped Out: Threats to the Human Right to Water in the Urban United States* 24 (Apr. 2013), https://www.law.georgetown.edu/human-rights-institute/wp-content/uploads/sites/7/2017/07/Tapped-Out.pdf (citing Jesu Estrada, *The Struggle for Water in Detroit: An Interview with Marian Kramer*, People's Tribune (Mar. 6, 2009), http://www.peoplestribune.org/PT.2009.03/PT.2009.03.06.html).

[2] *See, e.g.*, Office of Water, U.S. Envtl. Prot. Agency, *Report to Congress: Small Systems Arsenic Implementation Issues* 4 (Mar. 2002), https://nepis.epa.gov/Exe/ZyPdf.cgi?Dockey=20001ZJL.txt; U.S. Envtl. Prot. Agency, EPA Sci. Advisory Bd., Econ. Envtl. Comm., EPA-SAB-EEAC-03-004, *Affordability Criteria for Small Drinking Water Systems* 4 (Dec. 2002), https://yosemite.epa.gov/sab/SABPRODUCT.NSF/38385976FDAF17FF852571E F0041243D/$File/eeac03004.pdf; *see also* Stratus Consulting, *Affordability Assessment Tool for Federal Water Mandates* 4 (2013), https://www.awwa.org/Portals/0/AWWA/ETS/Resources/AffordabilityAssessment Tool.pdf.

an average of 10% of their household incomes on water,[3] and some pay much more.[4] As a result, many families in Detroit struggle to pay their water bills.

3.     When customers' water bills go unpaid, DWSD, a department of the City of Detroit, disconnects their service without first determining whether customers have the means to pay their bills. The looming resumption of water shutoffs will exacerbate an existing public health emergency in Detroit absent this Court's intervention.

4.     Between 2014 and 2019, more than 141,000 households in Detroit had their water service disconnected for non-payment.[5] Some families live for years without water service in their homes after a disconnection by DWSD. Others are trapped in a cycle of water insecurity with repeated disconnections and

---

[3] Dahlia Rockowitz et al., *Household Water Security in Metropolitan Detroit: Measuring the Affordability Gap*, Univ. of Mich. Poverty Sols. (Aug. 2018), https://poverty.umich.edu/10/files/2018/08/PovertySolutions-PolicyBrief-0818-r2.pdf.

[4] *See, e.g.*, Cria Kay et al., *Water Insecurity in Southeast Michigan: The Impacts of Unaffordability and Shutoffs on Resident Wellbeing* (Apr. 2018), Univ. of Mich. Sch. for Env't and Sustainability, https://deepblue.lib.umich.edu/bitstream/handle/2027.42/143169/Roadmap%20to%20Water%20Security_320%20%281%29.pdf?sequence=1&isAllowed=y.

[5] Joel Kurth & Mike Wilkinson, *I Hate to Complain, but I Haven't Had Water in a Year. A Detroit Story.*, Bridge Magazine (Feb. 17, 2020), https://www.bridgemi.com/michigan-health-watch/i-hate-complain-i-havent-had-water-year-detroit-story.

reconnections. These water insecure families risk losing service at any time because of their inability to pay DWSD's rates.

5.     In 2014, Detroit disconnected water service to approximately 44,000 households for non-payment of bills.[6] In 2018, Detroit disconnected water service from more than 16,000 households.[7] In 2019, shutoffs rose again to a total of 23,473.[8] As of January 2020, approximately 9,500 homes in Detroit were reportedly still without water service.[9]

6.     Families without water service in their homes are susceptible to infection. Through the years, Detroit's water shutoff policy has resulted in outbreaks of various forms of infectious diseases, as well as other threats to the health of affected families resulting from such things as the inability of people with diabetes to prepare medically necessary meals, the inability of parents to prepare infant formula, dehydration, and various other health consequences associated with the lack of water. Families without water service are also at risk of involvement with

---

[6] Kat Stafford, *Controversial Water Shutoffs Could Hit 17,461 Detroit Households*, Detroit Free Press (Mar. 26, 2018), https://www.freep.com/story/news/local/michigan/detroit/2018/03/26/more-than-17-000-detroit-households-risk-water-shutoffs/452801002/.

[7] Kurth & Wilkinson, *supra* note 5.

[8] *Id.*

[9] *Id.*

Child Protective Services, as the lack of running water is a factor in determining whether parents are providing a suitable home for their children.[10] In many cases, individuals who live without water service in their homes have become carriers of disease, infecting others within their physical proximity. This has created a public health emergency in Detroit.

7.    Despite repeated, consistent demands for remedial action by affected communities and their advocates, including Plaintiff People's Water Board Coalition, Defendants' response to this public health emergency has been woefully inadequate and appallingly weak. Defendants have failed to implement a program to ensure that Detroit's water insecure population has long-term access to affordable water and Defendant Detroit has continued to employ water shutoffs as a collection method despite the known risks of living without water.

8.    The public health emergency caused by Detroit's water shutoff policy has been exacerbated by the current pandemic.

9.    Water shutoffs disproportionately impact Detroit's Black and low-income residents. Detroit is a predominantly Black city and has a significant

---

[10] Mich. Dep't of Health & Human Servs., *Assessments: Section 1: Safety Assessment,   Number   9,   6,   (Feb.   1,   2019),* https://dhhs.michigan.gov/OLMWEB/EX/PS/Public/PSM/713-11.pdf#pagemode=bookmarks.

population of impoverished residents. According to data reported by the U.S. Census Bureau, as of July 2019, the population of Detroit was 670,031.[11] Approximately 79% of the city's population is Black and nearly 15% is white.[12] In Detroit, 36.4% of the population is impoverished.[13] Black people comprise the largest percentage of impoverished or low-income residents of Detroit.[14]

10.     Detroit is the epicenter of COVID-19 infections within Wayne County. As of May 15, 2020, Detroit's confirmed cases were concentrated in predominantly Black and lower-income neighborhoods.[15] According to the Brookings Institution, 90% of the city's zip codes with the highest number of confirmed cases have

---

[11]  U.S. Census Bureau, *QuickFacts: Detroit City, Michigan* (July 2019), https://www.census.gov/quickfacts/detroitcitymichigan.

[12] *Id.*

[13] *Id.*

[14] *See, e.g.*, New Detroit, *Metropolitan Detroit Race Equity Report* 26-28 (Mar. 2014),                                                 https://www.newdetroit.org/wp-content/uploads/2017/05/MetropolitanDetroit_RaceEquity_Report_NewDetroit.pdf .

[15] Makada Henry-Nickie & John Hudak, *Social Distancing in Black and White Neighborhoods in Detroit: A Data-driven Look at Vulnerable Communities*, Brookings     Inst.:     Fixgov     Blog     (May     19,     2020), https://www.brookings.edu/blog/fixgov/2020/05/19/social-distancing-in-black-and-white-neighborhoods-in-detroit-a-data-driven-look-at-vulnerable-communities/; *see also* John C. Austin, *COVID-19 is Turning the Midwest's Long Legacy of Segregation Deadly*, Brookings Inst.: The Avenue Blog (Apr. 17, 2020), https://www.brookings.edu/blog/the-avenue/2020/04/17/covid-19-is-turning-the-midwests-long-legacy-of-segregation-deadly/.

populations that are at least 80% Black.[16] Data compiled by the City of Detroit shows that Black people account for 82.1% of COVID-related deaths in the city.[17] As of late May 2020, Wayne County had the fifth highest death toll from COVID-19 in the country.[18]

11.    Since the COVID-19 crisis began, Defendants and other government officials have admonished members of the public to engage in regular handwashing to prevent infection and the spread of disease. Yet, through its water shutoff policy, Detroit has made handwashing a practical impossibility for thousands of families in the city for nearly 20 years.[19]

12.    The arrival of COVID-19 signaled catastrophe for Detroit communities that were unable to engage in defensive or preventive handwashing and other cleaning measures because of the lack of water service in their homes. The rates of

---

[16] Henry-Nickie & Hudak, *supra* note 15.

[17] Detroit Health Dep't, *COVID-19 Dashboard* (updated July 7, 2020), https://codtableau.detroitmi.gov/t/DHD/views/CityofDetroit-PublicCOVIDDashboard/DemographicCasesDashboard?%3AisGuestRedirectFro mVizportal=y&%3Aembed=y.

[18] Miriam Marini, *Michigan Reports 5 Coronavirus Deaths Sunday, Lowest Single-day Report Since March*, Detroit Free Press (May 24, 2020), https://www.freep.com/story/news/local/michigan/2020/05/24/michigan-reports-fewest-daily-coronavirus-deaths-since-march/5253290002/.

[19] *See* Estrada, *supra* note 1 (noting that 40,700 people in Detroit were without water service in 2001-2002, leading to local advocacy to try to halt Detroit's water shutoff policy).

infection in Detroit outpaced all other regions in the State of Michigan as well as many regions throughout the country.

13.     Through its Water Restart Plan and Governor Whitmer's Executive Order ("EO") 2020-28,[20] Detroit has been required since March 2020 to halt its water shutoff policy and restore water service to all customers previously disconnected for non-payment. On July 8, 2020, Defendant Whitmer rescinded EO 2020-28 and replaced it with EO 2020-144, which requires the restoration of water service to customers for non-payment until December 31, 2020.[21] However, Defendant Whitmer has not taken the actions necessary to ensure long-term water affordability and access in Detroit. In fact, EO 2020-144 specifies that it does not relieve a customer of the obligation to pay for water, prevent a public water supply from charging any customer for water service, or reduce the amount a resident may owe to a public water supply.[22]

---

[20]   Mich. Exec. Order 2020-28 (COVID-19) (Mar. 28, 2020), http://www.legislature.mi.gov/documents/2019-2020/executiveorder/pdf/2020-EO-28.pdf; Press Release, City of Detroit Water & Sewerage Dep't, *Mayor Duggan, Governor Whitmer and DWSD Announce Coronavirus Water Restart Plan* (Mar. 9, 2020), https://detroitmi.gov/news/mayor-duggan-governor-whitmer-and-dwsd-announce-coronavirus-water-restart-plan [hereinafter *Water Restart Plan*].

[21]   Mich. Exec. Order 2020-144 (July 8, 2020), https://content.govdelivery.com/attachments/MIEOG/2020/07/08/file_attachments/1491227/EO%202020-144.pdf.

[22] *Id.* at 2.

14.     Additionally, while EO 2020-28 was in effect, she failed to ensure that municipalities like Detroit were in compliance with the order.

15.     In June 2020, the Michigan Legislature passed a bill that will, among other appropriations, grant $25 million to water utility providers across the state to assist customers with arrearages and fees incurred during the COVID-19 pandemic.[23] This assistance is limited to $700 per household.[24] It provides no relief to customers for arrearages incurred prior to the COVID-19 pandemic or after December 2020, nor any long-term relief for Detroit's water insecure population. Governor Whitmer signed the bill into law on July 1, 2020, but Defendant Detroit has not indicated whether it will participate in the program.

16.     Defendants Detroit, Duggan, and Brown failed to fully comply with EO 2020-28 and restore water service to all customers previously disconnected for non-payment during the COVID-19 pandemic. Upon information and belief, some families in Detroit still lack water service as of the date of this filing, while the pandemic continues to threaten the health of city residents. Consequently, Defendants Detroit, Duggan, and Brown are also currently out of compliance with EO 2020-144, which replaced EO 2020-28. Further, Defendant Duggan has

---

[23] Mich. Senate Bill 0690 (2019), http://legislature.mi.gov/doc.aspx?2019-SB-0690.

[24] *Id.*

announced that Detroit will resume water shutoffs for customers who cannot keep up with their bill payments after the coronavirus crisis has passed.[25]

17.    By creating conditions that contribute to and threaten the introduction of infectious disease by knowingly and purposefully preventing many Detroit residents from washing their hands, flushing their toilets, and cleaning their homes, Defendants have caused and continue to cause disastrous consequences for Plaintiffs and thousands of similarly situated individuals.

18.    Plaintiffs bring this action for injunctive, declaratory, and compensatory relief under the Due Process Clause of the 14th Amendment to the U.S. Constitution, alleging that Defendants have violated their rights to substantive due process. In particular, Plaintiffs allege that Defendants deliberately and knowingly breached the constitutionally protected bodily integrity of Plaintiffs through their deliberate indifference to the known risks of living without water service that could, did, and will cause harm to Plaintiffs. Plaintiffs also allege Defendants Detroit, Duggan, and Brown have violated their rights to substantive due process under the Michigan Constitution of 1963 by these actions.

---

[25] Sarah Cwiek, *Detroit Announces Expanded Testing Plans, Stimulus Money for Struggling Residents*, Mich. Radio NPR (Apr. 27, 2020), https://www.michiganradio.org/post/detroit-announces-expanded-testing-plans-stimulus-money-struggling-residents.

19.    Plaintiffs also bring this action for injunctive, declaratory, and compensatory relief under the equal protection guarantees of the 14th Amendment to the U.S. Constitution and the Michigan Constitution of 1963, alleging that Defendant Detroit has violated their equal protection rights by disconnecting the water service of predominately Black impoverished customers without first determining whether they have the ability to pay.

20.    Plaintiffs further bring this action for injunctive, declaratory, and compensatory relief pursuant to the FHA and the ELCRA, alleging that Defendant Detroit's water shutoff policy has a disproportionate and unjustified impact on Black residents.

21.    From January 2017 to July 2018, 95% of residential water shutoffs occurred in Census tracts with a population that was greater than 50% Black. Additionally, from January 2019 to January 2020, 96% of residential water shutoffs occurred in zip codes with a population greater than 50% Black. These disparities persist even when controlling for differences in income and the number of unoccupied homes in Detroit.

22.    Defendant Detroit's policy of disconnecting water service to customers for non-payment causes Black residents to disproportionately experience water shutoffs, forcing them to live without water service in their homes.

23.    Through its water shutoff policy, Defendant Detroit discriminates against Black residents in violation of the FHA and ELCRA.

## JURISDICTION AND VENUE

24.    This Court has jurisdiction over this suit pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), 1367(a), and 2201 and 42 U.S.C. § 3613(a).

25.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because all incidents, events, and occurrences giving rise to this action occurred in the Eastern District of Michigan.

## PARTIES

*Plaintiffs*

26.    Plaintiff Jacqueline Taylor is a resident of Detroit, Michigan. She is Black. At all times relevant to her allegations herein, Ms. Taylor was a resident of Detroit in Wayne County and a citizen of the United States. She is a customer of DWSD.

