# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Jacqueline Taylor, et al.,

Plaintiffs,

v.

City of Detroit, et al.,

Defendants.

Case No. 4:20-cv-11860

Hon. Stephanie Dawkins Davis
Mag. Anthony P. Patti

Alice B. Jennings
Edwards & Jennings
Attorney for plaintiffs
65 Cadillac Square, Suite 2710
Detroit, MI 48226
(313) 961-5000
ajennings@edwardsjennings.com

Coty Montag
Jason Paul Bailey
Attorney for plaintiffs
NAACP Legal Defense &
Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
cmontag@naacpldf.org
jbailey@naacpldf.org

Charles N. Raimi
James N. Noseda
Hallam Stanton
City of Detroit Law Department
Attorneys for defendants City of
Detroit, Mayor Michael Duggan &
Gary Brown
Two Woodward Avenue
Detroit, Michigan 48226
(313) 224-4550
raimic@detroitmi.gov
nosej@detroitmi.gov
stantonh@detroitmi.gov

Daniel S. Korobkin
Mark P. Fancher
ACLU Fund of Michigan
Attorney for plaintiffs
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6800
dkorobkin@aclumich.org
mfancher@aclumich.org

Kurt Thornbladh
Thornbladh Law Group PLLC
Attorney for plaintiffs
Schaefer Plaza, 7301 Schaefer
Dearborn, MI 48126
(313) 943-2678
thornbladh.kurt3@gmail.com

Lorray S.C. Brown
Michigan Poverty Law Program
Attorney for plaintiffs
15 South Washington Street
Ypsilanti, MI 48197
(734) 998-6100
lorrayb@mplp.org

Monique Lin-Luse
NAACP Legal Defense &
Educational Fund, Inc.
Attorney for plaintiffs
40 Rector Street, Ste 5th Floor
New York, NY 10006
(212) 965-2200
mlinluse@naacpldf.org

Melissa Z. El Johnson
Melissa Z. El, P.C.
500 Griswold Suite 2410
Detroit, MI 48226
(313) 963-1049
eljohnsonlaw@gmail.com

## DEFENDANTS THE CITY OF DETROIT, MAYOR MICHAEL DUGGAN AND GARY BROWN'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6). As further explained in the accompanying brief, plaintiffs fail to state a claim upon which relief can be granted.[1]

By: /s/ Hallam Stanton
City of Detroit Law Department
Attorney for defendant City of Detroit
Two Woodward Avenue
Detroit, Michigan 48226
(313) 237-5082
stantonh@detroitmi.gov
P82319

Dated: August 27, 2020

---

[1] In accordance with Local Rule 7.1(a), the attorneys entitled to be heard on this motion conferred. The City explained the nature of the motion, but did not obtain concurrence in the relief sought.

**BRIEF IN SUPPORT OF DEFENDANTS THE CITY OF DETROIT, MAYOR MICHAEL DUGGAN AND GARY BROWN'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

## I.  Issues presented

i.  Do plaintiffs fail to state a claim under the Due Process Clauses of the United States and Michigan Constitutions, because they identify no fundamental right, nor conscience shocking conduct, and lack standing?

Defendants answer "yes."

ii.  Do plaintiffs fail to state a claim under the Equal Protection Clauses of the United States and Michigan Constitutions, because *Griffin v. Illinois*, 351 U.S. 12 (1956) is inapplicable, and the disputed policy is rationally related to a legitimate interest?

Defendants answer "yes."

iii.  Do plaintiffs fail to state a disparate impact claim under the Fair Housing Act, because the FHA is inapplicable, disparate impact is unavailable, and, in any event, plaintiffs fail to plead sufficient facts to proceed under a disparate impact theory?

Defendants answer "yes."

iv.  Do plaintiffs fail to state a disparate impact claim under the Elliott-Larsen Civil Rights Act, because the ELCRA is inapplicable, disparate impact is unavailable, and, in any event, plaintiffs fail to plead sufficient facts to proceed under a disparate impact theory?

Defendants answer "yes."

## II.   Most appropriate authority

**Cases**

*Bearden v. Georgia*, 461 U.S. 660 (1983) ........................................... 21, 23

*Bloch v. Frischholz*, 587 F.3d 771 (2009) ......................................... 28, 29

*Bolt v. City of Lansing*, 459 Mich. 152 (1998) ...................................... 26

*Cox v. City of Dallas*, 430 F.3d 734 (2005) ....................................... 28, 29

*Doe v. BlueCross BlueShield of Tennessee, Inc.*, 926 F.3d 235 (6th Cir. 2019) ................................................................. 35, 36, 37, 44

*Fowler v. Benson*, 924 F.3d 247 (2019) ...................................... 21, 22, 23

*Georgia State Conference of the NAACP v. City of LaGrange, Georgia*, 940 F.3d 627 (11th Cir. 2019) ............................................................. 31

*Griffin v. Illinois*, 351 U.S. 12 (1956) .................................. 20, 21, 22, 23

*Guertin v. State*, 912 F.3d 907 (2019) ........................................ passim

*In re City of Detroit, Mich.*, 841 F.3d 684 (6th Cir. 2016) .............. passim

*Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890 (5th Cir. 2019) ....................................................................... 40

*Tate v. Short*, 401 U.S. 395 (1971) .................................................. 20, 23

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015) .............................................................. passim

*The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690 (9th Cir. 2009) ....................................................................... 30, 31

*Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1988) ............ 39, 40, 42

*Williams v. Illinois*, 399 U.S. 235 (1970) ........................................ 21, 23

**Statutes**

42 U.S.C. § 3604(a) ........................................................................ passim

42 U.S.C. § 3604(b) ........................................................................ passim

Mich. Comp. Laws § 37.2502(1)(b) .................................................. passim

## III.   Table of contents

I.  Issues presented ...........................................................................i

II.  Most appropriate authority................................................ ii

III.  Table of contents................................................................. iii

IV.  Facts as pleaded in the complaint.................................... 1

V.  Standard of review .............................................................3

VI.  Argument .............................................................................4

   A.  The Court should dismiss plaintiffs' constitutional claims. ..........4

     i.  Plaintiffs fail to state a substantive due process claim. .............4

       a.  The right to bodily integrity does not encompass the right to be free of disease from a lack of water. ...........................................6

       b.  Plaintiffs lack standing. ...................................................... 10

       c.  Plaintiffs fail to plead conscience shocking behavior............13

     ii.  Plaintiffs fail to state an equal protection claim. ..................... 16

       a.  *Griffin* is limited to situations involving the deprivation of a fundamental liberty interest. ....................................................... 19

       b.  The City's policy is rationally related to a legitimate public purpose......................................................................................21

   B.  The Court should dismiss plaintiffs' statutory claims.................24

     i.  Plaintiffs fail to state a claim under the Fair Housing Act......24

       a.  Plaintiffs' claim falls outside the scope of § 3604(b). .............25

       b.  Disparate impact is not actionable under § 3604(b), and plaintiffs fail to state a claim based on disparate treatment. .....30

       c.  Plaintiffs fail to state a claim under disparate impact..........35

     ii.  Plaintiffs fail to state a claim under the Elliott-Larsen Civil Rights Act. ................................................................................. 41

       a.  Plaintiffs' claim falls outside the scope of § 502(1)(b)............42

       b.  § 502(1)(b) should be interpreted in accordance with § 3604(b), and plaintiffs fail to state a claim for the same reasons as explained *supra*, Part VI.B.i. ...................................................43

VII.  Conclusion and relief requested .....................................45

## IV.    Facts as pleaded in the complaint

Many Detroiters struggle to pay their water bills. This is for a number of reasons, including longstanding issues of systemic discrimination and the resulting racial wealth gap in what is a majority African American city. For this reason, the City of Detroit offers two options to assist struggling households. This includes the "10-30-50" program and the Water Residential Assistance Program ("WRAP"). (ECF No.1, PageID.15–19).