27.    Plaintiff Lisa Brooks is a resident of Detroit, Michigan. She is Black. At all times relevant to her allegations herein, Ms. Brooks was a resident of Detroit in Wayne County and a citizen of the United States. She is a customer of DWSD.

28.    Plaintiff Michele Cowan is a resident of Detroit, Michigan. She is Black. At all times relevant to her allegations herein, Ms. Cowan was a resident of Detroit in Wayne County and a citizen of the United States. She and her daughter

are customers of DWSD.

29.     Plaintiff Tuana Henry is a resident of Detroit, Michigan. She is Black. At all times relevant to her allegations herein, Ms. Henry was a resident of Detroit in Wayne County and a citizen of the United States. She is a customer of DWSD.

30.     Plaintiff Mattie McCorkle is a resident of Detroit, Michigan. She is Black. At all times relevant to her allegations herein, Ms. McCorkle was a resident of Detroit in Wayne County and a citizen of the United States. She is a customer of DWSD.

31.     Plaintiff Renee Wilson is a resident of Detroit, Michigan. She is Black. At all times relevant to her allegations herein, Ms. Wilson was a resident of Detroit in Wayne County and a citizen of the United States. She is a customer of DWSD.

32.     Plaintiff People's Water Board Coalition is a Michigan-based nonprofit organization with a mission of advocating for water access, affordability, and sanitation for all state residents. Its members include residential customers of DWSD and other organizations advocating for water affordability and sanitation.

*Defendants*

33.     Defendant City of Detroit is a Michigan municipal corporation located in Wayne County, Michigan. It is a home rule city organized under PA 279 of 1909, as amended, the Home Rule City Act, Mich. Comp. Laws Ann. § 117.1, *et seq*. It provides water and sewerage service to residents through DWSD, its agent.

14

34.     Defendant Governor Gretchen Whitmer, in her official capacity as Governor of the State of Michigan, is charged with ensuring the health and safety of the people of Michigan by effectively addressing public emergencies and ensuring compliance with her executive orders.

35.     Defendant Michael Duggan, in his official capacity as Mayor of the City of Detroit, is charged with ensuring the health and safety of the people of the City of Detroit.

36.     Defendant Gary Brown, in his official capacity as Director of DWSD, is charged with ensuring that the water services provided to DWSD customers do not jeopardize their health and safety.

## FACTUAL ALLEGATIONS

### *Detroit's Water System*

37.     In the first half of the 20th century, Detroit—the epicenter of the American automotive manufacturing industry—was a magnet for Black southerners relocating to the city during the Great Migration for better economic opportunities and freedom from the discrimination they suffered in the Jim Crow South.[26]

---

[26] *Growing Detroit's African-American Middle Class: The Opportunity for a Prosperous Detroit*, Detroit Future City (Feb. 2019), https://detroitfuturecity.com/middleclassreport/#middle-in.

38.     By 1950, Detroit boasted the most prosperous Black community in the country, as measured by earnings and family income.[27]

39.     However, Detroit's troubled racial history and the automotive industry's downturn led to the city's economic decline.[28] In particular, racially discriminatory housing practices contributed to the city's economic collapse. For example, the large-scale migration of white Detroit residents to the suburbs beginning in the 1960s—largely driven by fears of Black families moving into predominately white neighborhoods—contributed to the erosion of Detroit's tax base.[29] Redlining and other discriminatory lending practices contributed and continue to contribute to the racial wealth gap and the decline of Black homeownership in Detroit.[30] In addition, Detroit residents lost homes en masse due

---

[27] Reynolds Farley, *The Bankruptcy of Detroit: What Role did Race Play?*, 14 City & Comm. 118, 124 (June 2015), https://deepblue.lib.umich.edu/bitstream/handle/2027.42/112014/cico12106.pdf?sequence=1&isAllowed=y.

[28] Sharon Cohen, *Detroit's Downfall: Decline of Autos, Troubled Racial History Blamed for City's Decline*, Star Trib. (July 21, 2013), https://www.startribune.com/autos-troubles-race-at-root-of-detroit-collapse/216349491/.

[29] Brad Lander & Karl Kumodzi, *How Cities' Funding Woes Are Driving Racial and Economic Injustice—And What We Can Do About It*, The Nation (Apr. 28, 2015), https://www.thenation.com/article/archive/how-cities-funding-woes-are-driving-racial-and-economic-injustice-and-what-we-can-do/.

[30] Aaron Glantz & Emmanuel Martinez, *Detroit-area Blacks Twice as Likely to Be Denied Home Loan*, Detroit News (Feb. 15, 2018),

to tax foreclosures, as 155,171 properties—mostly concentrated in Black communities—were brought to tax auction between 2003 and 2017.[31]

40.    On July 18, 2013, when it alleged that it faced more than $18 billion in present and future debt, Detroit filed for bankruptcy protection, making it the largest American city ever to do so.[32]

41.    Prior to the bankruptcy filing, then-Governor Rick Snyder appointed an "emergency manager" in March 2013[33] to manage Detroit's fiscal problems pursuant to a state law that authorizes Michigan's governors to appoint individuals to perform the functions of local government for municipalities determined to be in financial distress.[34]

---

https://www.detroitnews.com/story/business/real-estate/2018/02/15/red-lining-home-loans/110436482/.

[31] Carl Hedman & Rolf Pendall, *Rebuilding and Sustaining Homeownership for African Americans*, Urban Inst., Se. Mich. Hous. Futures, Brief 3, 1-2 (June 2018), https://www.urban.org/sites/default/files/publication/98719/rebuilding_and_sustaining_homeownership_for_african_americans.pdf.

[32] Monica Davey & Mary Williams Walsh, *Billions in Debt, Detroit Tumbles Into Insolvency*, N.Y. Times (July 18, 2013), https://www.nytimes.com/2013/07/19/us/detroit-files-for-bankruptcy.html.

[33] Chris Isidore, *Detroit, in Financial Trouble, Gets Emergency Manager*, CNN Business (Mar. 14, 2013), https://money.cnn.com/2013/03/14/news/economy/detroit-emergency-manager/index.html.

[34] Mich. Comp. Laws Ann. § 141.1549.

42.     In 2014, Detroit's emergency manager, as part of his purported efforts to address the city's fiscal challenges, attempted to privatize Detroit's water operations by selling the facilities and operations of DWSD. DWSD increased use of water shutoffs as a collection method to eliminate delinquent water accounts, and thereby make the utility a more attractive product for potential buyers.

43.     A sale did not occur because of Detroit's bankruptcy, and court-supervised negotiations between the state, city, and suburban counties resulted in the creation of Great Lakes Water Authority ("GLWA"). That entity was designated as a "public body corporate" and it ultimately became the hub of a regional water system that included the City of Detroit, Wayne County, Oakland County, and Macomb County.

44.     GLWA leases Detroit's water system from the city and uses Detroit's water and sewer infrastructure to extend service to neighboring suburban counties.

*Water Rates and Assistance Programs in Detroit*

45.     For years, Detroit residents have suffered from the lack of access to affordable water. While water is generally considered "affordable" when families spend no more than 2% to 2.5% of their household incomes for water services,[35] low-income Detroit residents must pay an average of 10% of their household

---

[35] *See*, *e.g.*, *supra* note 2.

incomes on water,[36] and some must pay much more.[37] As a result, many families in Detroit struggle to pay their water bills.

46.     In response to public complaints that a high poverty rate in Detroit guarantees widespread termination of water service, Defendants have established or used water assistance programs that they know to be ineffective, and which ensure a chronic lack of access to water to low income families. These programs include the "10-30-50" program, and the Water Residential Assistance Program ("WRAP"), which is financed by GLWA.

47.     Pursuant to the 10-30-50 program, a customer makes a down payment of 10%, 30%, or 50% of the past due balance.[38] The percentage is based on the number of payment plans the customer entered into over the last 18 months; first time is 10%, second time is 30%, third time or more is 50%.[39] The balance of the past due amount is equally spread over a six to 24-month period which the customer pays in addition to the normal monthly bill (months are determined by the balance

---

[36] *See* Rockowitz et al., *supra* note 3.

[37] *See* Kay et al., *supra* note 4.

[38]    City of Detroit Water & Sewerage Dep't, *Payment Plan*, https://detroitmi.gov/departments/water-and-sewerage-department/bill-assistance-and-credits/payment-plan (last visited July 7, 2020).

[39] *Id.*

owed).[40] All payments must be made in full and on time to stay in the plan, and there are no income restrictions to qualify.[41] Upon information and belief, DWSD has discretion to determine whether a customer is eligible for enrollment into the 10-30-50 program and does not purport to consider a customer's indigency or ability to pay to determine eligibility.

48.     Launched on March 1, 2016, WRAP provides qualifying customers who are at or below 150% of the federal poverty threshold with a $25 monthly credit toward current bills with any past-due or arrearages frozen for 12 months.[42] DWSD customers who successfully make their monthly payments for one year receive up to $700 in credit toward their past due bill.[43] The WRAP program only provides customers with two years of assistance. Thereafter, customers must pay the full amount of their bills. Upon information and belief, DWSD has discretion to determine whether a customer is eligible for enrollment into WRAP and does not inquire into a customer's ability to pay to determine eligibility.

---

[40] *Id.*

[41] *Id.*

[42] Community Action Alliance Water Residential Assistance Program, *City of Detroit Water and Sewerage Department Frequently Asked Questions*, https://detroitmi.gov/sites/detroitmi.localhost/files/2018-02/WRAP%20FAQ_2.pdf.

[43] *Id.*

49.     Both the 10-30-50 program and WRAP are designed to provide limited, short-term assistance to families facing temporary financial instability. Neither program makes water service affordable for families facing chronic poverty, who are not able to pay for water at market rates.

50.     Water affordability advocates, including Plaintiff People's Water Board Coalition and its member organizations, have repeatedly urged Defendants to adopt a program that will make water affordable for everyone—specifically, a program that indexes billing to actual household income. Defendants have repeatedly rejected such programs since at least 2005, including a water affordability plan proposed by a member organization of Plaintiff People's Water Board Coalition.[44]

***Detroit's Water Shutoff Policy***

51.     Defendants City of Detroit, Duggan, and Brown have persisted in the practice of employing water shutoffs as a collection method with full knowledge that many households subject to termination cannot afford to pay market rates for water service.

52.     Detroit Ordinance § 48-1-44 authorizes the Detroit Board of Water

---

[44] Roger Colton, *A Water Affordability Program for the Detroit Water and Sewerage Department* (DWSD) (Jan. 2005), http://www.fsconline.com/downloads/Papers/2005%2001%20Detroit%20Water.pdf; *see also* Estrada, *supra* note 1.

Commissioners and its officers, agents, or employees to discontinue water service to any building or premises for any water rates, assessments, or charges that are delinquent.

53.     DWSD's procedures regarding discontinuation and termination of water service are set forth in its "Interim Collection Rules and Procedures."[45] Defendant Detroit has previously asserted that the Interim Rules are no longer in place. Upon information and belief, no subsequent collection rules and procedures have been approved for use by DWSD. However, DWSD has posted a one paragraph summary of its policies on its website ("Customer Policies").[46] For purposes of this Complaint, both the Interim Rules and Customer Policies are described below.

54.     Rule 1(1) of the Interim Collection Rules and Procedures provides that residential customers are billed quarterly.[47] Rule 1(2) requires DWSD to mail bills to customers at least 20 days before the due date.[48] Rule 6(2)(a)-(b) provides that a customer who fails to pay their bill by the due date is issued a "Past Due Notice" 11

---

[45] City of Detroit Water & Sewerage Dep't, *Interim Collection Rules and Procedures* (revised Jan. 22, 2003) (attached as Exhibit 1) [hereinafter *Interim Rules*].

[46] City of Detroit Water & Sewerage Dep't, *Customer Policies*, https://detroitmi.gov/departments/water-and-sewerage-department/customer-care/customer-policies [hereinafter *Customer Policies*].

[47] *Interim Rules*, *supra* note 45, at 1. Customers are now billed on a monthly basis.

[48] *Id.*

days after the due date and a "WATER SHUT OFF-FINAL NOTICE" 32 days after the billing date.[49]

55.     Rule 19 of the Interim Collection Rules and Procedures authorizes DWSD to discontinue a customer's service if a bill is not paid within 10 days of the date specified as the "Notice Date" on the "WATER SHUT OFF-FINAL NOTICE."[50]

56.     Rule 24 of the Interim Collection Rules and Procedures authorizes DWSD to shut off water service to a customer for non-payment for a delinquent balance, provided that DWSD notified the customer of a delinquency and made diligent efforts to have the customer pay the outstanding or delinquent balance, either in whole or through a reasonable payment plan agreement ("PPA").[51]

57.     Rule 27 of the Interim Collection Rules and Procedures authorizes DWSD to negotiate a reasonable PPA with a customer when "extenuating circumstances" exist and payment cannot be made in full.[52]

58.     DWSD's Customer Policies contain limited information about its water shutoff procedures. The policies state, in relevant part, "[c]ustomers are responsible

---

[49] *Id.* at 3.

[50] *Id.* at 9.

[51] *Id.* at 11-12.

[52] *Id.* at 13.

for paying bills on time and in full. As part of DWSD's continuing efforts to keep rates low, customers who fail to keep their accounts current will be issued a final notice to pay the past-due bill. Service interruptions procedures begin if payment has not been received by the due date stated in the Final Notice."[53]

59.     DWSD's Customer Policies direct customers who have difficulty paying their past due balance to the 10-30-50 program and WRAP.[54] The Customer Policies do not mention PPAs or whether DWSD considers a customer's ability to pay prior to disconnecting their service.[55] Upon information and belief, the Interim Rules pertaining to PPAs have been substituted by the 10-30-50 program.

60.     DWSD previously hung notices on customers' doors that informed them of an impending service disconnection no later than seven days prior to the disconnection, pursuant to an informal policy. However, upon information and belief, DWSD no longer hangs such notices on customers' doors.

61.     DWSD's physical offices are currently closed to the public and customers are left with limited options to enroll in the 10-30-50 program or WRAP. Upon information and belief, customers are allowed to enroll in these water assistance programs only via telephone. Many customers must wait an inordinate

---

[53] *Customer Policies*, *supra* note 46.

[54] *Id.*

[55] *Id.*

24

amount of time before talking with a customer representative about enrolling in an assistance program or are disconnected from their phone call before being able to do so. Additionally, many low-income residents of Detroit use prepaid cell phones with a set number of usable minutes per month. Being on hold with DWSD to obtain assistance is a financial burden many cannot afford.

62.    Upon information and belief, DWSD disconnects water service to many of its customers without first attempting to determine their ability to pay.