Under 10-30-50, a customer makes a down payment of between ten and fifty percent of any arrearage. The remaining balance is spread equally over as many as twenty-four months, helping the customer pay in installments. With WRAP, customers who are at or below 150% of the federal poverty line are given a twenty-five dollar a month credit towards their current bill. Any amount owed from prior bills is frozen. And if customers make twelve timely monthly payments, they receive a 700 dollar credit towards the balance. Customers can participate for a second twelve-month period, if necessary. (*Id.* at PageID.19–20).

For a number of years, the City has disconnected a customer's water service if they persistently fail to pay their bills. The City does this to

1

collect arrearages. Those who are incapable of paying are encouraged to sign up for 10-30-50 or WRAP to avoid a service interruption. Under this policy, some plaintiffs have, in the past, had their water disconnected. (*Id.* at PageID.4, 19–21, 27, 58–75).

On March 9, 2020, the City announced its COVID-19 Water Restart Plan. Due to the newly emergent coronavirus, every household in Detroit would have water restored if currently disconnected, and there would be a moratorium on service interruptions while the pandemic lasted. The plan will remain in effect until the threat posed by the coronavirus recedes. (*Id.* at PageID.30).

Plaintiffs have benefited from this plan. They have had their water service restored and are paying a low, fixed monthly water bill of twenty-five dollars. More relief is on the way. On July 1, 2020, Governor Gretchen Whitmer signed into law a bill that will provide twenty-five million dollars in water utility assistance to households across the state. The Michigan Department of Health and Human Services will reimburse water utility providers directly in exchange for forgiveness of customer arrearages and fees incurred during the COVID-19 state of emergency. (*Id.* at PageID.34–36, 58–75).

The City's decision to adopt the Water Restart Plan was grounded in the advice of public health experts. Given the importance of handwashing to fighting the coronavirus, the City did not want households to be without water while the risk posed by the pandemic continued. Plaintiffs have not caught the coronavirus. Due to the plan, neither they nor their neighbors are at risk on the basis that they lack water. (*Id.* at PageID.41, 43–44, 58–75).

## V.   Standard of review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Dismissal is likewise appropriate where the complaint, however factually detailed, fails to state a claim as a matter of law." *In re City of Detroit, Mich.*, 841 F.3d 684, 699 (6th Cir. 2016).

## VI.   Argument[2]

### A. The Court should dismiss plaintiffs' constitutional claims.

In Counts I and III, plaintiffs allege a violation of their substantive

due process right to bodily integrity and their right to equal protection.

They bring these claims under the Fourteenth Amendment to the United

States Constitution and Article I of the Michigan Constitution.[3] For the

following reasons, both Counts should be dismissed.[4]

### i.   Plaintiffs fail to state a substantive due process claim.

In Count I, plaintiffs plead that the right to bodily integrity is

guaranteed by the substantive component of due process. They contend

that the right to bodily integrity encompasses "the right to be free of

---

[2] For the purposes of this motion only, the City chooses not to challenge plaintiffs' class allegations. (ECF No.1, PageID.75–78).

[3] Plaintiffs request damages. (*Id.* at PageID.99). Plaintiffs rely on 42 U.S.C. § 1983 with respect to their federal claims. However, there is no analogous state statute, and there is no inferred damages remedy against a municipality under the Michigan Constitution. *Jones v. Powell*, 462 Mich. 329, 335–36 (2000). The Court should therefore dismiss plaintiffs' damages claim in this respect.

[4] In order to hold defendants liable under the federal Constitution, plaintiffs must satisfy *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). The same is true under the Michigan Constitution. See *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998). The City assumes that plaintiffs have satisfied this requirement, for the purposes of this motion only.

4

disease from [a] lack of water service." And argue that the City has violated this right by "causing conditions leading to the introduction of infectious disease into their bodies." In plaintiffs' view, the City's policy of disconnecting water service for nonpayment is to blame. (ECF No. 1, PageID.78–81).[5]

As plaintiffs observe, "[t]he Due Process Clause guarantees more than fair process . . . [it] also provides heightened protection against government interference with . . . fundamental rights . . . ." *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997).[6] But this is a narrow guarantee: substantive due process only protects those rights "so rooted in the traditions and conscience of our people," *Bell v. Ohio State Univ.*, 351 F.3d 240, 250 (6th Cir. 2003), "that neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U.S. at 721. Additionally, where, as here, the claim is based on an alleged abuse of executive power,

_____

[5] Since defendants Duggan and Brown are sued in their official capacities, and official capacity suits are claims against the municipality, *Cady v. Arenac Cty.*, 574 F.3d 334, 342 (6th Cir. 2009), the term "the City" will be used throughout to refer to defendants collectively.

[6] The due process protections offered by Michigan's Constitution are coextensive with that of the federal Constitution's Fourteenth Amendment. *Cummins v. Robinson Twp.*, 283 Mich. App. 677, 700–01 (2009). This brief will analyze them as if they are one and the same.

only truly arbitrary conduct is actionable. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). A plaintiff must therefore do more than identify a fundamental right; she must also show that the right was violated by conduct that "shocks the conscience." *Guertin v. State*, 912 F.3d 907, 922 (2019).

### a. The right to bodily integrity does not encompass the right to be free of disease from a lack of water.

Courts have held in limited circumstances that the right to bodily integrity is a fundamental one. Yet substantive due process claims focus on the exact description of the interest at stake. See *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) ("It is important . . . to focus on the allegations in the complaint to determine how petitioner describes the constitutional right at stake . . . ."); *Glucksberg*, 521 U.S. at 722. And the specific interest claimed here is that "the right to be free of disease from [a] lack of water service" is encompassed by the right to bodily integrity. (ECF No. 1, PageID.81).

However, the right to bodily integrity has applied in at most three situations. Most commonly, in cases concerned with physical punishment or restraint. *Guertin*, 912 F.3d at 919. Additionally, in lawsuits involving nonconsensual medical procedures. E.g., *Washington v. Harper*, 494 U.S.

210, 232 (1990); *Winston v. Lee*, 470 U.S. 753, 767 (1985). And finally, in *Guertin v. State*, the Sixth Circuit applied it in the context of the Flint Water Crisis. Since plaintiffs' claim, here, does not involve physical punishment or restraint, or a nonconsensual medical procedure, it can only proceed, if at all, under *Guertin*'s banner.