63.    Between 2014 and 2019, more than 141,000 households in Detroit had their water service disconnected for non-payment.[56] Some families live for years without water service in their homes after a disconnection by DWSD. Others are trapped in a cycle of water insecurity with repeated disconnections and reconnections. These families risk losing water service at any time because of their chronic poverty and inability to pay DWSD's rates for water services.

64.    After disconnecting customers' water service, DWSD directs its contractors to spray bright blue paint on the water cap or sidewalk in front of customers' homes to indicate that service has been or soon will be disconnected at

---

[56] Kurth & Wilkinson, *supra* note 5.

the property.[57] The spray paint is a source of humiliation and embarrassment for affected residents and their neighbors, as it serves no discernable purpose other than to constantly remind the community that the residents do not have water.

65.    In 2018, DWSD disconnected water service from more than 16,000 households.[58] In 2019, shutoffs rose again to a total of 23,473.[59] As of January 2020, approximately 9,500 homes in Detroit were reportedly still without water service.[60]

66.    Detroit has a reported history of disconnecting service to residential water customers with relatively low unpaid bills while failing to disconnect service to commercial and governmental customers with much larger outstanding balances.[61]

---

[57] *See Behind Detroit's Grim Blue Graffiti*, Zocola Public Square (May 28, 2015), https://www.zocalopublicsquare.org/2015/05/28/behind-detroits-grim-blue-graffiti/viewings/glimpses/.

[58] Kurth & Wilkinson, *supra* note 5.

[59] *Id.*

[60] *Id.*

[61] *See* Violet Ikonomova, *More Than 17,000 Detroit Homes Face Water Shutoffs, Official Says 'The Problem is Poverty'*, Detroit Metro Times (Mar. 26, 2018), https://www.metrotimes.com/news-hits/archives/2018/03/26/more-than-17000-detroit-homes-face-water-shutoffs-official-says-the-problem-is-poverty; Joel Kurth, *Detroit Hits Residents on Water Shut-offs as Businesses Slide*, Detroit News (Mar. 31, 2016), https://www.detroitnews.com/story/news/local/detroit-city/2016/03/31/detroit-water-shutoffs/82497496/.

67.    One recent report found that water shutoffs are an ineffective method of incentivizing customers to pay, as many low-income customers are willing to pay for service but are unable to do so given the increasing burden of water costs, particularly in Detroit.[62]

***Prior Advocacy to Halt Shutoffs***

68.    In July 2019, civil rights lawyers filed an administrative complaint with the Michigan Department of Health and Human Services ("MDHHS"), urging the agency to require DWSD to suspend water shutoffs to avoid a public health emergency.[63] The petition raised two questions: (1) whether mass water shutoffs are an "imminent danger" as defined by Michigan law (Mich. Comp. Laws Ann. § 333.2251), requiring the health director to take "immediate action" to suspend shutoffs; and (2) whether the spread of water-borne illness constitutes an "epidemic" as defined by state law (Mich. Comp. Laws Ann. § 333.2253), requiring the health director to suspend water shutoffs in order to "insure continuation of essential public

---

[62] *See Water Equity and Security in Detroit's Water and Sewer District*, Haas Inst. for a Fair and Inclusive Soc'y (Jan. 2019), https://haasinstitute.berkeley.edu/sites/default/files/detroit_water_equity_full_report_jan_11_2019.pdf.

[63] Press Release, ACLU of Michigan, *Civil Rights Coalition Files Petition Urging the Michigan Department of Health and Human Services to Suspend Detroit Water Shutoffs to Avoid Public Health Emergency* (July 23, 2019), https://www.aclu.org/press-releases/civil-rights-coalition-files-petition-urging-michigan-department-health-and-human.

health services."[64] The petition was supported by scientific studies that demonstrated a correlation between the lack of access to water and the spread of disease.[65] The petition also emphasized that water is a necessity of life, and without water for drinking, cooking, cleaning, and bathing, people are certain to become ill and eventually die.

69.    In September 2019, MDHHS denied the petition, stating that water shutoffs do not rise to the level of an imminent danger because there is no causal association between shutoffs and water-borne disease.[66] In making this determination, MDHSS did not address the multiple scientific studies reaching the opposite conclusion.

---

[64] ACLU of Mich., Request for MDHHS Declaratory Ruling (July 23, 2019) (attached as Exhibit 2).

[65] *Id.* at 7-9 (citing, e.g., Alexander Plum et al., *The Impact of Geographical Water Shutoffs on the Diagnosis of Potentially Water-associated Illness, with the Role of Social Vulnerability Examined*, The Henry Ford Global Health Initiative (Apr. 8, 2017), http://mediad.publicbroadcasting.net/p/michigan/files/201707/water_shutoffs_and_illnesses.pdf; George Gaines, *Three Waterborne Outbreaks in Detroit* (2016 & 2017), The People's Water Bd. (July 14, 2018), https://www.peopleswaterboard.org/wp-content/uploads/2018/07/DetInfDisease.pdf).

[66] Letter re Request for Declaratory Ruling from Robert Gordon, Director of MDHHS, to Mark Fancher, ACLU of Mich. (Sept. 23, 2019) (attached as Exhibit 3).

70.     In response, lawyers directed the petition to Defendant Whitmer, requesting that she effectively overrule MDHHS.

71.     Defendant Whitmer has a duty to address public emergencies pursuant to Michigan law. The Michigan Emergency Management Act provides: "[t]he governor is responsible for coping with dangers to this state or the people of this state presented by a disaster or emergency."[67]

72.     The Michigan Emergency Management Act also grants the Governor the authority and capacity to direct local authorities to use local resources to cope with a disaster or emergency.[68]

73.     Despite these enumerated powers, on February 21, 2020, the Governor's counsel declined to use her emergency powers to overrule MDHHS's denial of the petition.[69] The Governor's response stated that she supports efforts to increase funding for WRAP and that she was requesting that MDHHS coordinate WRAP with the State Emergency Relief ("SER") program.[70]

---

[67] Mich. Comp. Laws Ann. § 30.403(1).

[68] Mich. Comp. Laws Ann. § 30.405(1)(b), (j).

[69] Christine Ferretti, *State: 'Insufficient' Data to Support Ban on Water Shutoffs in Detroit*, Detroit News (Feb. 26, 2020), https://www.detroitnews.com/story/news/local/detroit-city/2020/02/26/state-insufficient-data-support-moratorium-detroit-shutoffs/4881623002/.

[70] *Id.* The program's website states that "[t]he SER program is not an appropriate solution to ongoing or chronic financial difficulties." MDHHS, *Assistance*

74. Defendant Whitmer's response did not acknowledge the multiple scientific studies establishing a correlation between the lack of access to water and the spread of disease or the chronic poverty of Detroit's water insecure population.

**Executive Orders 2020-28 and 2020-144**

75. On March 9, 2020, in anticipation of the coronavirus outbreak and just weeks after she declined to overrule MDHHS's decision, Defendant Whitmer announced with Defendant Duggan the Coronavirus COVID-19 Water Restart Plan, which provided for a moratorium on shutoffs and, purportedly, reconnection of all water service in Detroit during the pandemic.[71] In announcing the plan and recognizing "the importance of handwashing," Defendant Whitmer and Defendant Duggan proclaimed that "no resident of the city of Detroit [should have] their water shut off for lack of funds."[72]

---

*Programs, Emergency Relief: Home, Utilities & Burials*, https://www.michigan.gov/mdhhs/0,5885,7-339-71547_5531-15407--,00.html (last visited July 8, 2020).

[71] *Water Restart Plan*, *supra* note 20.

[72] Ariana Taylor, *Detroit Mayor Rolls Out Plan to Stop Water Shutoffs Amid Coronavirus Fears*, Detroit News (Mar. 9, 2020), https://www.detroitnews.com/story/news/local/detroit-city/2020/03/09/detroit-mayor-rolls-out-plan-stop-water-shutoffs-amid-coronavirus-fears/5000160002/.

76.    On March 10, 2020, Michigan confirmed its first two cases of COVID-19.[73]

77.    On March 28, 2020, Defendant Whitmer issued EO 2020-28.[74] The order directed public water utilities in Michigan to restore water service to occupied residences where water service was shut off due to non-payment, as long as the utility did not have reason to believe that reconnection would create a risk to public health.[75] It required public water utilities to make best efforts to determine which occupied residences within their service areas do not have water service.[76] The order also required public utilities to submit a report by April 12, 2020 to the State Emergency Operations Center regarding access to water in their service areas.[77]

78.    On April 10, Defendant Detroit submitted its report required under EO 2020-28.[78] Detroit's report made clear that the city placed the burden on customers

---

[73] Pat Byrne et al., *Michigan Coronavirus Cases: Tracking the Pandemic*, Detroit Free Press (last updated July 5, 2020), https://www.freep.com/in-depth/news/nation/coronavirus/2020/04/11/michigan-coronavirus-cases-tracking-covid-19-pandemic/5121186002/.

[74] *See* Mich. Exec. Order 2020-28, *supra* note 20.

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] Letter from Gary A. Brown, Director, Detroit Water & Sewerage Dep't to Mich. Emergency Operations Ctr. (Apr. 10, 2020),

to request a reconnection of service instead of proactively determining which accounts need service restored and safely restoring service, as required by the order. According to DWSD's website, customers were required to call a hotline to have their water service restored.[79]

79.    Defendant Detroit's report also indicated that the city may have unlawfully limited the restoration of service to a small subset of customers, as DWSD's website notes that the restart plan applies to customers who "[h]ad their water service *recently* interrupted due to non-payment."[80] While reportedly 9,500 households in Detroit lacked water service as of January 2020, the city reported on April 10 that it had restored service to only 1,200 of its customers, about 13% of the overall total of households reportedly without service.[81]

80.    Defendant Detroit also indicated that it may disconnect water service to additional customers while EO 2020-28 was operative. The city's guidelines state that "[o]nce service is restored, customers must make a monthly minimum payment

---

http://www.deq.state.mi.us/documents/waterinfo/DetroitCityof.pdf    [hereinafter Brown Letter].

[79] City of Detroit Water & Sewerage Dep't, *Coronavirus COVID-19 Water Restart Plan*,    https://detroitmi.gov/departments/customer-care/water-and-sewerage-department/coronavirus-covid-19-water-restart-plan (last visited July 8, 2020).

[80] *Id.* (emphasis added).

[81] Brown Letter, *supra* note 78.

of $25 during the time of the COVID-19 outbreak in Detroit to avoid service interruption."[82] EO 2020-28 imposed no requirement of a minimum payment in order for water to be restored.

81.    As described further below, DWSD did not restore water service to Plaintiffs McCorkle and Wilson until late April or early May 2020.

82.    Defendants Whitmer, Detroit, Duggan, and Brown did not ensure that EO 2020-28 was properly implemented and enforced. Upon information and belief, DWSD has not restored water service to all customers, and some families continue to live without water service during the current pandemic.

83.    EO 2020-28 specified that: "[t]his order is effective immediately and continues until the termination of the state of emergency under section 3 of Executive Order 2020-4."[83] It was extended under several other executive orders continuing the state of emergency in Michigan.

84.    On July 8, 2020, Defendant Whitmer rescinded EO 2020-28 and issued EO 2020-144.[84] EO 2020-144 requires the restoration of water service to customers

---

[82] City of Detroit Water & Sewerage Dep't, *Program Update: COVID-19 Water Restart Plan* (Apr. 9, 2020), https://detroitmi.gov/sites/detroitmi.localhost/files/2020-04/DWSD%20Update%20-%20Coronavirus%20Water%20Restart%20Plan%20-%2004092020_0.pdf.

[83] Mich. Exec. Order 2020-28, *supra* note 20.

[84] Mich. Exec. Order 2020-144, *supra* note 21.

disconnected for non-payment through the remainder of 2020.[85] In the order, she noted that "it is crucial that all Michiganders can access clean water in their homes and wash their hands thoroughly and regularly. Now more than ever, the provision of clean water to residences is essential to human health and hygiene, and to the public health and safety of this state."[86] EO 2020-144 specifies that it does not relieve a customer of the obligation to pay for water, prevent a public water supply from charging any customer for water service, or reduce the amount a resident may owe to a public water supply.[87]

85. On June 17, 2020, the Michigan Legislature passed Senate Bill ("SB") 690, a supplemental spending plan to provide relief for small businesses, health care providers, and local governments struggling with the financial impacts from the COVID-19 outbreak.[88] The plan appropriates $880 million in federal dollars from the Coronavirus Aid, Relief, and Economic Security Act.[89]

---

[85] *Id.* at 2.

[86] *Id.*

[87] *Id.*

[88] SB 0690, *supra* note 23; Laina G. Stebbins, *Legislature OKs $880M Spending Bill, Rejects Dem Asks for Mental Health, Sick Leave*, Michigan Advance (June 17, 2020), https://www.michiganadvance.com/2020/06/17/legislature-oks-880m-spending-bill-rejects-dem-asks-for-mental-health-sick-leave/.

[89] Stebbins, *supra* note 88.

86.     Among other appropriations, SB 690 grants $25 million in limited water utility assistance for households across the state.[90] Pursuant to the bill, MDHHS will make payments to water utility providers to reimburse them for providing bill forgiveness for arrearages and fees incurred by customers during the COVID-19 state of emergency.[91] It will also require utilities to provide a 25% discount on the total water bill for eligible customers through the end of December 2020.[92] The maximum reimbursement for each household is $700.[93]

87.     To receive funds under the bill, water utility providers must agree to a number of conditions, including that they will (1) not shut off water service to residential customers for at least 90 days beyond the date that the customer receives water utility assistance; (2) forgive 25% of the amount billed for water service to residential customers before December 1, 2020; and (3) notify customers of the discount provided and bill forgiveness, among other requirements.[94]

---

[90] SB 0690, *supra* note 23, at § 107(2).

[91] *Id.* at § 404(2).

[92] *Id.*

[93] *Id.*

[94] *Id.* at § 404(3)(a)-(3).

88. To be eligible for this assistance, a residential customer must be eligible for the state's food assistance program and must have accumulated new arrearages or fees after March 1, 2020 and during the COVID-19 state of emergency.[95]

89. Defendant Whitmer supported the passage of SB 690 and signed the bill into law on July 1, 2020.[96]

90. On information and belief, Defendant Detroit has not indicated whether it will comply with the conditions required under SB 690 and accept funds for water utility assistance.

91. The water assistance program established by SB 690 does not provide any relief to customers for arrearages incurred prior to or after the COVID-19 pandemic and provides no long-term relief for Detroit's water insecure population.