True, *Guertin* addressed the concept of bodily integrity in a new context. But the Flint Water Crisis was, after all, a unique situation. Officials, in the interest of saving money, created a public health emergency, distributing lead tainted water to thousands of Flint residents. 912 F.3d at 926–32. Those same officials covered up the ensuing crisis, going as far as to tell people that the water was safe to drink and bathe in. *Id.*

The present case involves dramatically different facts, confirming that *Guertin* does not reach this setting. For one, the means by which the harm occurred in *Guertin* involved a direct bodily intrusion: official malfeasance pumped polluted water to household taps from which residents drank. Plaintiffs, here, do not claim that Detroit's water is unsafe to drink. And they do not allege a direct invasion of unsafe water into their bodies. Rather, they engage in hypothesizing: the City is

7

"employing water shutoffs," hindering their ability to practice good hygiene, placing them at risk of catching an illness they have yet to catch. (ECF No. 1 at PageID.79–80). Unlike in *Guertin*, here, there is no suggestion that the City introduced disease into their bodies, nor that the City even brought disease into their immediate surroundings.

Moreover, *Guertin* involved deception. Flint officials knew that the water was dangerous but hid the risks, "turning residents' voluntary consumption of a substance vital to subsistence into an involuntary and unknowing act of self-contamination." 912 F.3d at 925–26. In this case, there is no suggestion that the City deceived plaintiffs. Whatever faults plaintiffs attribute to the City's policy, at no point did the City mislead them into ingesting harmful substances. This distinction is paramount, as the idea of false pretenses was key to *Guertin*'s finding that the right to bodily integrity involved the interplay between "informed consent" and "state interests." *Id.* at 919. In other words, it is not enough that the City created a risk of harm, plaintiffs have to plead that the City misled them into harm's way. This they cannot plausibly do.[7]

---

[7] Plaintiffs have not brought their substantive due process claim based on a state-created danger theory. They cannot plausibly do so. See *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998).

There is no support for plaintiffs' claim that the right to bodily integrity includes "the right to be free of disease from [a] lack of water service." By asserting as much, plaintiffs are asking the Court to recognize a new fundamental right. But the Court should reject this invitation, since to do so would be contrary to binding precedent. There is no daylight between plaintiffs' "right to be free of disease from [a] lack of water service," and a purported right to water service in general. If a municipality decides in the future to interrupt water service for nonpayment, a resident will always be able to claim that she is at greater risk of disease because of that decision. Yet the Sixth Circuit has not once, but twice rejected the idea that there is a "fundamental right to water service." *Detroit*, 841 F.3d at 700; *Mansfield Apartment Owners Ass'n v. City of Mansfield*, 988 F.2d 1469, 1477 (6th Cir. 1993).[8]

As a final point, recognizing plaintiffs' asserted right would also upend the considered decisions of Detroit's policymakers: those actually responsible for operating the City's water system. That responsibility includes delivery of clean, safe water, while keeping the system

---

[8] Caselaw also runs counter to the notion that the right to live in a contaminant-free environment is somehow protected by substantive due process. *Guertin*, 912 F.3d at 922.

financially solvent and, at the same time, keeping rates as affordable as possible. The Court would have to do this with little guidance as to how such a change could affect the system. Courts should be "reluctant to expand the concept of substantive due process" where few "guideposts [exist] for responsible decisionmaking." *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 125 (1992). As such, for this reason too, the Court should reject plaintiffs' invitation.

### b. Plaintiffs lack standing.

As is well known, to bring their bodily integrity claim, plaintiffs must have Article III standing. *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 860 (6th Cir. 2020). Among other things, this means that plaintiffs must identify an "injury in fact." *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1302 (2017). An "injury in fact" is a harm that is concrete, particularized, and actual or imminent. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). And while the mere risk of injury can sometimes suffice, it cannot be "too speculative." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Instead, the injury must be "certainly impending." *Id.* Even where the harm alleged is a violation of substantive due process, a plaintiff must plausibly plead that there is a "substantial

10

risk" that her rights will actually be violated. *Kanuszewski v. Michigan Dep't of Health & Human Servs.*, 927 F.3d 396, 408–11 (6th Cir. 2019).

Plaintiffs request both retrospective and prospective relief. Therefore, they must have standing to pursue at least one or the other. See *id.* If plaintiffs fail to identify an "injury in fact" that supports either, they are asking this Court to issue an advisory opinion. *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 465 (6th Cir. 2019). Article III grants no such power. *Miller v. City of Wickliffe, Ohio*, 852 F.3d 497, 503 (6th Cir. 2017).

To start: plaintiffs lack standing with respect to their retrospective request for compensatory damages. (ECF No. 1, PageID.99). Recall that plaintiffs' claim is that the City violated their "right to be free of disease from [a] lack of water . . . ." (ECF No. 1, PageID.81). So to meet the "injury in fact" requirement, plaintiffs must plead that they caught a disease because of a lack of water. But plaintiffs alleged no such thing. In fact, they do not contend that they caught a disease at all. Plaintiffs cannot demand compensation for a harm that has yet to befall them. See *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 865 (6th Cir. 2020) ("[T]he fear of a future harm is not an injury in fact unless the future

11

harm is "certainly impending.") As such, they don't have standing to bring this claim, at least as far as it relates to damages.

Plaintiffs' request for prospective relief fares no better. First, plaintiffs suggest that they are at greater risk of contracting COVID-19 because of the City's policy. (ECF No. 1, PageID.37–47). Yet they also make it clear that the City has reconnected their water since the pandemic began. (*Id.* at PageID.58–73). Also, that the City has no intention of disconnecting it again until the pandemic passes. (*Id.* at PageID.36–37). So there is no way to conclude that their "right to be free of disease from [a] lack of water" is imminently under threat with respect to the coronavirus. They themselves plead that service interruptions will not resume while COVID-19 remains a reality.

Plaintiffs next propose that they are at greater risk of contracting other non-pandemic related diseases because of the City's policy. These include "shigellosis (an acute dysentery); giardiasis (a protozoan infection); and campylobacter (an acute intestinal disease)." (ECF No. 1, PageID.47). However, here too, plaintiffs' pleadings are insufficient. For one, their allegations are not particularized. They discuss the general risk faced by residents living in neighborhoods with higher rates of

12

service interruptions, (*id.*), but not the risk they themselves face. Cf. *Heartwood, Inc. v. Agpaoa*, 628 F.3d 261, 268 (6th Cir. 2010) ("[E]nvironmental plaintiffs seeking to establish standing must identify particular segments of a river, sections and sub-sections of a forest, or passes in a mountain range that they use and will continue to use."). For another, any risk they face is far from concrete. Putting aside that they currently have water service, this is evidenced by the fact that plaintiffs have had their water disconnected in the past without contracting alleged any illness. Plaintiffs are again relying on an impermissible fear-of-future-harm theory. See *Buchholz*, 946 F.3d at 865.

### c. Plaintiffs fail to plead conscience shocking behavior.

Plaintiffs' theory also requires that they allege conduct that "shocks the conscience." *Guertin*, 912 F.3d at 922. Where, as here, the alleged abuse of executive authority has occurred after time for deliberation, only actions demonstrating a "deliberate indifference" to the rights of others "shocks the conscience." *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000). "[D]eliberate indifference" amounts to "subjective recklessness." *In re Flint Water Cases*, 960 F.3d 303, 324 (6th Cir. 2020). "[P]laintiffs must show the government officials 'knew of facts from which

they could infer a substantial risk of serious harm, that they did infer it, and that they acted with indifference toward the individual's rights.'" *Id.*, quoting *Guertin*, 912 F.3d at 926.