92. On April 27, 2020, Defendant Duggan indicated that Detroit will resume water shutoffs for customers who cannot keep up with their bill payments

---

[95] *Id.* at § 404(4).

[96] Scott McClallen, *Legislature Approves $880 Million in COVID-19 Response Funding*, The Center Square (June 18, 2020), https://www.thecentersquare.com/michigan/legislature-approves-880-million-in-covid-19-response-funding/article_b28cef5c-b159-11ea-a97e-6f7a8aa46769.html; SB 0690, *supra* note 23.

after the coronavirus crisis has passed.[97]

***Shutoffs Pose a Threat to Detroit Residents' Bodily Integrity***

93.     Mass water shutoffs made it impossible for thousands of Detroit residents—many with pre-existing health conditions—to take the precaution of handwashing and cleaning to avoid infection by COVID-19.

94.     Public health experts warn that COVID-19 can spread and entire populations can become ill when people do not have the ability to wash their hands.[98] The Centers for Disease Control and Prevention deems frequent handwashing for at least 20 seconds with soap and water necessary to decrease the risk of infection.[99] Bottled water and hand sanitizer are not sufficient substitutes to reduce the risk of infection.

---

[97] Cwiek, *supra* note 25.

[98] *See, e.g.*, Ctrs. for Disease Control & Prevention, *Water Sanitation & Environmentally-related Hygiene: Keeping Hands Clean* (Dec. 4, 2019), https://www.cdc.gov/healthywater/hygiene/hand/handwashing.html; World Health Org., *WHO Saves Lives: Clean Your Hands in the Context of COVID-19*, https://www.who.int/docs/default-source/coronaviruse/who-hh-community-campaign-finalv3.pdf?sfvrsn=5f3731ef_2.

[99] Ctrs. for Disease Control & Prevention, *Coronavirus Disease 2019 (Covid-19): Protect Yourself* (Apr. 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

95.    People over the age of 65 are at far greater risk of severe illness and death from COVID-19 than are younger people.[100] People older than 65 are at particular risk when they live in multigenerational households where younger family members attend school or work outside of the home.[101] Although the share of Americans living in multigenerational families has increased for all races since 1980 and is currently at a record high, Black households are more likely to be multigenerational than are white households.[102] As U.S. Surgeon General Jerome M. Adams acknowledged, "[p]eople of color are more likely to live in densely packed areas and in multi-generational housing situations, which create higher risk for spread of highly contagious disease like covid-19."[103]

---

[100] Ctrs. for Disease Control & Prevention, *COVID-19 Guidance for Older Adults* (June 25, 2020), https://www.cdc.gov/aging/covid19-guidance.html.

[101]  Cara Anthony, '*Staying Away from Grandma' Isn't An Option In Multigenerational Homes*, Kaiser Health News (Apr. 6, 2020), https://khn.org/news/multigenerational-households-social-distancing-at-home-coronavirus/.

[102] D'Vera Cohn & Jeffrey S. Passel, *A Record 65 Million Americans Live in Multigenerational Households*, Pew Research Ctr. (Apr. 5, 2018), https://www.pewresearch.org/fact-tank/2018/04/05/a-record-64-million-americans-live-in-multigenerational-households/; Andre M. Perry, et al., *Mapping Racial Inequity Amid COVID-19 Underscores Policy Discriminations Against Black Americans*, Brookings Inst. (Apr. 16, 2020), https://www.brookings.edu/blog/the-avenue/2020/04/16/mapping-racial-inequity-amid-the-spread-of-covid-19/.

[103] Eugene Scott, *4 Reasons Coronavirus is Hitting Black Communities So Hard*, Wash.                Post                (Apr.                10,                2020),

96.     Several studies indicate that children who are infected with COVID-19 are as infectious as infected adults, and carry the same viral load.[104] Although rates of recorded infections in children are lower than that of the general population, otherwise healthy children have been known to experience severe illness and death due to the disease.[105] Black children are more likely to suffer from co-morbidities like asthma than are white children.[106] Black children have also been disproportionately infected by a childhood inflammatory disease related to COVID-19 that has been identified in New York.[107]

---

https://www.washingtonpost.com/politics/2020/04/10/4-reasons-coronavirus-is-hitting-black-communities-so-hard/.

[104] Gretchen Vogel & Jennifer Couzin-Frankel, *Should Schools Reopen? Kids' Role in Pandemic Still a Mystery*, Science (May 4, 2020), https://www.sciencemag.org/news/2020/05/should-schools-reopen-kids-role-pandemic-still-mystery.

[105] Diane Alexander & Janet Currie, *Is It Who You Are Or Where You Live? Residential Segregation and Racial Gaps In Childhood Asthma*, Nat'l Bureau of Econ. Res. Working Paper 23622 (July 2017), https://www.nber.org/papers/w23622.

[106] Lara S. Shekerdemian, et al., *Characteristics and Outcomes of Children with Coronavirus Disease 2019 (Covid-19) Infection Admitted to US and Canadian Pediatric Intensive Care Units*, JAMA Pediatrics (May 11, 2020), https://jamanetwork.com/journals/jamapediatrics/fullarticle/2766037.

[107] New York State, *Childhood Inflammatory Disease Related to Covid-19*, https://coronavirus.health.ny.gov/childhood-inflammatory-disease-related-covid-19.

97.    National and state data have shown that Black people are dying of COVID-19 at a disproportionate rate. As the *New York Times* reported on July 5, 2020, "Black and Latino people have been disproportionately affected by the coronavirus in a widespread manner that spans the country, throughout hundreds of counties in urban, suburban and rural areas, and across all age groups."[108] Nationwide, counties that are majority-Black have three times the rate of infections and almost six times the rate of deaths as counties where white residents are in the majority.[109] Although Black people account for only 13% of the total U.S. population, they account for nearly one quarter (23%) of all COVID-19 deaths.[110]

98.    These disparities are exacerbated in Michigan: Black Michiganders account for 40% of COVID-19 deaths despite making up less than 14% of the total

---

[108] Richard A. Oppel, Jr. et al., *The Fullest Look Yet at the Racial Inequity of the Coronavirus*, N.Y. Times (July 5, 2020), https://www.nytimes.com/interactive/2020/07/05/us/coronavirus-latinos-african-americans-cdc-data.html.

[109] Reis Thebault et al., *The Coronavirus is Infecting and Killing Black Americans at an Alarmingly High Rate*, Wash. Post. (Apr. 7, 2020), https://www.washingtonpost.com/nation/2020/04/07/coronavirus-is-infecting-killing-black-americans-an-alarmingly-high-rate-post-analysis-shows/?arc404=true.

[110] Ariana Eunjung Cha, *'We Don't Get Justice': When a Black girl's Death from Covid-19 Feels Like a Collision of Two Crises*, Wash. Post. (June 6, 2020), https://www.washingtonpost.com/health/2020/06/05/coronavirus-baltimore-race-police-violence/.

population of the state.[111] As of July 7, 2020, the COVID-19 infection rate for Black Michiganders was 13,422 per one million persons, more than four times the number of infections for white Michiganders (3,324 infections per one million persons).[112]

99.     Detroit is the epicenter of COVID-19 infections within Wayne County and in Michigan overall.[113] As of May 15, 2020, Detroit's confirmed cases were concentrated in predominantly Black and lower-income neighborhoods.[114] According to the Brookings Institution, 90% of the city's zip codes with the highest number of confirmed cases have populations that are at least 80% Black.[115] Data

---

[111]     Mich. Exec. Order 2020-55 (Apr. 20, 2020), http://www.legislature.mi.gov/documents/2019-2020/executiveorder/pdf/2020-EO-55.pdf; *see also* APM Research Lab, *The Color of Coronavirus: COVID-19 Deaths by Race and Ethnicity in the U.S.* (June 24, 2020), https://www.apmresearchlab.org/covid/deaths-by-race (estimating that Black people account for 41% of COVID-19 deaths in Michigan).

[112] *Coronavirus Michigan Data, Cases by Race*, Michigan.gov (July 7, 2020), https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173---,00.html.

[113] *Coronavirus Michigan Data, Cases by County*, Michigan.gov (July 7, 2020), https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173---,00.html (City of Detroit and Wayne County reported separately); *Michigan Coronavirus Map and Case Count*, N.Y. Times (July 8, 2020), https://www.nytimes.com/interactive/2020/us/michigan-coronavirus-cases.html (Michigan state and county data reported separately); *Wayne County COVID-19 Data: Tracking Cases, Deaths; City-by-city Breakdown*, Click on Detroit (July 5, 2020), https://www.clickondetroit.com/news/local/2020/04/04/wayne-county-covid-19-data-tracking-cases-deaths/.

[114] Henry-Nickie & Hudak, *supra* note 15; *see also* Austin, *supra* note 15.

[115] Henry-Nickie & Hudak, *supra* note 15.

41

compiled by the City of Detroit shows that Black people account for 81.3% of COVID-related deaths in the city.[116] As of late May 2020, Wayne County had the fifth highest death toll from COVID-19 in the country.[117]

100.   In Detroit, many low-income residents suffer from medical conditions such as heart disease,[118] asthma,[119] diabetes,[120] hypertension,[121] and assorted

---

[116] Detroit Health Dep't, *supra* note 17.

[117] Marini, *supra* note 18.

[118] Mich. Dep't of Cmty. Health, *Impact of Heart Disease and Stroke in Michigan: 2008 Report on Surveillance* 23 (August 2008), https://www.michigan.gov/documents/mdch/Impact_complete_report_245958_7.pdf (finding that as of 2006, Wayne County had the third-highest age-adjusted cardiovascular disease mortality rate in Michigan).

[119] Peter DeGuire, et al., *Detroit: The Current Status of the Asthma Burden*, Mich. Dep't of Health & Human Svcs. (Mar. 2016), https://www.michigan.gov/documents/mdhhs/Detroit-AsthmaBurden_516668_7.pdf (finding that Detroit has a greater overall asthma burden than Michigan and that hospitalization rate for white Detroiters was 35% less than that for Black Detroiters).

[120] *Diabetes Risk Factors Community Profile: Wayne County, Detroit, and Inkster and Eastern Detroit*, Dirs. of Health Promotion & Ed. (Aug. 2013), https://midiabetesprevention.org/documents/DPP-Map-Wayne-County-Detroit-and-Inkster.pdf.

[121] Crain's Content Studio, *Wayne State Develops Novel Geocoded Map to Improve Health Outcomes Throughout Michigan*, Crain's Detroit Business (May 31, 2019), https://www.crainsdetroit.com/sponsored-content/wayne-state-develops-novel-geocoded-map-improve-health-outcomes-throughout.

autoimmune diseases.[122] These conditions compound the complications associated with the lack of water due to shutoffs.[123] Further, low-income people and Black people are particularly likely to work in low-wage service jobs and essential services that require them to work outside of their homes, thereby exposing them to greater risk of infection.[124] They also risk exposing others to infection if they become sick themselves.

101. As COVID-19 became a pandemic, Defendants made several statements related to handwashing. These include, among others, Defendant Whitmer's statement in EO 2020-28, which was repeated in EO 2020-144: "Now more than ever, the provision of clean water to residences is essential to human

---

[122] Detroiters are particularly susceptible to other diseases as well. Sarah L. Reeves, et al., *Incidence, Demographic Characteristics, and Geographic Distribution of Sickle Cell Trait and Sickle Cell Anemia Births in Michigan, 1997-2014*, 7 Molecular Genetics & Genomic Medicine e795, at 3 (2019) (finding that Detroit has the highest incidence of sickle cell trait births in the state).

[123] Annette Prüss-Ustün, et al., *Burden of Disease from Inadequate Water, Sanitation and Hygiene for Selected Adverse Health Outcomes: An Updated Analysis with a Focus on Low- and Middle-income Countries*, 222 International Journal of Hygiene and Environmental Health 765, 770 (2019) (finding that inadequate drinking water, sanitation, and hygiene behaviors were the but-for cause of 60% of the worldwide total of diarrheal deaths, or 829,000 deaths, in 2016. Thirteen percent of the overall disease burden of acute respiratory infections in 2016 were attributable to inadequate handwashing with soap).

[124] Elise Gould & Heidi Shierholz, *Not Everybody Can Work from Home; Black and Hispanic Workers Are Much Less Likely to be Able to Telework*, Econ. Pol'y Inst.: Working Econ. Blog (Mar. 19, 2020), https://www.epi.org/blog/black-and-hispanic-workers-are-much-less-likely-to-be-able-to-work-from-home/.

health and hygiene and to the public health and safety of this state."[125] Defendant Duggan stated: "Given the importance of handwashing . . . the governor and I sat down and said we're going to have a solution that no resident of the City of Detroit has their water shut off for lack of funds."[126]

102.   Detroit neighborhoods that have experienced high rates of water shutoffs are also neighborhoods that have experienced significant rates of COVID-19 infection. COVID-19 infections in Detroit escalated to levels that caused the city to become designated as a "hot spot," with high concentrations of infections.[127]

103.   Figure 1 below reflects an analysis of Detroit zip codes where water shutoffs occurred between 2010 and 2020 and where COVID-19 cases have been reported. As shown in the figure, zip codes with below-average shutoffs per 1,000 people had, on average, 4.2 (or 24%) fewer COVID-19 cases per 1,000 than zip codes with above-average shutoffs. Zip codes with below-average shutoffs had 13

---

[125] Mich. Exec. Order 2020-28, *supra* note 20, at 1; Mich. Exec. Order 2020-144, *supra* note 21, at 2.

[126] Taylor, *supra* note 72.

[127] David Eggert, *Deaths Spike in Michigan; Top Doctor Warns About Detroit*, Assoc. Press (Mar. 27, 2020), https://www.usnews.com/news/best-states/michigan/articles/2020-03-27/surgeon-general-on-pandemic-detroit-will-worsen-next-week.

COVID-19 cases per 1,000 people, while zip codes with above-average shutoffs had

17.2 COVID-19 cases per 1,000 people. This difference is statistically significant.[128]

---

[128] Statistical significance is a measure of probability that an observed outcome would not have occurred by chance. Generally, an outcome is statistically significant if the probability that it could have occurred by chance is less than 5%, known as the 95% confidence level. Here, all results described in this Complaint are statistically significant at the 95% confidence level or higher.

**Figure 1: Analysis of Detroit Zip Codes Where Water Shutoffs Occurred from 2010-2020 and Reported COVID-19 Cases**



104. The Brookings Institution determined that the zip codes where five of the named Plaintiffs reside have some of the highest concentrations of COVID-19 infection.[129] These zip codes all have a predominantly Black population and have high rates of water shutoffs, as discussed further below.