However, the Sixth Circuit has previously rejected the idea that "[w]ithholding water on condition of payment for delinquent charges" shocks the conscience. *Detroit*, 841 F.3d at 699. And when the Sixth Circuit decided that case, the "correlation between the lack of water service and the spread of disease," (ECF No. 1, PageID.80), was presumably as strong then as it is now. The only thing different, here, is the COVID-19 pandemic. Therefore, if plaintiffs state a claim to conscience shocking behavior at all, it must be premised on this distinction.

With this in mind, plaintiffs fail to plead that the City acted with the requisite deliberate indifference. In fact, they allege the opposite. They note that they City knew of facts from which they could infer a risk of serious harm due to the coronavirus. (ECF No. 1, PageID.30). In addition, plaintiffs point out that the City did in fact infer it by early March. (*Id.*) Yet rather than argue that the City turned the other way, they instead admit that the City recognized "the importance of

14

handwashing," issued a "moratorium on shutoffs," and announced a "Coronavirus COVID-19 Water Restart Plan, which provided for . . . [the] reconnection of all water service in Detroit during the pandemic." (*Id.*) Plaintiffs further admit that Mayor Duggan stated "no resident of the city of Detroit [should have] their water shut off for lack of funds" while the pandemic lasts. (*Id.*) Surely, this is the very opposite of deliberate indifference.

Plaintiffs may instead be contending that the City did not reconnect their water service with sufficient haste, (*id.* at PageID.33) ("DWSD did not restore water service to Plaintiffs McCorkle and Wilson until late April or early May 2020), and that this "shocks the conscience." But arguing that the City failed to implement its water restart plan with enough speed, is a world away from suggesting that the City was deliberately indifferent. The latter is approaching an intent to harm. See *Schroder v. City of Fort Thomas*, 412 F.3d 724, 730 (6th Cir. 2005). The former is the reality of governing a city of a 142 square miles, with a sizable, dispersed, underserved community.

Lastly, plaintiffs suggest that the City has still not reconnected water to every household in Detroit. (ECF No. 1, PageID.33). The City

urges plaintiffs to identify such households if any do in fact exist.[9] But regardless, this allegation is irrelevant to the current legal issue. The question is whether the City acted with indifference towards *plaintiffs'* rights, not the rights of others. And, again, plaintiffs clearly allege that they have had their water service restored. (*Id.* at PageID.58–73). Plaintiffs thus fail to plead conscience shocking conduct.[10] For this reason and those explained above, the Court should dismiss Count I.

### ii.   Plaintiffs fail to state an equal protection claim.

In Count III, plaintiffs plead that the right to equal protection "includes a prohibition against state actions that punish individuals for non-payment of municipal services without first considering whether the individual had the ability to pay and whether non-payment was willful." In plaintiffs' view, the City's policy "of disconnecting water service to

---

[9] City of Detroit, Press Release, DWSD's Statement in Response to Class Action Lawsuit Regarding Water Shutoffs (Jul. 9, 2020).

[10] Unlike cases involving statutes, plaintiffs cannot bring a substantive due process claim based on executive action by alleging that there is no rational basis. *Guertin*, 912 F.3d at 922. See *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–54 (1998). Even if rational basis applies, plaintiffs' claim still fails. See *infra*, Part VI.A.ii.b.

16

residential account holders . . . constitutes a violation of [this] equal protection guarantee[].” (*Id.* at PageID.89–91.)[11]

The essence of an equal protection claim is class-based discrimination. *Herron v. Harrison*, 203 F.3d 410, 417 (6th Cir. 2000). Normally, this means that a plaintiff must plead that she has been treated differently than others, in like circumstances and under like conditions. *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 682 (6th Cir. 2011). Yet in this case, plaintiffs do not plead disparate treatment. To the contrary, they allege that a facially-neutral policy has been applied evenhandedly, resulting in a disparate impact. (ECF No.1, PageID.91).

Still, this alone does not rule out plaintiffs’ claim entirely. If they also plead facts from which it can be inferred that the City’s policy was motivated by racial animus, their claim may still proceed under *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–68 (1977). However, to do so, plaintiffs must allege more than facts merely consistent with discriminatory “intent as volition or intent as awareness

---

[11] The federal and Michigan Equal Protection Clauses are coextensive and will be analyzed together. *Harville v. State Plumbing & Heating Inc.*, 218 Mich. App. 302, 305 (1996). See also *supra*, note 6.

17

of consequences." *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979). Rather, they must plead allegations consistent with the theory that the City "selected or reaffirmed a particular course of action . . . 'because of,' not merely 'in spite of,' its adverse effects upon" Detroit's African American community. *Id.*

However, plaintiffs' complaint is mostly silent with regard to racial animus. They plead, for example, that defendants have "persisted in the practice of employing water shutoffs as a collection method with full knowledge that many households . . . cannot afford to pay. . . ." (ECF No. 1, PageID.21). Similarly, they allege that "Detroit has a history of disconnecting service to residential . . . customers . . . while failing to disconnect service to commercial and government customers . . . ." (*Id.* at PageID.26.) But these allegations do not link the City's policy with a racially discriminatory intent. And while plaintiffs' complaint contains statements relating to the issue of structural racism more generally, (*id.* at PageID.15–18), this does not show, by any means, that the City acted with the goal of harming African Americans.

That leaves one further possibility: plaintiffs are attempting to state a claim under *Griffin v. Illinois*, 351 U.S. 12 (1956) and its progeny.

18

### a. *Griffin* is limited to situations involving the deprivation of a fundamental liberty interest.

In *Griffin v. Illinois*, the Supreme Court held that the Equal Protection Clause prevents a state from granting appellate review to only those individuals able to afford a trial transcript. 351 U.S. at 19. The Court later extended *Griffin* in *Mayer v. City of Chicago*, 404 U.S. 189, 195–99 (1971) (ruling that *Griffin* applies to indigent defendants looking to appeal custodial and noncustodial convictions alike). And relied on *Griffin* in a series of cases at the intersect of indigence and the criminal justice system, including *Williams v. Illinois*, 399 U.S. 235 (1970) (a state cannot subject a defendant to a period of imprisonment beyond the statutory maximum solely because she is too poor to pay a fine); *Tate v. Short*, 401 U.S. 395 (1971) (a state cannot convert a fine imposed under a fine-only statute into a jail term solely because a defendant is too poor to immediately pay the fine in full); and *Bearden v. Georgia*, 461 U.S. 660 (1983) (a state cannot revoke a defendant's probation for failing to pay a fine and restitution absent evidence that the defendant had the means to pay and chose not to).

However, in *Fowler v. Benson*, the Sixth Circuit recently addressed the applicability of *Griffin* outside of the criminal justice context. There,

19

the question was whether, consistent with the Equal Protection Clause, the Michigan Secretary of State could suspend "an indigent person's driver's license, on the basis of unpaid court debt." 924 F.3d 247, 252, 260 (2019). The *Fowler* plaintiffs contended that this license suspension scheme violated *Griffin*. *Id.* at 260. Yet the Sixth Circuit rejected this argument. It observed that the *Griffin* line of cases involved the nexus between indigence and the types of fundamental liberty interests associated with the criminal justice system, like imprisonment and probation. *Id.* at 260–61. The Sixth Circuit contrasted those interests with protected property interests, such as the one a person may have in a driver's license. It found the distinction critical, and refused to import *Griffin* out of the criminal justice setting. *Id.* at 261–62.