---

[129] *See* Henry-Nickie & Hudak, *supra* note 15. These zip codes are: 48221 (Plaintiff Lisa Brooks); 48227 (Plaintiff Michele Cowan); 48204 (Plaintiff Tuana Henry); 48217 (Plaintiff Mattie McCorkle); and 48223 (Plaintiff Renee Wilson). Data is not available for the zip code where Plaintiff Taylor lives (48203), as that zip code is shared between Detroit and Highland Park.

105.    Plaintiffs risk infection not only as a result of not having access to water for disease prevention through handwashing and other cleaning measures, but also as a consequence of their residence in neighborhoods where there are high disease infection rates caused by significant numbers of water shutoffs. In these environments, the risk of contact with infected persons and hazardous conditions are significantly increased. One researcher connected spikes in three diseases to water shutoffs in Detroit.[130] The diseases observed were shigellosis (an acute dysentery); giardiasis (a protozoan infection); and campylobacter (an acute intestinal disease).[131] The researcher took special note of findings regarding patients at Detroit's Henry Ford Hospital: "Patients who came from blocks with water shut off[s] were 1.55 times more likely to be diagnosed with a water associated illness. Also, if the patient had waterborne disease, they more likely lived on a block with a shut off."[132]

***Water Shutoffs Disproportionately Impact Black Residents in Detroit***

106.    Defendant Detroit's water shutoff policy has a disproportionate impact on Black residents of the city.

107.    According to data reported by the U.S. Census Bureau, as of July 2019,

---

[130] Gaines, *supra* note 65, at 1.

[131] *Id.*

[132] *Id.* at 2.

the population of Detroit was 670,031.[133] Approximately 78.6% of the city's population is Black and 14.6% is white.[134] In Detroit, 36.4% of the population is impoverished.[135]

108.   From 2013 to 2017, Detroit's population was 81% Black and 9.4% white.[136] During this time period, 82% of Detroit's Census tracts had a population that was at least 75% Black and 89% of the city's Census tracts had a majority-Black population.[137] Additionally, during this period, there were 254 Detroit Census tracts with a majority-Black population and five Census tracts with a majority-white population. Map 1 below shows the racial demographics in Detroit between 2013 and 2017.

---

[133] U.S. Census Bureau, *supra* note 11.

[134] *Id.*

[135] *Id.*

[136] The white population in Detroit increased from 9.4% in 2013-2017 to 14.6% in 2019.

[137] U.S. Census Bureau, *2013-2017 American Community Survey 5-year Estimates* (2019), https://data.census.gov/cedsci/table?q=race&g=0500000US26163.140000&hidePr eview=false&tid=ACSDT5Y2017.B02001&vintage=2017&layer=VT_2017_140_ 00_PY_D1&cid=B03002_001E&y=2017&t=Race%20and%20Ethnicity.

**Map 1: Map of Detroit's Black Population, 2013-2017**



Black population in Detroit, 2013-2017

109.   Several studies have shown a connection between race and water shutoffs in Detroit. In 2016, the organization We the People of Detroit Community Research Collective examined water shutoffs in the city and determined there was a widespread impact on Black neighborhoods.[138] In 2019, another report found that water shutoff notices in several cities in the Great Lakes region, including Detroit, were disproportionately concentrated in majority Black (as well as Latinx and low-

---

[138] We the People of Detroit Community Research Collective, *Mapping the Water Crisis*, https://www.wethepeopleofdetroit.com/community-research (last visited July 8, 2020).

income) neighborhoods.[139]

110.    Defendant Detroit's water shutoff policy has a disproportionate impact on Black neighborhoods in the city. Map 2 below shows the location of water shutoffs per 1,000 people that occurred between January 2017 and July 2018 and the racial demographics in Detroit between 2013 and 2017. As demonstrated by the map, the greatest number of shutoffs occurred in areas of the city with the highest percentage of Black residents. By comparison, areas of the city with the lowest percentage of Black residents experienced fewer shutoffs.

---

[139] Maria Zamudio & Will Craft, *So Close, Yet So Costly* 7, APM Reports (Feb. 7, 2019), https://www.apmreports.org/story/2019/02/07/great-lakes-water-shutoffs.

**Map 2: Water Shutoffs and Race in Detroit by Census Tract, 2017-2018**



Shutoffs and race in Detroit, 2017-2018

111.   Map 3 below shows the location of water shutoffs per 1,000 people that occurred between January 2019 and January 2020 and the racial demographics in Detroit between 2013 and 2017. As demonstrated by the map, the greatest number of shutoffs occurred in areas of the city with the highest percentage of Black residents. By comparison, areas of the city with the lowest percentage of Black residents experienced fewer shutoffs.

**Map 3: Water Shutoffs and Race by Detroit Zip Code, 2019-2020**



Shutoffs and race by Detroit zip code, 2019-2020

112.   From January 2017 to July 2018, 91% of residential water shutoffs occurred in Census tracts with a population that was greater than 75% Black. During this same time period, 9% of shutoffs occurred in Census tracts that had a population that was less than 75% Black. These differences are statistically significant.

113.   From January 2017 to July 2018, Detroit Census tracts with a less than 75% Black population had, on average, 21.5 (or 60%) fewer shutoffs per 1,000 people than tracts with a greater than 75% Black population. As shown below in Figure 2, tracts with a greater than 75% Black population had 35.6 shutoffs per 1,000 people, while tracts with a less than 75% Black population had 14.2 shutoffs per

1,000 people. This difference is statistically significant. These results remained statistically significant even when accounting for differences in income and taking account of the number of unoccupied homes in Detroit.

**Figure 2: Analysis of Water Shutoffs in Census Tracts with Population Greater than 75% Black and Less than 75% Black, 2017-2018**



114.   From January 2017 to July 2018, 95% of residential water shutoffs occurred in Census tracts with a population that was greater than 50% Black. During this same time period, 5% of shutoffs occurred in Census tracts with a population that was less than 50% Black. These differences are statistically significant.

115.   From January 2017 to July 2018, Detroit Census tracts with a less than

50% Black population had, on average, 21.7 (or 64%) fewer shutoffs per 1,000 people than tracts with a greater than 50% Black population. As shown below in Figure 3, tracts with a greater than 50% Black population had 34.1 shutoffs per 1,000 people, while tracts with a less than 50% Black population had 12.4 shutoffs per 1,000 people. This difference is statistically significant. These results remained statistically significant even when accounting for differences in income and the number of unoccupied homes.

**Figure 3: Analysis of Water Shutoffs in Census Tracts with Population Greater than 50% Black and Less than 50% Black, 2017-2018**



116.   From January 2017 to July 2018, Detroit Census tracts with a greater

than 50% white population had, on average, 16.4 (or 48%) fewer shutoffs per 1,000 people than majority-Black tracts. As shown below in Figure 4, majority-Black tracts had 34.1 shutoffs per 1,000 people, while majority-white tracts had 17.7 shutoffs per 1,000 people. This difference is statistically significant. These results remained statistically significant even when accounting for differences in income and the number of unoccupied homes.

**Figure 4: Analysis of Water Shutoffs in Census Tracts with Population Greater than 50% Black and Greater than 50% White, 2017-2018**



117.   From January 2019 to January 2020, 93% of residential water shutoffs occurred in zip codes with a population greater than 75% Black. During this same

time period, 7% of shutoffs occurred in zip codes with a less than 75% Black population. This difference is statistically significant.

118.   From January 2019 to January 2020, Detroit zip codes with a less than 75% Black population had, on average, 31.3 (or 67%) fewer shutoffs per 1,000 people than tracts with a greater than 75% Black population. As shown below in Figure 5, zip codes with a greater than 75% Black population had 46.9 shutoffs per 1,000 people, while zip codes with a less than 75% Black population had 15.6 shutoffs per 1,000 people. This difference is statistically significant.

**Figure 5: Analysis of Water Shutoffs in Census Tracts with Population Greater than 75% Black and Less than 75% Black, 2019-2020**



119.    From January 2019 to January 2020, 96% of residential water shutoffs occurred in zip codes with a population that was greater than 50% Black. During this same time period, 4% of shutoffs occurred in zip codes with a less than 50% Black population. This difference is statistically significant.

120.    From January 2019 to January 2020, Detroit zip codes with a less than 50% Black population had, on average, 30.6 (or 68%) fewer shutoffs per 1,000 people than tracts with a greater than 50% Black population. As shown below in Figure 6, zip codes with a greater than 50% Black population had 44.9 shutoffs per 1,000 people, while zip codes with a less than 50% Black population had 14.3 shutoffs per 1,000 people. This difference is statistically significant. These results remained statistically significant even when accounting for differences in income and the number of unoccupied homes.

**Figure 6: Analysis of Water Shutoffs in Census Tracts with Population Greater than 50% Black and Less than 50% Black, 2019-2020**



*The Named Plaintiffs Have and Will Continue to be Harmed by Defendants' Actions*

121.    Plaintiff Jacqueline Taylor is a 66-year-old Black resident of Detroit. She owns her home in zip code 48203. Ms. Taylor's monthly average income from Social Security benefits is $860. Ms. Taylor has disabilities and has had a home health aide assisting her in her home.

122.    Due to Ms. Taylor's age, she is at a heightened risk of developing life-threatening complications if she contracts COVID-19.

123.   In January and February 2016, Ms. Taylor was hospitalized and in a rehabilitation center for a hip replacement. At that time, no one was living in her home or using her water service. Prior to her surgery, she had two inspections of her home to confirm she had no water leaks. She also had a new toilet installed around that time.

124.   After returning home from her surgery, Ms. Taylor received a bill from DWSD for water usage totaling approximately 75,000 gallons during the period in which no one was living in her home. The bill was approximately $1,500 to $2,000.

125.   Ms. Taylor contacted DWSD regarding the bill, but the department refused to adjust it. Ms. Taylor could not afford to pay the bill and believes she was overbilled.

126.   Ms. Taylor tried to enroll in WRAP but was unable to do so.

127.   DWSD eventually disconnected Ms. Taylor's water service in mid-2018. By that time, DWSD claimed that she owed nearly $6,000 in water service arrearages. DWSD did not affirmatively confirm whether Ms. Taylor had the ability to pay her bill before disconnecting her service.

128.   Ms. Taylor lived without water service in her home from mid-2018 until March 2020, after the announcement of Detroit's Water Restart Plan and EO 2020-28.

129.   During the time that Ms. Taylor had no water service in her home, We the People of Detroit donated four cases of bottled water to Ms. Taylor every two weeks, so that she had water for handwashing, drinking, bathing, cleaning, and sanitation. She would also go to her son's house to bathe.

130.   During the time that Ms. Taylor lacked water service, she would wash her hands by first warming a bowl of donated bottled water in the microwave. She would then pour the warmed water on her hands, lather with soap, and rinse her hands with additional bottled water.

131.   DWSD reconnected Ms. Taylor's water service in March 2020, after the announcement of the Water Restart Plan and EO 2020-28. Her current monthly bill is $25 pursuant to the plan, and she still owes DWSD the prior arrearages.

132.   Ms. Taylor has called DWSD to inquire about enrolling in WRAP but has not been able to reach anyone.

133.   When Detroit resumes water shutoffs, Ms. Taylor will be at immediate risk of losing water service to her home due to her low income and inability to pay her water bill, including prior arrearages.

134.   Plaintiff Lisa Brooks is a 55-year-old Black resident of Detroit. She has rented her home in zip code 48221 for ten years. She lives in the home with two of her children, ages 14 and 16. Her monthly income is approximately $1,200 from Social Security disability and the Michigan Bridges food assistance program.

135.   Ms. Brooks has chronic obstructive pulmonary disease, diabetes, arthritis, and other breathing issues. She must use a portable oxygen tank to assist her breathing. Her 16-year-old son has asthma and uses a nebulizer, which requires the use of water.

136.   Under the terms of her lease, Ms. Brooks is required to pay her water bill, which is in her name.

137.   DWSD first disconnected Ms. Brooks's water service in 2018. DWSD did not affirmatively confirm whether Ms. Brooks had the ability to pay her bill before disconnecting her service.

138.   Ms. Brooks and her children lived without water for about a year. During this time, Ms. Brooks received water assistance from We the People of Detroit, which provided her with eight to 12 cases of water every two weeks for handwashing, drinking, bathing, cleaning, and sanitation. She would also go to relatives' homes to bathe.

139.   In 2019, Ms. Brooks was able to have her service reconnected by DWSD. She entered into a payment plan with DWSD, which required her to pay her current monthly bill (typically around $100 a month) plus $98 per month. This required payment was approximately 17% of Ms. Brooks's total monthly income.

140.   Ms. Brooks was unable to keep up with the payment plan due to her low income. DWSD disconnected her water service again in the winter of 2019.

Once again, DWSD did not affirmatively confirm whether Ms. Brooks had the ability to pay her bill before disconnecting her service. Ms. Brooks and her children lived without water service in their home until March 2020. During this time, Ms. Brooks again obtained water from We the People of Detroit.

141.    During the time that Ms. Brooks lacked water service, she would wash her hands by wetting them with donated bottled water, adding soap, and then rinsing with more bottled water.

142.    DWSD reconnected Ms. Brooks's water service in March 2020, after the announcement of the Water Restart Plan and EO 2020-28. She is paying $25 a month for her water service as part of that plan.

143.    Ms. Brooks currently owes DWSD around $2,000 in arrearages.

144.    When Detroit resumes water shutoffs, Ms. Brooks will be at immediate risk of losing water service to her home due to her low income and inability to pay her water bill.

145.    Ms. Brooks's children, who attend high school, have been distance learning since March 2020. They are expected to return to school this fall. This may increase their risk of COVID-19 infection, particularly if there is a second wave of infections this winter, and also places Ms. Brooks at a greater risk of infection. This risk will be exacerbated if DWSD disconnects water service to Ms. Brooks's home

after the expiration of EO 2020-144 and they do not have running water to wash their hands, flush their toilets, or clean their home.

146.   According to an analysis conducted by the Brookings Institution, Ms. Brooks lives in a zip code with one of the highest concentrations of COVID-19 infections in Detroit.[140] The zip code where Ms. Brooks resides, 48221, has a population that is 92.9% Black. From January 2019 to January 2020, this zip code had 58.86 shutoffs for every 1,000 persons and was ranked fifth in number of shutoffs among 25 zip codes with available data.

147.   Ms. Brooks and her family live in close physical proximity to many persons who are infected or who have a highly enhanced risk of infection of COVID-19 or other diseases and who may lack water service to wash their hands, flush their toilets, or clean their homes. This places Ms. Brooks and her family at a heightened risk of infection of COVID-19 or other diseases.