What was true in *Fowler* is true here. This case does not involve a fundamental liberty interest associated with the criminal justice system. Plaintiffs clearly assert that their equal protection claim relates to "a constitutionally protected *property* interest in the continuation of their residential water service." (ECF No. 1, PageID.90) (emphasis added). So while the *Griffin* line of cases does distinguish between those who can and cannot afford to pay a fine or fee, *Fowler* controls and prevents

plaintiffs from relying on that distinction here. See *Sykes v. Anderson*, 625 F.3d 294, 319 (6th Cir. 2010).

Plaintiffs may try to distinguish *Fowler* from the present case. However, it is hard to see how they can. True, there are differences between the suspension of a driver's license and water service. But both could be considered essential. After all, in Michigan, as elsewhere, the right to drive and the right to earn a living are inexorably intertwined. *Fowler*, 924 F.3d at 271 (Donald, J., dissenting).

### b. The City's policy is rationally related to a legitimate public purpose.

Plaintiffs' wealth-based discrimination claim hinges on at most rational basis. *Phillips v. Snyder*, 836 F.3d 707, 719 (6th Cir. 2016); see also *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29 (1973) ("[T]his Court has never heretofore held that wealth discrimination alone provides an adequate basis for invoking strict scrutiny. . . ."). Even at the motion to dismiss stage this represents a heavy burden. *Theile v. Michigan*, 891 F.3d 240, 243 (6th Cir. 2018). The City's policy is presumptively valid. *Walker v. Bain*, 257 F.3d 660, 668 (6th Cir. 2001). Plaintiffs' claim fails if the Court can conceive of any set of facts to

suggest that the policy is rationally related to a legitimate government end. *Theile*, 891 F.3d at 243.

In this case, a set of conceivable facts clearly exists. First, the City has a legitimate interest in maintaining the financial stability of the water system and keeping rates as low as possible. See *Detroit*, 841 F.3d at 700; see also *Mansfield Apartment Owners*, 988 F.2d at 1477 (noting that a municipality has a valid governmental interest in maintaining its financial stability). Plaintiffs do not (and cannot) disagree. Their differences relate more to the means used rather than the ends achieved. (ECF No. 1, PageID.91–92).

But contrary to plaintiffs' position, disconnecting water service for nonpayment does in fact rationally relate to the goals stated above. Service interruptions are one way, and sometimes the only way, to ensure that those who are *capable* of paying do in fact pay. Put differently, the City's policy is designed to prevent widespread delinquencies by those who may otherwise *choose* not to pay. The Detroit Water and Sewerage Department is funded entirely from the revenues it collects from customers, and the system is required to operate on a balanced budget.

22

So uncollected arrearages are folded into future rate increases, resulting in a greater percentage of residents unable to afford water.

That a conceivable set of facts exists stops plaintiffs' claim from proceeding. But there is more to this than the conceivable; the City's policy is based on the real. Every winter, service interruptions are paused to protect against the risk of burst pipes. During that time, the rate of delinquencies dramatically rises, and does not recover until the City starts warning residents that service interruptions will resume in the spring.

Inevitably, the City's policy affects some more than others. That is true of any government policy. That is why the City started its 10-30-50 and WRAP payment plans: to help those individuals most affected, who, in this case, happen to be some of Detroit's lowest-income residents. Plaintiffs disparage these payment plans as inadequate because they do not " index billing to actual household income." (ECF No. 1, PageID.21.) But this critique is not of constitutional significance. And moreover, even if practically possible, their preferred solution is legally impermissible.

As the Sixth Circuit has already concluded: "Michigan law directs municipalities to set water rates at the reasonable cost of providing the

23

service." *Detroit*, 841 F.3d at 700, citing Mich. Comp. Law § 141.121. In other words, municipalities cannot provide customers with water for free. See Mich. Comp. Law § 141.118. And neither can they charge some more while others pay less, as this would create a group subject to an unconstitutional tax under the Michigan Constitution. See *Bolt v. City of Lansing*, 459 Mich. 152, 158 (1998); *Jackson Cty. v. City of Jackson*, 302 Mich. App. 90, 93–112 (2013). So as things stand, the City cannot legally implement plaintiffs' proposal. It would require a change in state law, and a state constitutional amendment. As a result, and for the reasons explained above, the Court should dismiss Count III.

### B. The Court should dismiss plaintiffs' statutory claims.

In Counts IV and V, plaintiffs bring claims of a disparate racial impact under the federal Fair Housing Act (FHA), 42 U.S.C. § 3601 *et seq*., and the analogous Michigan law, Article V of the Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2501 *et seq*. For the following reasons, both should be dismissed.

### i. Plaintiffs fail to state a claim under the Fair Housing Act.

In Count IV, plaintiffs bring a claim under § 3604(b) of the FHA. They plead that the City's "policy of disconnecting water service to

customers for non-payment" discriminates against them "on the basis of race in the terms, conditions, or privileges of the provision of services or facilities of a dwelling . . . ." Plaintiffs base this claim on a disparate impact theory of liability. And although left unstated, this discrimination allegedly occurred post-acquisition—after the initial sale or rental of plaintiffs' properties. (ECF No. 1, PageID.93–94).

### a. Plaintiffs' claim falls outside the scope of § 3604(b).

In relevant part, § 3604(b) is limited to claims involving the "provision of [a] service[]" connected to "the terms, conditions, or privileges" associated with the "sale or rental of a dwelling."[12] The Sixth Circuit has not addressed the exact scope of §3604(b) in this context. However, other circuits have, and their decisions permit post-acquisition claims, as here, to proceed in at most two situations: first, where an owner or tenant are claiming actual or constructive eviction; and second, where the claim is related to a term, condition, or privilege tied to a property's *initial* sale or rental.

---

[12] Section 3604(b) makes it unlawful to "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race . . . ." 42 U.S.C. § 3604(b).

For example, in *Cox v. City of Dallas*, the Fifth Circuit held that a service had to be specifically connected to the sale or rental of a dwelling. 430 F.3d 734, 745 (2005). In doing so, the Fifth Circuit refused to "unmoor[] the 'services' language from the 'sale or rental' language," fearful of turning §3604(b) into a "general anti-discrimination" provision. *Id.* Thus, § 3604(b) did not extend to claims of diminished "habitability," as this lacked the required nexus. *Id.* at 745–76. In the Fifth Circuit's view, § 3604(b) was mostly limited to conduct resulting in actual or constructive eviction, as this implicated a privilege of sale or rental: the right to inhabit. *Id.* at 746–47.