148.   Plaintiff Michele Cowan is a 42-year-old Black resident of Detroit. She owns her home with her 23-year-old daughter in zip code 48227. Ms. Cowan lives with two of her adult daughters and her two grandchildren, ages two and six. Her family's income is approximately $1,300 per month.

---

[140] Henry-Nickie & Hudak, *supra* note 15.

149.   Ms. Cowan works at a home health aide service for elderly persons. She did not work between March and early June 2020 due to the risk of contracting COVID-19, but returned to work in mid-June 2020. Her employment exposes her to an increased risk of contracting and spreading COVID-19.

150.   DWSD disconnected Ms. Cowan's water service in August 2019 for approximately $700 in arrearages. She still owes DWSD this amount. DWSD did not affirmatively confirm whether Ms. Cowan had the ability to pay her bill before disconnecting her service.

151.   Ms. Cowan previously tried to enroll in WRAP but was informed she did not qualify for the program.

152.   Ms. Cowan and her family lived without water from August 2019 until March 2020. During this time, We the People of Detroit provided Ms. Cowan and her family with bottled water for handwashing, drinking, bathing, cleaning, and sanitation. She would receive eight to 10 cases of water every two weeks from the organization.

153.   During the time that Ms. Cowan lacked water service, she would wash her hands by wetting them with donated bottled water, adding soap, and then rinsing with more bottled water.

154.   DWSD reconnected Ms. Cowan's water service in March 2020, after the announcement of the Water Restart Plan and EO 2020-28.

155.   When Detroit resumes water shutoffs, Ms. Cowan will be at immediate risk of losing water service to her home due to her low income and inability to pay her water bill.

156.   Ms. Cowan's six-year-old grandchild has been distance learning since March 2020, and is expected to return to school in the fall. This may increase her grandchild's risk of COVID-19 infection, particularly if there is a second wave of infections this winter, and also places Ms. Cowan and her family at a greater risk of infection. This risk will be exacerbated if DWSD disconnects water service to Ms. Cowan's home after the expiration of EO 2020-144 and they do not have running water to wash their hands, flush their toilets, or clean their home.

157.   According to an analysis conducted by the Brookings Institution, Ms. Cowan lives in a zip code with one of the highest concentrations of COVID-19 infections in Detroit.[141] The zip code where Ms. Cowan resides, 48227, has a population that is 96.7% Black. From January 2019 to January 2020, this zip code had 41.85 shutoffs for every 1,000 persons and was ranked 10th in number of shutoffs among 25 zip codes with available data.

158.   Ms. Cowan and her family live in close physical proximity to many persons who are infected or who have a highly enhanced risk of infection of COVID-

---

[141] *Id.*

19 or other diseases and who may lack water service to wash their hands, flush their toilets, or clean their homes. This places Ms. Cowan and her family at a heightened risk of infection of COVID-19 or other diseases.

159.   The lack of water service in her home has been very stressful for Ms. Cowan and her family. She has anxiety over the prospect of losing water service when DWSD resumes shutoffs.

160.   Plaintiff Tuana Henry is a 45-year-old Black resident of Detroit. She owns her home in the west side of the city, in zip code 48204. She has eight children living with her, six of whom are under the age of 18. Ms. Henry's income averages between $1,200 and $1,500 per month. Ms. Henry has asthma and bronchitis, requiring the use of a water-based nebulizer and other inhalants.

161.   Due to her low income, Ms. Henry enrolled in WRAP in approximately 2016. However, due to the cost, she was unable to pay her monthly bill and the required payment on her delinquent bill. Between 2016 and 2020, Ms. Henry's water service was disconnected by DWSD for non-payment several times. DWSD marked Ms. Henry's property with bright blue spray paint to show that her water service had been disconnected. DWSD did not affirmatively confirm whether Ms. Henry had the ability to pay her bill before disconnecting her service.

162.   In approximately May 2019, Ms. Henry's water service was disconnected by DWSD. She lived without water service from May 2019 until

March 2020. During the time that she lived without water service, Ms. Henry would purchase bottled water or fill up gallons from her son's home or her neighbor's home. She once received water from the Michigan Welfare Rights Organization.

163.   During the time that Ms. Henry lacked water service, she would wash her hands by wetting them with donated bottled water, adding soap, rinsing with more bottled water, and then drying her hands.

164.   DWSD reconnected Ms. Henry's water service in March 2020, after the announcement of the Water Restart Plan and EO 2020-28.

165.   When Detroit resumes water shutoffs, Ms. Henry will be at immediate risk of losing water service to her home due to her low income and inability to pay her water bill.

166.   Six of Ms. Henry's children attend school. They have been distance learning since March 2020, but are expected to return to school in the fall. This may increase her children's risk of COVID-19 infection, particularly if there is a second wave of infections this winter, and also places Ms. Henry and her family at a greater risk of infection. This risk will be exacerbated if DWSD disconnects water service to Ms. Henry's home after the expiration of EO 2020-144 and she and her family do not have running water to wash their hands, flush their toilets, or clean their home.

167.   According to an analysis conducted by the Brookings Institution, Ms. Henry lives in a zip code with one of the highest concentrations of COVID-19

infections in Detroit.[142] The zip code where Ms. Henry resides, 48204, has a population that is 95.8% Black. From January 2019 to January 2020, this zip code had 78.57 shutoffs for every 1,000 persons and was ranked second in number of shutoffs among 25 zip codes with available data.

168.   Ms. Henry and her family live in close physical proximity to many persons who are infected or who have a highly enhanced risk of infection of COVID-19 or other diseases and who may lack water service to wash their hands, flush their toilets, or clean their homes. This places Ms. Henry and her family at a heightened risk of infection of COVID-19 or other diseases.

169.   Ms. Henry fears that she will contract COVID-19 and that it will exacerbate her existing medical conditions if her water service is terminated again.

170.   Plaintiff Mattie McCorkle is a 41-year-old Black resident of Detroit. She owns her home in zip code 48217. Ms. McCorkle lives in her home with her husband and three children, ages 18, 12, and six. She and her husband had a joint income of approximately $22,000 in 2019.

171.   Ms. McCorkle and her husband are both essential workers. Ms. McCorkle is employed as a restaurant server. She did not work from March to June 2020 due to COVID-19, but is now back at work. Ms. McCorkle and her husband's

---

[142] *Id.*

roles as essential workers increase their risk of COVID-19 infection. Ms. McCorkle is very concerned that she or her husband may contract or spread COVID-19.

172.   In 2016, DWSD disconnected Ms. McCorkle's water service for non-payment. DWSD did not affirmatively confirm whether Ms. McCorkle had the ability to pay her bill before disconnecting her service.

173.   Following her service disconnection, Ms. McCorkle enrolled in WRAP. However, she was unable to keep up with her payments to DWSD. In 2018, DWSD disconnected Ms. McCorkle's water service again. She looked to enroll in an assistance program at that time but was informed she did not qualify for WRAP.

174.   Ms. McCorkle lived without water service in her home from 2018 until April or May 2020. Initially, Ms. McCorkle struggled to get water donated to her home for handwashing, drinking, bathing, cleaning, and sanitation. Eventually she was connected to We the People of Detroit, which would deliver eight cases of water every two weeks to her home.

175.   DWSD did not reconnect Ms. McCorkle's water service until late April or early May 2020. Her water pipes are in need of repairs. Currently, she can only obtain water from the basement of her house. She must fill up jugs to use the water in other areas of her home.

176.   In order to wash her hands, Ms. McCorkle must fill up a pail or bucket of water from her basement, bring it upstairs, boil it on her hot water heater, and then

lather with soap and rinse. She is able to use this water from her basement for handwashing and cleaning her dishes, but it is difficult for her to use it for other cleaning purposes.

177. Ms. McCorkle is currently paying $25 a month for her water service under the Water Restart Plan, but also owes DWSD past arrearages.

178. When Detroit resumes water shutoffs, Ms. McCorkle will be at immediate risk of losing water service to her home due to her low income and inability to pay her water bill. She is very concerned about the lack of water service for herself and her family.

179. According to an analysis conducted by the Brookings Institution, Ms. McCorkle lives in a zip code with one of the highest concentrations of COVID-19 infections in Detroit.[143] The zip code where Ms. McCorkle resides, 48217, has a population that is 96.7% Black. From January 2019 to January 2020, this zip code had 41.13 shutoffs for every 1,000 persons and was ranked 11th in number of shutoffs among 25 zip codes with available data.

180. Ms. McCorkle and her family live in close physical proximity to many persons who are infected or who have a highly enhanced risk of infection of COVID-19 or other diseases and who may lack water service to wash their hands, flush their

---

[143] *Id.*

toilets, or clean their homes. This places Ms. McCorkle and her family at a heightened risk of infection of COVID-19 or other diseases.

181.   Plaintiff Renee Wilson is a 49-year-old Black resident of Detroit. She owns her home in Detroit's Brightmoor neighborhood, in zip code 48223. Ms. Wilson lives with her son and minor grandchild. Nine of Ms. Wilson's minor grandchildren, ranging in age from one year to 16 years old, frequently visit her home, including staying overnight. Ms. Wilson's monthly income is $659 from Social Security disability benefits, or $7,908 annually. For a household of three people, this is less than 50% of the federal poverty level.[144]

182.   In 2016 and 2017, DWSD disconnected Ms. Wilson's water service on two occasions. In approximately 2017, Ms. Wilson was enrolled in WRAP. Under the terms of the plan, Ms. Wilson was required to pay her current bill, which averages around $200 per month, and $200 per month on her delinquent bill. This required payment of $400 a month is more than 60% of her entire monthly income.

183.   In May 2019, Ms. Wilson was unable to make her monthly payment to DWSD. As a result, her water service was disconnected. While she was unable to make her payments, DWSD did not affirmatively confirm whether Ms. Wilson had the ability to pay her bill before disconnecting her service.

---

[144] U.S. Dep't of Health & Human Servs., Off. of the Ass't Sec'y for Planning and Eval., *Poverty Guidelines* (Jan. 8, 2020), https://aspe.hhs.gov/poverty-guidelines.

184.   Ms. Wilson had no water service in her home between May 2019 and May 2020. Ms. Wilson's church donated 30 cases of bottled water to her every two weeks for handwashing, drinking, bathing, cleaning, and sanitation.

185.   During the time that Ms. Wilson lacked water service, she would wash her hands by warming donated bottled water on the stove, placing it in a bowl, wetting her hands with water and soap, and then rinsing with bottled water. She would also use hand sanitizer.

186.   On April 14, 2020, DWSD sent Ms. Wilson a bill for $3,111.78 for arrearages owed prior to her shutoff in May 2019. On May 4, she called DWSD to determine if she had a reconnection fee. At no time did DWSD advise Ms. Wilson that the Water Restart Plan and EO 2020-28 required the restoration of water service to Detroit residents. On May 4, Brightmoor Food Pantry paid Ms. Wilson's full water bill and her water service was restored that month.

187.   When Detroit resumes water shutoffs, Ms. Wilson will be at immediate risk of losing water service to her home due to her low income and inability to pay her water bill. Her average monthly bill of $200 is approximately 30% of her monthly income.

188.   According to an analysis conducted by the Brookings Institution, Ms. Wilson lives in a zip code with one of the highest concentrations of COVID-19

infections in Detroit.[145] The zip code where Ms. Wilson resides, 48223, has a population that is 89.7% Black. From January 2019 to January 2020, this zip code had 30 shutoffs for every 1,000 persons and was ranked 13th in number of shutoffs among 25 zip codes with available data.

189.   Ms. Wilson and her family live in close physical proximity to many persons who are infected or who have a highly enhanced risk of infection of COVID-19 or other diseases and who may lack water service to wash their hands, flush their toilets, or clean their homes. This places Ms. Wilson and her family at a heightened risk of infection of COVID-19 or other diseases.

190.   Plaintiff People's Water Board Coalition and its member organizations have engaged in advocacy and expended resources to advocate for water affordability in Detroit for nearly two decades.

191.   For years, the Coalition has urged local officials in Detroit, including the Mayor and City Council, to impose a moratorium on water shutoffs and implement a water affordability plan so that the city's low-income residents can afford their water bills. Coalition members have attended city council and town hall meetings, provided testimony, written letters, and arranged for media interviews on water issues. The Coalition has also engaged in state- and federal-level advocacy

---

[145] Henry-Nickie & Hudak, *supra* note 15.

with the Governor, state legislators, and congressional representatives on these issues.

192.   On March 16, 2020, the Coalition sent a letter to Defendant Whitmer, expressing concern with Detroit's ability to reconnect water service to all disconnected households.[146] The letter urged the Governor to impose an indefinite moratorium on shutoffs and implement a water affordability plan based on a household's ability to pay.

193.   During the COVID-19 pandemic, and as recently as June 26, 2020, members of the Coalition have regularly encountered and provided assistance to Detroit residents who were unaware of the Water Restart Plan and EO 2020-28 and have not had their water restored during the health crisis.

194.   During the COVID-19 pandemic, the Coalition has sought to increase awareness of the importance of handwashing and the dangers of water shutoffs through billboards placed along Detroit freeways, including I-75, I-96, the Lodge Freeway, and the Southfield Freeway.[147]

---

[146] Letter from People's Water Board Coalition to Governor Gretchen Whitmer (Mar. 16, 2020), https://www.peopleswaterboard.org/wp-content/uploads/2020/03/PWB_AppealToWhitmer.pdf.

[147] People's Water Board, *Billboards*, https://www.peopleswaterboard.org/billboards/ (last visited July 8, 2020).

195.   The Coalition brought on four organizers during the pandemic to canvass Detroit neighborhoods and inform residents of the Water Restart Plan and EO 2020-28 to ensure that water is restored for all city residents.

196.   The Coalition has provided bottled water to some residents living without water service during the COVID-19 pandemic, despite the Water Restart Plan and EO 2020-28.

## CLASS ALLEGATIONS

197.   Plaintiffs bring this case as a proposed class action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

198.   Plaintiffs request that this Court certify four main classes as follows:

   a.   A class of all current and future Detroit residents who reside in, or live in close proximity to, neighborhoods where disease has spread widely and has caused high rates of infection because of significant numbers of water shutoffs ("Class A");

   b.   A class of all current and future DWSD customers who are or will be at risk of becoming physically ill because they lack water service or are "water insecure" (i.e., they may lose water service at any time because of their chronic poverty and inability to pay market rate fees for water) ("Class B");

   c.   A class of all residential DWSD customers who, within the last

two years, have had their water service disconnected by Detroit

for non-payment without Detroit first determining whether they

had the means to pay and willfully refused to do so ("Class C");

and

d.     A class of all Black residents of Detroit who, within the last two

years, have had their water service disconnected by Detroit for

non-payment or are at risk losing water service once the city

resumes shutoffs ("Class D").