The Seventh Circuit took a similar view in *Bloch v. Frischholz*. There, the Seventh Circuit built on *Cox* and explained that the text of § 3604(b) required the service to be linked to a "term[], condition[], or privilege[]" that accompanied the "sale or rental" of a property. 587 F.3d 771, 780 (2009). The court agreed with *Cox* that the right to inhabit a premises was a "privilege of sale"—making claims of actual or constructive eviction actionable—and also agreed that mere claims of diminished habitability were insufficient. *Id.* at 779. But unlike in *Cox*, the Seventh Circuit took a broader view. It extended the reach of §

26

3604(b) to include any other term, condition, or privilege related to the initial sale or rental of a dwelling. *Id.* at 779-780. For instance, *Bloch* addressed the terms of a owners' association agreement signed by the plaintiffs at the time of purchasing their condo. *Id.*

In this case, plaintiffs' claim falls outside these two situations. Plaintiffs do not allege eviction, constructive or otherwise. And neither do they identify any other term, condition, or privilege relating to the initial sale or rental of their properties. The conduct at issue here is the City's "policy of disconnecting water service to customers for non-payment." (*Id.* at  PageID.93). Plaintiffs do not allege that receiving water service without having to pay for it was guaranteed at the point of initial sale or rental. They plausibly cannot do so.

To be sure, some circuits have used broad language when construing the phrase "provision of [a] service." But a thorough reading of these cases makes it clear that they are in harmony with the Fifth and Seventh Circuits' rulings. *Cf. King v. Order of United Commercial Travelers*, 333 U.S. 153, 157 (1948) (noting laws should in general produce uniform decisions regardless of location).

27

First, in *The Committee Concerning Community Improvement v. City of Modesto*, the Ninth Circuit held that § 3604(b) could encompass a claim relating to the inadequate provision of law-enforcement. 583 F.3d 690, 713–15 (9th Cir. 2009). The court tied this conduct to the privilege of "quiet enjoyment." *Id.* at 713–15. However, even here, the privilege was linked to the *initial* sale or rental. When originally taking up their residences, the *Modesto* plaintiffs expected to receive police protection on a par with other parts of the county in-exchange for tax dollars. *Id.* at 696–99. Plaintiffs, here, cannot point to a similar expectation. When they initially bought or rented their properties, there was no term, condition, or privilege that guaranteed water service regardless of payment.

Next, in *Georgia State Conference of the NAACP v. City of LaGrange*, the Eleventh Circuit held that a claim tied to the provision of water, gas, and electric service could proceed under § 3604(b). 940 F.3d 627, 634 (11th Cir. 2019). But like in *Modesto*, the claim in *Georgia State* was linked to a privilege associated with the *initial* sale or rental. Under a new city policy, the plaintiffs, there, were prevented from having water service if they owed *any* municipal debts, regardless of whether they were current on their water bills. *Id.* at 630–31. Thus, *Georgia State* stands in

28

contrast to the present lawsuit. There, the issue was whether a city could disconnect water supply regardless of payment. Here, the issue is whether the City can disconnect water supply for nonpayment. Superficially, *Georgia State* appears to help plaintiffs. But in reality, it is distinguishable.

In addition to persuasive caselaw, § 3604(b)'s text compels the same construction. By its plain terms, § 3604(b) does not apply to every housing-related service. And the phrase "terms, conditions, or privileges" necessarily requires, at a minimum, some nexus with the initial sale or rental of a property. Otherwise, any encroachment on a person's enjoyment of their residence could be characterized as violating a "privilege" and triggering § 3604(b)'s protections. The word "privilege" would, in effect, swallow the entire provision. Cf. *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995) (stating that courts should avoid rendering words in a statute redundant). Additionally, this interpretation also comports with the FHA's express purpose—fair *access* to housing. See 42 U.S.C. § 3601. It stands to reason that § 3604(b) only extends to such "terms, conditions, or privileges" that existed at the time of that access.

29

Such a reading of § 3604(b) still gives it plenty of teeth in the post-acquisition context. For example, it would prevent the owner of an apartment building from prohibiting African American residents from using the pool, the laundry room, or the in-house dry-cleaning service. For another, it would stop the owner of a rental property from preventing tenants from hosting African American guests for dinner. And when you look at it that way, it is intuitive to think that § 3604(b) was meant to remedy that kind of post-acquisition conduct. But that is not what is going on here, and it is a stretch to believe that § 3604(b) reaches the City's policy.

### b. Disparate impact is not actionable under § 3604(b), and plaintiffs fail to state a claim based on disparate treatment.

In *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, the Supreme Court held that disparate impact claims were actionable under § 3604(a) of the FHA. 135 S. Ct. 2507, 2516–26 (2015). Section 3604(a) reads in relevant part:

> It shall be unlawful . . . [t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable or deny*, a dwelling to any person because of race . . . .

30

42 U.S.C. § 3604 (emphasis added). The Court found that "the phrase 'otherwise make unavailable' [was] of central importance ," as "Congress' use of the phrase . . . refer[ed] to the consequences of an action rather than the actor's intent." 135 S. Ct. at 2518. From this, and after reviewing the text of Title VII and the Age Discrimination in Employment Act— which both included a similar phrase ("otherwise adversely affect") and where previous decisions had recognized disparate impact—the Court articulated its rule: "antidiscrimination laws must be construed to encompass disparate-impact claims when their text refers to the consequences of actions and not just to the mindset of actors." *Id.*

*Inclusive Communities*' reasoning restricts actions brought under § 3604(b) to liability under an intentional discrimination (disparate treatment) theory. In contrast to  § 3604(a), § 3604(b) includes no phrase of "central importance" such as "otherwise make unavailable" or "otherwise adversely affect." Instead, it is limited to prohibiting discrimination based solely on an actor's intent ("because of race"). It thus lacks the "results-orientated language" that would "counsel[] in favor of recognizing disparate-impact liability." 135 S. Ct. at 2518. Unlike § 3604(a), which begins with a prohibition on disparate treatment

31

("because of") before using the term "otherwise" to introduce a catchall phrase focused on consequences ("otherwise make unavailable"), § 3604(b) only includes a prohibition on disparate treatment ("because of"). See *Henry Ford Health Sys. v. Dep't of Health & Human Servs.*, 654 F.3d 660, 666 (6th Cir. 2011) ("A legislature's decision to include a phrase in one section but not in a second . . . may imply that the second section should be read not to include the phrase.").

*Thus, Inclusive Communities* controls and rules out disparate impact liability under § 3604(b). True, prior to *Inclusive Communities*, Sixth Circuit cases permitted disparate impact claims to proceed under § 3604(b). See generally *Graoch Assocs. # 33, L.P. v. Louisville /Jefferson Cty. Metro Human Relations Comm'n*, 508 F.3d 366, 371–74 (6th Cir. 2007). But the Sixth Circuit has always assumed as much and never addressed the issue directly, cf. *Doe v. BlueCross BlueShield of Tennessee, Inc.*, 926 F.3d 235, 242 (6th Cir. 2019) (noting that a court is free to decide an issue if a prior decision has not definitely answered it), nor tackled the textual differences between §3604(a) and § 3604(b).

What is more, post-*Inclusive Communities* caselaw has effectively ruled out the possibility. In *Doe v. BlueCross BlueShield of Tennessee*, the

32

Sixth Circuit held that § 504 of the Rehabilitation Act did not provide for disparate impact liability. 926 F.3d at 241. § 504 states that:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a). The *Doe* court ruled that § 504's language did "not encompass actions taken for nondiscriminatory reasons" (disparate impact). 926 F.3d at 242. In coming to that decision, it relied on comparisons with other anti-discrimination provisions such as Title VII, stating that "when the Court has found that a statue prohibits disparate-impact discrimination, it has relied on language like 'otherwise adversely affect' or 'otherwise make unavailable,' which refers to the consequences of an action rather than the actor's intent." *Id.* In contrast, the Sixth Circuit noted, Title VI, like § 504 (and, importantly, § 3604(b)) includes no such language. It was thus limited in scope to actions based on disparate treatment. *Id.*; *see also Alexander v. Sandoval*, 532 U.S. 275, 278–80 (2001) (holding that it was 'beyond dispute' that a statute banning discrimination 'on the ground of race' prohibited only intentional discrimination').