199.   All Named Plaintiffs are members of Class A they seek to represent.

200.   All Named Plaintiffs are members of Class B they seek to represent.

201.   All Named Plaintiffs are members of Class C they seek to represent.

202.   All Named Plaintiffs are members of Class D they seek to represent.

203.   The members of each class are collectively referred to as "Class

Members."

204.   Plaintiffs reserve the right to amend the definition of the above-defined

classes based on discovery or legal developments.

205.   This action is properly maintained as a class action because:

a.     Joinder of all Class Members is impracticable because of the size

of each respective class or subclass. Upon information and belief,

each class or subclass includes at least several hundred, if not

several thousand, members.

b.    Defendants have acted or refused to act on grounds generally applicable to each respective class or subclass.

c.    Common questions of law and fact exist as to Class Members within each respective class or subclass and predominate over any questions affecting only individual members. Common legal and factual questions include but are not limited to: (i) the direct impact of mass water shutoffs on the health or bodily integrity of all members of the Class; (ii) whether Defendant Detroit's policies and practices have a disparate impact on Black residents in violation of the FHA and ELCRA; (iii) whether any disparate impact is justified by a substantial, legitimate, nondiscriminatory interest; (iv) whether punitive damages for Class Members for Defendant Detroit's violations of the FHA are warranted; and (v) whether a declaratory judgment and/or injunctive relief are warranted regarding Defendants' policies and practices.

d.    Plaintiffs' claims are typical of the claims of the classes they seek to represent.

e.    A class action is superior to the other available methods to adjudicate this litigation fairly and efficiently.

    f.    There will be no difficulty in the management of this action as a class action. Moreover, judicial economy will be served by maintaining this lawsuit as a class action because it will likely prevent individual harmed persons from filing hundreds or even thousands of similar suits, which would otherwise burden the judicial system. There are no obstacles to effective and efficient management of this lawsuit as a class action.

206.  Plaintiffs will fairly and adequately represent and protect the interests of Class Members because their interests coincide with—and are not antagonistic to—the interests of the Class Members they seek to represent. Plaintiffs have retained Counsel who are competent and have extensive experience in federal civil rights, constitutional, consumer, and class action litigation.

## CLAIMS FOR RELIEF

### COUNT ONE
**Violation of Substantive Due Process**
**U.S. Constitution, Amendment XIV, 42 U.S.C. § 1983; Michigan Constitution of 1963, Article I, § 17**
**All Plaintiffs against Defendants City of Detroit, Duggan, and Brown**

207.  Plaintiffs, on behalf of themselves and Classes A and B, re-allege and re-plead all the allegations of the preceding and subsequent paragraphs of this Complaint and incorporate them herein by reference.

208.   Plaintiffs have a clearly established fundamental right to bodily integrity under the substantive due process guarantees the U.S. Constitution and the Michigan Constitution of 1963.

209.   The Due Process Clause of the 14th Amendment to the U.S. Constitution prohibits state and local governments from depriving individuals of life, liberty, or property without due process of the law.[148]

210.   42 U.S.C. § 1983 ("Section 1983") allows individuals to bring actions against state actors, including municipalities, for deprivations of federal constitutional and statutory rights, including those protected by the 14th Amendment.

211.   The Michigan Constitution of 1963 provides that "[n]o person shall be . . . deprived of life, liberty or property, without due process of law."[149]

212.   The above conduct of Defendants Detroit, Duggan, and Brown has been taken under color of state and local law.

213.   Defendants Detroit, Duggan, and Brown have persisted in the practice of employing water shutoffs as a collection method even though many households subject to termination cannot afford to pay market rates for water service. In

---

[148] U.S. Const. amend. XIV, § 1, cl. 3.

[149] Mich. Const. 1963, Article I, § 17.

addition, the lack of water service in many residents' homes is humiliating to residents because of Defendant Detroit's practice of marking customers' homes with bright blue paint when their water service is or is about to be disconnected, which leads to the stigmatization of residents.

214.    In response to public complaints that a high poverty rate in Detroit guarantees widespread termination of water service, Defendants have established or used ineffective water assistance programs, which ensure a chronic lack of access to water to low income families. These include the 10-30-50 program and WRAP.

215.    The inability of many families to pay for water service has led to an increasing number of water disconnections for non-payment by DWSD.

216.    This lack of water service contributes to the spread of disease in the City of Detroit, including infections of COVID-19.

217.    By establishing the Water Restart Plan, Defendants Detroit, Duggan, and Brown effectively admitted the correlation between the lack of water service and the spread of disease.

218.    Upon information and belief, Defendants Detroit, Duggan, and Brown were out of compliance with EO 2020-28 and are now out of compliance with EO 2020-144 because there are residents of Detroit who previously had their water service disconnected for non-payment and have not been restored during the COVID-19 pandemic.

219.   In the face of a pandemic, the absence of an affordability plan, and a high death toll, Defendant Duggan has stated that he plans to resume the use of water shutoffs as a collection method after the coronavirus crisis has passed. This places Detroit residents at risk of infection from various diseases and other health problems that result from the lack of water.

220.   Plaintiffs and Classes A and B derive from the 14th Amendment a fundamental liberty interest in personal security that includes their right to be free from any arbitrary bodily punishment that strips them of the essence of their personhood. This includes the right to be free of disease from the lack of water service.

221.   Defendants Detroit, Duggan, and Brown breached the constitutionally protected bodily integrity of Plaintiffs and Classes A and B by continuing to implement their water shutoff policy in deliberate indifference to the known correlation between disease and the lack of water service.

222.   Defendants Detroit, Duggan, and Brown violated the bodily integrity of Plaintiffs and Classes A and B by causing conditions leading to the introduction of infectious disease into their bodies, and/or by increasing the substantial likelihood that such will occur.

223.   Defendants' water shutoff policy shocks the conscience and violates the substantive due process rights of Plaintiffs and Classes A and B.

224.   The infringement of Plaintiffs' rights by Defendants Detroit, Duggan, and Brown is ongoing and likely to continue into the future.

## COUNT TWO
### Violation of Substantive Due Process
### U.S. Constitution, Amendment XIV, 42 U.S.C. § 1983
### All Plaintiffs against Defendant Gretchen Whitmer

225.   Plaintiffs, on behalf of themselves and Classes A and B, re-allege and re-plead all the allegations of the preceding and subsequent paragraphs of this Complaint and incorporate them herein by reference.

226.   Plaintiffs have a clearly established fundamental right to bodily integrity under the substantive due process guarantee of the U.S. Constitution.

227.   The Due Process Clause of the 14th Amendment to the U.S. Constitution prohibits state governments from depriving individuals of life, liberty, or property without due process of the law.[150]

228.   Section 1983 allows individuals to bring actions against state actors for deprivations of federal constitutional and statutory rights, including those protected by the 14th Amendment.

229.   The above conduct of Defendant Whitmer has been taken under color of state and local law.

230.   Pursuant to the Michigan Emergency Management Act, Defendant

---

[150] U.S. Const. amend. XIV, § 1, cl. 3.

Whitmer has a duty to address public emergencies. The Act provides that "[t]he governor is responsible for coping with dangers to this state or the people of this state presented by a disaster or emergency."[151] The Act also grants Governor Whitmer the authority and capacity to direct local authorities to use local resources to cope with a disaster or emergency.[152]

231.   For years, long before the current pandemic, the City of Detroit has experienced an ongoing public health emergency due to its water shutoff policy, because the lack of water service in many residents' homes leads to disease and the potential for disease.

232.   During the early weeks of 2020, the inadequacy of the 10-30-50 program and WRAP to assist Detroit's water insecure population exacerbated the vulnerability of those residents to COVID-19 infection and other diseases due to their inability to wash their hands, bathe, flush their toilets, and clean their homes.

233.   Defendant Whitmer has not only a responsibility to address public health emergencies, but she also has the authority and capacity to direct local authorities to use local resources to address these problems pursuant to the Michigan Emergency Management Act.

---

[151] Mich. Comp. Laws Ann. § 30.403(1).

[152] Mich. Comp. Laws Ann. § 30.405(1)(b), (j).

234.    Defendant Whitmer's willingness in March 2020 to ensure water availability for the people of Detroit was prompted solely by the statewide threat posed by COVID-19. As late as February 2020, Defendant Whitmer refused a request that she use her authority to require the reconnection of water service for those in Detroit who were disconnected for non-payment even though it was clear that Detroit residents faced a severe ongoing threat to public health that pre-dated the arrival of COVID-19.

235.    On March 28, 2020, Defendant Whitmer issued EO 2020-28. The order required public water utilities in Michigan to restore water service to occupied residences where water service was shut off due to non-payment. On July 8, 2020, EO 2020-28 was replaced by EO 2020-144, which requires the reconnection of water service for residents through the end of 2020.

236.    In EOs 2020-28 and 2020-144, Defendant Whitmer explicitly acknowledged the correlation between the lack of water and disease by stating "[n]ow more than ever, the provision of clean water to residences is essential to human health and hygiene, and to the public health and safety of this state."[153]

237.    Defendant Whitmer also has a duty under the Michigan Emergency Management Act to ensure full compliance with her executive orders. However,

---

[153] Mich. Exec. Order 2020-28, *supra* note 20, at 1; Mich. Exec. Order 2020-144, *supra* note 21, at 2.

upon information and belief, she took no action to ensure that Detroit and other municipalities within Michigan complied with EO 2020-28. Upon information and belief, Defendants Detroit, Duggan, and Brown were out of compliance with EO 2020-28 and are now out of compliance with EO 2020-144 because there were and are residents of Detroit who previously had their water service disconnected for non-payment and have not been restored during the COVID-19 pandemic.

238.   Because Defendant Duggan has stated his intention to resume the use of water shutoffs as a collection method, Defendant Whitmer must ensure either that water shutoffs will not occur or that water shutoffs will not cause another public health emergency of the type that existed prior to the COVID-19 pandemic. This can happen through a permanent ban on water shutoffs and/or the institution of a meaningful water affordability program that will ensure water is affordable and available to all, including Detroit's water insecure population.

239.   Defendant Whitmer issued EOs 2020-28 and 2020-144 in light of the ongoing health impacts of the pandemic. Her evaluation of the need for these orders necessarily involved an examination of the ongoing health risks posed by COVID-19, including infection rates, deaths, and other conditions. Because of the Governor's broader responsibility under the Michigan Emergency Management Act to address all public health emergencies, she is also required to consider the inevitable adverse public health consequences of the planned resumption of water

shutoffs, even after the expiration of EO 2020-144 or any subsequent order requiring the restoration of water service during the COVID-19 pandemic.

240.   Upon information and belief, water shutoffs in Detroit will resume when the immediate threat of COVID-19 has passed. If there is no permanent ban on water shutoffs and the institution of a water affordability plan for Detroit residents, other public health dangers of the kind that predated COVID-19 and that have always been caused by water shutoffs will remain. Because of Defendant Whitmer's obligation to address all public health emergencies, she is obligated to ensure water availability for all persons after the immediate threat of COVID-19 has passed.

241.   Despite this responsibility, Defendant Whitmer made clear in EO 2020-144 that the order does not relieve a customer of the obligation to pay for water, prevent a public water supply from charging any customer for water service, or reduce the amount a resident may owe to a public water supply.[154]

242.   As of the date of this filing, Defendant Whitmer has used her authority to make water available after the expiration of EO 2020-144 only to support water assistance programs that are ineffective and that do not ensure the availability of water to Detroit's water insecure population. Specifically, she sought increased

---

[154] Mich. Exec. Order 2020-144, *supra* note 21, at 2.

funding for WRAP shortly before the onset of the COVID-19 pandemic and also supported the passage of SB 690, which will establish a statewide fund of $25 million to assist water utilities with arrearages incurred by customers during the pandemic. This fund is limited to $700 in assistance for eligible households and only covers arrearages and fees incurred during the COVID-19 state of emergency. Like the 10-30-50 program and WRAP, this fund will not address the ongoing or long-term water needs of Detroit's water insecure population.

243.   Defendant Whitmer is fully knowledgeable of the inadequacy of this water assistance fund and other water assistance programs. She has used the authority of her office to solely sustain or facilitate creation of water assistance programs that do not address the needs of Detroit's water insecure population, rather than require the establishment of an effective water affordability program. This decision constitutes an affirmative act to create or increase the risk of harm to Plaintiffs. In the absence of an emergency order or a water affordability program, Detroit's water insecure population will lose the ability to wash their hands, bathe, flush their toilets, and clean their homes once Detroit resumes its water shutoff policy.

244.   Defendant Whitmer knows or should know that the resumption of water shutoffs in Detroit and the lack of a water affordability plan for Detroit residents will result in the increased risk to Plaintiffs of infection from COVID-19 and other

diseases, due to the lack of water for handwashing and cleaning purposes. Defendant Whitmer's decision to rely solely upon water assistance programs that provide limited relief will not address the needs of Detroit's water insecure population.

245.   Plaintiffs derive from the 14th Amendment a fundamental liberty interest in personal security that includes their right to be free from any arbitrary bodily punishment that strips them of the essence of their personhood. This includes the right to be free of disease from the lack of water service.

246.   Defendant Whitmer's actions constitute a state-created danger resulting from the Governor's deliberate indifference to the threat of violation of Plaintiffs' bodily integrity.

247.   Defendant Whitmer's actions will violate Plaintiffs' bodily integrity by causing conditions leading to the introduction of infectious disease into the Plaintiffs' bodies, and/or the substantial likelihood that such will occur.

248.   Because of the information available to Defendant Whitmer, her failure to use her authority under the Michigan Emergency Management Act to permanently ban water shutoffs and institute a water affordability plan for Detroit residents will be acts taken after careful, protracted contemplation of the threat posed by mass water shutoffs to the bodily integrity of Plaintiffs. These acts shock the conscience and will violate the substantive due process rights of Plaintiffs.

249.   The infringement of Plaintiffs' rights by Defendant Whitmer is ongoing and likely to continue into the future.

**COUNT THREE**
**Violation of Equal Protection**
**U.S. Constitution, Amendment XIV, 42 U.S.C. § 1983; Michigan Constitution of 1963, Article I, § 2**
**All Plaintiffs against Defendant City of Detroit**

250.   Plaintiffs, on behalf of themselves and Class C, re-allege and re-plead all the allegations of the preceding and subsequent paragraphs of this Complaint and incorporate them herein by reference.