33

Together, *Inclusive Communities* and *Doe* make it clear that §
3604(b) does not encompass disparate impact liability. Nor is there
anything unusual about recognizing disparate impact under § 3604(a)
but not (b). In fact, claims brought under other FHA sections are already
limited to disparate-treatment theories. For instance, to bring a claim
under § 3617, a plaintiff has to demonstrate "discriminatory animus."
*HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 613 (6th Cir. 2012). And
consistent with *Inclusive Communities* and *Doe*, § 3617, too, contains no
"result-orientated" language. Instead, like § 3604(b), § 3617 starts and
stops with the language of disparate treatment.

As such, plaintiffs § 3604(b) claim can only proceed if resting on
disparate-treatment. However, plaintiffs fail to plead facts consistent
with this theory. Their claim rests on a facially-neutral policy applied
universally, not a policy of treating a class of persons disparately. This
lack of different treatment makes it impossible for plaintiffs to proceed
under intentional discrimination liability. *See Ricci v. DeStefano*, 557
U.S. 557, 577 (2009).

As a final point, plaintiffs fail to plead adequate facts to establish
discriminatory motive. In contrast to disparate impact, where a

defendant acts for a "nondiscriminatory reason but nevertheless disproportionately harms a protected group," *Doe*, 926 F.3d at 241, a plaintiff wishing to bring a disparate-treatment claim must demonstrate racial animus. *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 612 (6th Cir. 2012). But here, plaintiffs' complaint is short on allegations. See *supra*, Part VI.A.ii.

### c. Plaintiffs fail to state a claim based on a disparate impact theory.

In order to bring a disparate impact claim under *Inclusive Communities*, a plaintiff must identify (1) a race-neutral policy that has created "arbitrary, artificial, and unnecessary barriers" to fair housing; and (2) a "robust" causal connection tying the policy to an adverse racial impact. 135 S. Ct. at 2522–25. Step two, in particular, is crucial. A demonstrated "[r]acial imbalance . . . does not, without more" suffice, *id.* at 2523, and "disparate-impact claim[s] that [rely] on a statistical disparity . . . fail if the plaintiff cannot point to a . . . policy . . . *causing* that disparity." *Id.* (emphasis added). For this reason, "a plaintiff who fails to allege facts at the pleading stage or produce statistical evidence

demonstrating [this] causal connection" fails to state a claim. *Id.* at 2523–24.[13]

The Sixth Circuit has not yet addressed the exact contours of this "robust causality requirement." *Id.* at 2523. However, *Inclusive Communities* was not drafting from a blank sheet of paper. Rather, the Court built on years of precedent in the Title VII context where a disparate impact causality requirement is firmly established. Title VII is therefore instructive, as is the case to which *Inclusive Communities* cited, *Wards Cove Packing Company v. Atonio*, 490 U.S. 642 (1988). See *Inclusive Communities*, 135 S. Ct. at 2523 (2015).

In *Wards*, the Court explained that for the purposes of causality in the employment context, the proper comparison is "between the racial composition of [the at-issue jobs] and the racial composition of the qualified ... population in the relevant labor market." 490 U.S. 642, 650-51 (1988). The Court made it clear that comparing the racial composition of the at-issue jobs with that of the workforce in general was flawed. *Id.*

---

[13] Claims under the FHA are ultimately resolved using the *McDonnell Douglas* framework. However, *McDonnell Douglas* is an evidentiary standard. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). At the motion to dismiss stage, plaintiffs need only plead sufficient facts to state a plausible claim. See *supra*, Part V.

at 651. This was because if the absence of minorities was due to a dearth of qualified applicants *for reasons outside of an employer's control*, the relevant employment practices "cannot be said to have had a 'disparate impact' . . . ." *Id.* at 651–52 (emphasis added).

The Sixth Circuit has applied this rule in Title VII cases on countless occasions. *E.g.*, *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005); *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 405–07 (6th Cir. 1999). And those Courts of Appeals to have recently addressed *Inclusive Communities* "robust causality requirement" have applied a similar standard in the FHA context: to establish causation, a plaintiff must demonstrate that the challenged conduct causes a disparity on account of race, not environmental factors outside of a defendant's control. *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 906–09 (5th Cir. 2019); see also *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 425 (4th Cir. 2018) ("[A]dequate safeguards must be implemented at the prima facie stage to avoid hailing defendants into court for racial disparities they did not create . . . ."); *Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo, Fla.*, 759 F. App'x 828, 835–36 (11th Cir. 2018) ("If this citywide comparison demonstrated that

a disproportionate percentage of racial minorities . . . were impacted . . . we would then proceed to consider the causal relation."); *City of Los Angeles v. Bank of Am. Corp.*, 691 F. App'x 464, 465 (9th Cir. 2017) (no causation where evidence only showed that policies affected racial minorities, not that they caused a disparate racial impact).

Not only is this general rule in keeping with Title VII, it is consistent with *Inclusive Communities* and its ruling that defendants cannot be "liable for racial disparities they did not create," and that "[c]ourts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision." 135 S. Ct. at 2523–24. That is what causality (as opposed to mere correlation) mandates.

Even when reading plaintiffs' allegations in a favorable light, they fail to make this "robust" causality showing. Plaintiffs offer ten pages of statistical evidence which they contend demonstrates that Detroit's Black population has potentially suffered from a comparatively higher rate of service interruptions when compared to its non-Black residents. (ECF No. 1, PageID.47–58). However, plaintiffs plead no facts from which it can be inferred that the City's policy caused that alleged disparity on

38

account of race rather than a reason outside the City's control. See *Wards*, 490 U.S. at 651-52. In effect, plaintiffs' complaint offers nothing more than a "[r]acial imbalance," which on its own does not make their case. See *Inclusive Communities*, 135 S.Ct. at 2523.

Under the unique facts, here, it is not clear that plaintiffs can even make the required showing. At the last census, Detroit's population was eighty-four percent African American, the largest in the nation. U.S. Dept. of Commerce, Sonya Rastogi et al., The Black Population, Census Briefs 14 (2010). Plaintiffs recognize that forty percent of Detroit's population is impoverished. (ECF No.1, PageID.48). And they accept that Detroit's impoverished population is mostly comprised of African Americans. (*Id.* at PageID.7). They also acknowledge that many impoverished households struggle to pay their water bills. (*Id.* at PageID.18–19). As such, plaintiffs' claim that the City's policy affects African Americans more than others simply tracks Detroit's socio-economic makeup. Wealth (or lack of it) is the cause giving rise to the pernicious effect.

Importantly, the fact that plaintiffs may not be able to make out causation does not mean that a different rule should apply. "It may . . .