251.   The Equal Protection Clause of the 14th Amendment to the U.S. Constitution prohibits state and local governments from denying to any person within their jurisdiction the equal protection of the laws.[155] This includes a prohibition against state actions that punish individuals for non-payment of municipal services without first considering whether the individual had the ability to pay and whether non-payment was willful.

252.   Section 1983 allows individuals to bring actions against state actors, including municipalities, for deprivations of federal constitutional and statutory rights, including those protected by the 14th Amendment.

---

[155] U.S. Const. amend. XIV, § 1. cl. 4.

253.   The Michigan Constitution of 1963 provides that "[n]o person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin."[156]

254.   The above conduct of Defendant Detroit has been taken under color of state and local law.

255.   DWSD's Interim Rules and/or Customer Policies do not provide a method by which to determine whether a customer has the means to pay their bill prior to a disconnection of water service.

256.   Plaintiffs and Class C have a substantial interest in their water service, as water is necessary for human survival, especially in the midst of a pandemic where water is critical to stop the spread of COVID-19 and other bacterial or viral infections through frequent handwashing and cleaning.

257.   Plaintiffs and Class C have a constitutionally protected property interest in the continuation of their residential water service.

258.   Defendant Detroit's practice of disconnecting water service to residential account holders in ways that are humiliating and threaten public health

---

[156] Mich. Const. 1963, Article I, § 2.

constitutes a violation of the equal protection guarantees of the 14th Amendment to the U.S. Constitution and the Michigan Constitution of 1963.

259. Defendant Detroit's practice of disconnecting water service to residential account holders in a manner that has a disproportionate impact on the city's Black residents constitutes a violation of the equal protection guarantees of the 14th Amendment to the U.S. Constitution and the Michigan Constitution of 1963.

260. Defendant Detroit does not reasonably further any legitimate government interest in collecting unpaid water debt by disconnecting the water service of predominately Black residential customers who do not have the means to pay because they are indigent, through no fault of their own, at great risk to public health and societal costs.

261. Defendant Detroit does not reasonably further any legitimate government interest in collecting unpaid water debt by disconnecting the water service of predominately Black residential customers who do not have the means to pay because they are indigent, through no fault of their own, especially in light of the COVID-19 pandemic, as the disconnection of water service will result in the increased risk of infection from COVID-19 and other diseases.

262. Defendant Detroit does not reasonably further any legitimate government interest in collecting unpaid water debt by disconnecting the water

service of predominately Black residential customers who do not have a means to pay because they are indigent, through no fault of their own, as the city is likely to suffer even greater economic losses associated with an increase in COVID-19 infections, including but not limited to increased hospitalizations and a further decrease in tax revenue that will result from a prolonged uncontrolled pandemic.

263. Defendant Detroit does not reasonably further any legitimate government interest in collecting unpaid water debt by disconnecting the water service of predominately Black residential customers who do not have a means to pay because they are indigent, through no fault of their own, as such a policy does not make it more likely that the city will recover its costs from indigent residents who are truly unable to pay their arrearages.

264. Defendant Detroit does not reasonably further any legitimate government interest in collecting unpaid water debt through the implementation of the 10-30-50 program and WRAP, as DWSD continues to disconnect water service to tens of thousands of predominately Black residents each year, which demonstrates the ineffectiveness of the programs in maintaining service and collecting unpaid water debt.

265. There are more reasonable means for Defendant Detroit to accomplish its interest in collecting unpaid water debt, including by reducing or forgiving the amount owed and/or establishing a water affordability program that takes a

customer's level of income into account and ability to pay into account prior to the disconnection of water service. These alternative means of collecting unpaid water debt without disconnecting water service would pose no public health threat or result in significant societal costs, such as the loss of life, livelihoods, or to the city's tax revenue during a prolonged and uncontrolled pandemic.

266. DWSD's Interim Rules and/or Customer Policies violate the equal protection rights of Plaintiffs and Class C under the U.S. and Michigan Constitutions because they authorize the disconnection of a customer's water service without first determining whether the customer has the ability to pay and is willfully refusing to do so.

267. The infringement of Plaintiffs' rights by Defendant Detroit is ongoing and likely to continue into the future.

**COUNT FOUR**
**Race Discrimination Under the Fair Housing Act**
**42 U.S.C. §§ 3601 *et seq*.**
**All Plaintiffs against Defendant City of Detroit**

268. Plaintiffs, on behalf of themselves and Class D, re-allege and re-plead all the allegations of the preceding and subsequent paragraphs of this Complaint and incorporate them herein by reference.

269. Defendant Detroit's discriminatory policy of disconnecting water service to customers for non-payment has a disproportionate and unjustified impact on Black residents of the city. Defendant Detroit's policy causes Black residents to

93

disproportionately experience water shutoffs, forcing them to live without water service in their homes.

270.   Defendant Detroit's water shutoff policy has been in place for years and has been temporarily halted due to the city's Water Restart Plan and EOs 2020-28 and 2020-144. Upon information and belief, water shutoffs in Detroit will resume when the immediate threat of COVID-19 has passed.

271.   By the actions described throughout this Complaint, Defendant Detroit has violated, and continues to violate, the rights of Plaintiffs and Class D under the FHA, 42 U.S.C. §§ 3601 *et seq.* and implementing regulations by discriminating on the basis of race in the terms, conditions, or privileges of the provision of services or facilities of a dwelling, in violation of 42 U.S.C. § 3604(b) and implementing regulations.

272.   By the actions described throughout this Complaint, Defendant Detroit has engaged in, and will continue to engage in, a policy, pattern, and practice of discrimination against Black residents of Detroit due to their race, or the racial composition of their neighborhood, in violation of the FHA.

273.   The past and continuing acts and conduct of Defendant Detroit have had and will continue to have a harmful disparate impact on Black residents of Detroit, in violation of the federally protected rights of Plaintiffs and Class D.

274.   Defendant Detroit's discriminatory policy of disconnecting water

service to customers, prior to March 2020 and continuing upon the expiration of EO 2020-144, has harmed and will continue to harm Plaintiffs and Class D, and constitutes unlawful discrimination on the basis of race in violation of 42 U.S.C. §§ 3601 *et seq*.

275.   Plaintiffs and Class D have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the relief sought in this action is the only means of securing complete and adequate relief. The policy identified above has been in place for several years, and Defendant Detroit plans to continue this discriminatory action by immediately resuming water shutoffs. Plaintiffs and Class D have suffered, and will continue to suffer, irreparable injury from the discriminatory actions of Defendant Detroit.

276.   With the exception of the current period where Detroit has been banned from disconnecting water service to residents for non-payment, Defendant Detroit has maintained these acts, policies, and practices continuously, and they constitute a continuing violation of 42 U.S.C. §§ 3601 *et seq*.

277.   Defendant Detroit's discriminatory policy is an artificial, arbitrary, and unnecessary barrier to housing.

278.   Defendant Detroit's discriminatory policy is not justified by one or more substantial, legitimate, nondiscriminatory interests. To the extent Detroit may claim that its policy is justified by a substantial, legitimate, nondiscriminatory

interest, that interest may be achieved by less discriminatory means.

## COUNT FIVE
### Race Discrimination Under the Elliott-Larsen Civil Rights Act
### Mich. Comp. Laws Ann. § 37.2502
### All Plaintiffs against Defendant City of Detroit

279.   Plaintiffs, on behalf of themselves and Class D, re-allege and re-plead all the allegations of the preceding and subsequent paragraphs of this Complaint and incorporate them herein by reference.

280.   Defendant Detroit's discriminatory policy of disconnecting water service to customers for non-payment has had and will continue to have a disproportionate and unjustified impact on Black residents of the city.

281.   By the actions described throughout this Complaint, Defendant Detroit has violated, and will continue to violate, the rights of Plaintiffs and Class D under ELCRA, Mich. Comp. Laws Ann. § 37.2502, by discriminating on the basis of race in in the terms, conditions, or privileges of a real estate transaction or in the furnishing of facilities or services in connection with a real estate transaction.

282.   By the actions described throughout this Complaint, Defendant Detroit has engaged in, and will continue to engage in, a policy, pattern, and practice of discrimination against Black residents of Detroit due to their race, or the racial composition of their neighborhood, in violation of ELCRA.

283.   The past and continuing acts and conduct of Defendant Detroit have had and will continue to have a harmful disparate impact on Black residents of

96

Detroit, in violation of the protected rights of Plaintiffs and Class D.

284. Defendant Detroit's discriminatory policy of disconnecting water service to customers has harmed and will continue to harm Plaintiffs and Class D, and constitutes unlawful discrimination on the basis of race in violation of ELCRA, Mich. Comp. Laws Ann. § 37.2502.

285. Plaintiffs and Class D have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the relief sought in this action is the only means of securing complete and adequate relief. The policy identified above has been in place for several years, and Defendant Detroit plans to continue this discriminatory action by immediately resuming water shutoffs. Plaintiffs and Class D currently suffer, and will continue to suffer, irreparable injury from the discriminatory actions of Defendant Detroit.

286. Defendant Detroit has maintained these acts, policies, and practices continuously, and they constitute a continuing violation of ELCRA.

287. Defendant Detroit's discriminatory policy is an artificial, arbitrary, and unnecessary barrier to housing.

288. Defendant Detroit's discriminatory policy is not justified by one or more substantial, legitimate, nondiscriminatory interests. To the extent Detroit may claim that its policy is justified by a substantial, legitimate, nondiscriminatory interest, that interest may be achieved by less discriminatory means.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class Members pray for relief as follows:

a.   Certification of the case as a class action on behalf of each proposed class;

b.   Designation of all Plaintiffs as representatives of Class A;

c.   Designation of all Plaintiffs as representatives of Class B;

d.   Designation of all Plaintiffs as representatives of Class C;

e.   Designation of all Plaintiffs as representatives of Class D;

f.   Designation of Plaintiffs' counsel of record as Class Counsel;

g.   Declaration that the actions of Defendants described above constitute a violation of Plaintiffs' rights to substantive due process under the 14th Amendment to the U.S. Constitution, brought under 42 U.S.C. § 1983;

h.   Declaration that the actions of Defendants Detroit, Duggan, and Brown described above constitute a violation of Plaintiffs' rights to substantive due process under the Michigan Constitution of 1963, Article I, § 17;

i.   Declaration that the actions of Defendant Detroit described above constitute a violation of Plaintiffs' rights to equal protection under the 14th Amendment to the U.S. Constitution, brought under 42 U.S.C. § 1983, and the Michigan Constitution of 1963, Article I, § 2;

j.   Declaration that the actions of Defendant City of Detroit described above constitute discrimination on the basis of race in violation of the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, and the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws Ann. § 37.2502;

k.    Permanent injunction prohibiting Defendants from engaging in the unconstitutional and/or discriminatory conduct described herein and requiring Defendants to take all steps necessary to remedy the effect of such conduct and prevent similar occurrences in the future;

l.    Compensatory damages against Defendants City of Detroit, Duggan, and Brown for their constitutional violations, in an amount to be determined at trial, to fully compensate Plaintiffs for injuries including, but not limited to, humiliation, embarrassment, and emotional distress that they have suffered as a result of these Defendants' actions described above;

m.    Compensatory damages against Defendant City of Detroit for its violations of the FHA and ELCRA, in an amount to be determined at trial, to fully compensate Plaintiffs for injuries including, but not limited to, monetary loss, humiliation, embarrassment, emotional distress, the deprivation of statutory rights, and other damages they have suffered as a result of Defendant City of Detroit's actions described above;

n.    Punitive damages against Defendant City of Detroit for its violations of the FHA, in an amount to be determined at trial, which would punish Defendant City of Detroit for its intentional, malicious, willful, callous, wanton, and reckless disregard for Plaintiffs' rights and effectively deter Defendant City of Detroit from engaging in similar conduct in the future;

o.    Reasonable attorneys' fees and costs, pursuant to 42 U.S.C. §§ 1988 and 3613(c)(2) and Mich. Comp. Laws Ann. § 37.2802;

p.    Prejudgment and post-judgment interest; and

q.    Such other relief as the Court deems appropriate and just.

## **JURY DEMAND**

Plaintiffs demand a trial by jury in this action.

Dated:        Detroit, Michigan
July 9, 2020

                              Respectfully submitted,

                              By:  */s/*Mark P. Fancher
                              Mark P. Fancher (P56223)
                              Daniel S. Korobkin (P72842)
                              Bonsitu Kitaba-Gaviglio (P78822)
                              **AMERICAN CIVIL LIBERTIES UNION
                                FUND OF MICHIGAN**
                              2966 Woodward Avenue
                              Detroit, Michigan 48201
                              Tel.: (313) 578-6800
                              mfancher@aclumich.org
                              dkorobkin@aclumich.org
                              bkitaba@aclumich.org

                              **NAACP LEGAL DEFENSE
                              AND EDUCATIONAL FUND, INC.**
                              Coty Montag
                              Jason Bailey
                              700 14th Street NW, Suite 600
                              Washington, DC 20005
                              Tel.: (202) 682-1300
                              cmontag@naacpldf.org
                              jbailey@naacpldf.org

                              Monique Lin-Luse
                              40 Rector Street, 5th Floor
                              New York, New York 10006
                              Tel.: (212) 965-2200
                              mlinluse@naacpldf.org

                              **EDWARDS & JENNINGS, P.C.**
                              Alice B. Jennings (P29064)
                              Cadillac Tower Building
                              65 Cadillac Square, Suite 2710
                              Detroit, Michigan 48226
                              Tel.: (313) 961-5000
                              ajennings@edwardsjennings.com

                              100

**MICHIGAN          POVERTY          LAW PROGRAM**
Lorray S. C. Brown (P60753)
15 South Washington Street, Suite 202
Ypsilanti, Michigan 48197
Tel.: (734) 998-6100 ext. 613
Fax.: (734) 998-9125
lorrayb@mplp.org

**THORNBLADH LEGAL GROUP PLLC**
Kurt Thornbladh (P25858)
7301 Schaefer
Dearborn, Michigan 48126
Tel: (313) 943 2678
kthornbladh@gmail.com

**MELISSA Z. EL, P.C.**
Melissa Z. El Johnson (P29865)
500 Griswold Suite 2410
Detroit, Michigan 48226
Tel.: (313) 963-1049
Fax: (313) 963-3342
eljohnsonlaw@gmail.com

*Attorneys for Plaintiffs and the Putative Classes*