39

be difficult to establish causation because of multiple factors." *Inclusive Communities*, 135 S. Ct. at 2523–24. But that is no reason to ignore its requirement. And although plaintiffs state several times that their evidence "remain[s] statistically significant even when accounting for differences in income," (ECF No. 1, PageID.53–55, 57), they offer nothing to support this naked conclusion.

What this really does is lead back to the case against recognizing disparate impact in this case. If plaintiffs, here, have done enough to demonstrate causality, a government or private defendant could be sued any time a fee is unaffordable for Detroit's lower-income residents. For example, will a disparate impact claim lie against a broadband provider such as Xfinity for adhering to a similar disconnection policy? Again, Detroit's lowest income residents are majority African American. (*Id.* at PageID.7.) So these policies, too, will result in a disparate impact. The Court warned against the FHA becoming "an instrument to force . . . [defendants] to reorder their priorities." *Inclusive Communities*, 135 S. Ct. at 2522,. It was for this reason.

Besides, disparate impact cannot be the right answer here. A disparate impact claim involves a lawful policy carried out for a

40

"nondiscriminatory reason [that] nevertheless disproportionately harm[s] a protected group." *Doe*, 926 F.3d at 241. Given this, how can the City carry out its policy in the future while avoiding a disparate impact lawsuit? Plaintiffs will no doubt say change the policy, but this begs the question; under plaintiffs' theory, the policy itself is lawful. The truth is that the City would have to ensure that an equal number of African American and non-African American households are affected, giving rise to the type of racial quotas that *Inclusive Communities* made clear would lead to "serious constitutional questions." 135 S.Ct. at 2522.[14] For this reason, and those stated above, Count IV should be dismissed.

### ii. Plaintiffs fail to state a claim under the Elliott-Larsen Civil Rights Act.

In Count V, plaintiffs plead that the City of Detroit has violated their rights under Article V of the Elliott-Larsen Civil Rights Act

---

[14] Plaintiffs' claim also fails for a different reason. They fail to explain how defendants' "policy of disconnecting water service to customers for non-payment" has created "arbitrary, artificial, and unnecessary barriers" to fair housing. Plaintiffs do not allege that the policy prevents African Americans from accessing housing, nor that it perpetuates segregation. *Inclusive Communities*, 135 S. Ct. at 2522. They do not even describe the pre-policy racial composition of Detroit's neighborhoods. So it is impossible to infer how housing demographics have been impacted by the policy.

41

(ELCRA). Specifically, plaintiffs bring this claim under § 502(1)(b). Like their FHA claim, plaintiffs allege that the City's "policy of disconnecting water service to customers for non-payment" results in a "disparate impact on Black residents . . . ." (ECF No. 1, PageID.96).[15]

### a. Plaintiffs' claim falls outside the scope of § 502(1)(b).

Article V of the ELCRA is Michigan's FHA analog. Section 502(1)(b) of Article V states as follows:

> A person engaging in a real estate transaction . . . shall not on the basis of . . . race . . . [d]iscriminate against a person in the terms, conditions, or privileges of a real estate transaction or in the furnishing of facilities or services in connection with a real estate transaction.

Mich. Comp. Laws § 37.2502(1)(b). In turn, ELCRA defines a "real estate transaction" as "the sale, exchange, rental, or lease of real property, or an interest therein." § 501(b).[16] The provision of water is not the "sale, exchange, rental, or lease of real property . . . ." So plaintiffs can only

---

[15] Under Michigan Law, statutes of limitations start to accrue as soon as the first tortious act and injury are complete. *Marilyn Froling Revocable Living Tr. v. Bloomfield Hills Country Club*, 283 Mich. App. 264, 290 (2009). Therefore, plaintiffs' class action may run into a limitations problem. The City preserves this issue for a future occasion.

[16] The City is a person within the meaning of Article V. Mich. Comp. Laws § 37.2103(g)

42

proceed under § 502(1)(b) if it is "an interest therein." In other words, the provision of water must be an interest in regard to the "sale, exchange, rental, or lease of real property," see Black's Law Dictionary (11th ed. 2019) ("therein"), as that term is used in the statute. Only then would the City be "[a] person engaging in a real estate transaction," and only then could it possibly be discriminating "against a person . . . in the furnishing of facilities or services in connection with a real estate transaction."

No credible construction can make that leap. Nowhere have those words ever being used to describe the provision of water. Utilities such as gas, electric, and water are a public service (universally subject to a fee), not a property interest. Section 502(1)(b)'s simply does not apply.

### b. § 502(1)(b) should be interpreted in accordance with § 3604(b), and plaintiffs fail to state a claim for the same reasons as explained *supra*, Part VI.B.i.

Assuming that § 502(1)(b) applies to the provision of water, this Court should look to the FHA for guidance on how to interpret it. *Mencer v. Princeton Square Apartments*, 228 F.3d 631, 634 (6th Cir. 2000). With respect to § 502(1)(b), there is little applicable state-level caselaw to rely on. So there is only really, first, the statutory text and, second, analogous federal precedent. See *Garg v. Macomb Cty. Cmty. Mental Health Servs.*,

472 Mich. 263, 283 (2005) ("The persuasiveness of federal precedent can only be considered after the statutory differences between Michigan and federal law have been fully assessed . . . .").

For the same reasons as stated above in the FHA context, plaintiffs' claim fails. First, disparate impact liability is not available under § 502(1)(b). See *supra*, Part VI.B.i.b. The statutory language contains no textual indication that the Legislature intended to impose disparate impact liability on § 502(1)(b) defendants, and no caselaw answers that question to the contrary. Second, even if disparate impact liability is available, plaintiffs plead insufficient facts to demonstrate causation. See *supra*, Part VI.B.i.c. Plaintiffs have alleged a racial disparity. But the cause of any such disparity is not race; it is the racial wealth gap that afflicts too many in Detroit. Yet wealth discrimination is not actionable under the ELCRA.

Finally, if this Court were to let plaintiffs' claim proceed, the same reasoning would permit a future plaintiff to sue a broadband provider (or any other housing-related service provider). See *supra*, Part VI.B.i.c. In fact, that possibility is even more likely under the ELCRA, as unlike § 3604(b) of the FHA which prohibits discrimination in the "provision of

44

services" connected to the "terms, conditions, or privileges of sale or rental of a dwelling," 42 U.S.C. § 3604(b), § 502(1)(b) prohibits discrimination simply in "the furnishing of . . . services in connection with a real estate transaction." So a future plaintiff would not even have to prove that broadband, for example, is a "term[], condition[], or privilege[]" relating to the "sale or rental" of a dwelling. She could simply point to the fact that it is a housing-related service. Cf. *Dep't of Civil Rights v. Beznos Corp.*, 421 Mich. 110, 120 (1984) ("As we have often stated, construction of a statute in a way that would produce absurd and undesirable results should be avoided."). As with the FHA, plaintiffs fail to state a claim.

## VII.   Conclusion and relief requested

For the reasons stated above, the City respectfully requests that the Court dismiss plaintiffs' complaint.

By: /s/ Hallam Stanton
City of Detroit Law Department
Attorney for defendant City of Detroit
Two Woodward Avenue
Detroit, Michigan 48226
(313) 237-5082
stantonh@detroitmi.gov
P82319

Dated: August 27, 2020

**Certificate of Service**

I hereby certify that on August 27, 2020, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to the attorneys of record with the court.

/s/ Hallam Stanton