## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| JACQUELINE TAYLOR, LISA BROOKS, MICHELE COWAN, TUANA HENRY, MATTIE MCCORKLE, RENEE WILSON, and PEOPLE'S WATER BOARD COALITION, on behalf of themselves and all others similarly situated, | Case No. 4:20-cv-11860<br><br>Hon. Linda V. Parker |
| Plaintiffs, | |
| v. | |
| CITY OF DETROIT, a Municipal Corporation, through the Detroit Water and Sewerage Department, its Agent; GOVERNOR GRETCHEN WHITMER, in her official capacity; MAYOR MICHAEL DUGGAN, in his official capacity; and GARY BROWN, in his official capacity. | |
| Defendants. | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS THE CITY OF DETROIT, MAYOR MICHAEL DUGGAN, AND GARY BROWN'S MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................... ii

TABLE OF AUTHORITIES ............................................................ iv

QUESTIONS PRESENTED.............................................................. x

CONTROLLING OR MOST APPROPRIATE AUTHORITIES .................. xi

INTRODUCTION ........................................................................ 1

COUNTER-STATEMENT OF FACTS .............................................. 4

  I.  DETROIT'S WATER AFFORDABILITY CRISIS ............................... 4

  II.  WATER SERVICE RECONNECTIONS DURING THE COVID-19
     PANDEMIC........................................................................ 6

STANDARD OF REVIEW .............................................................. 9

ARGUMENT .............................................................................. 10

  I.  PLAINTIFFS' FAIR HOUSING CLAIMS AGAINST THE CITY OF
     DETROIT ARE SUFFICIENTLY PLEADED ..................................... 10

   A.  Plaintiffs Have Stated a Claim Under the Fair Housing Act ............... 10

     1.  Section 3604(b) of the FHA Covers Post-Acquisition Conduct ........ 10

     2.  Disparate Impact Claims Are Authorized Under Section 3604(b)..... 17

     3.  Plaintiffs Have Pleaded a Prima Facie Case of Disparate Impact
       Discrimination Under the FHA......................................... 20

      a.  *Plaintiffs Have Alleged Facts Challenging Detroit's Water
         Shutoff Policy* ............................................................. 20

      b.  *Plaintiffs Have Alleged Facts Demonstrating the Disparate Impact
         of Detroit's Water Shutoff Policy on Black Residents* ................. 22

c. *Plaintiffs Have Alleged Facts Supporting a Robust Causal Connection Between Detroit's Policy and the Disparate Impact on Black Residents* ............................................................. 25

B.  Plaintiffs Have Stated a Claim Under ELCRA ..................................... 29

1.  Detroit Is Liable for Its Water Shutoff Policy Under ELCRA ........... 29

2.  Plaintiffs Have Sufficiently Pleaded an ELCRA Claim ..................... 30

II.  PLAINTIFFS' CONSTITUTIONAL CLAIMS ARE PROPERLY STATED ............................................................................................... 30

A.  Plaintiffs Have Adequately Pleaded a Substantive Due Process Violation Against the Detroit Defendants ........................................... 30

1.  Defendants' Actions Implicate a Fundamental Right ...................... 30

2.  Plaintiffs Have Sufficiently Pleaded Conscience-Shocking Behavior ........................................................................................ 33

3.  Plaintiffs Have Standing .................................................................... 39

B.  Plaintiffs Have Adequately Pleaded an Equal Protection Claim Against Detroit ................................................................................... 42

1.  *Griffin v. Illinois* Is Applicable to Detroit's Water Shutoff Policy .. 42

2.  The Court Must Evaluate Detroit's Shutoff Policy Under the Strict Scrutiny Standard .................................................................. 45

3.  Detroit's Policy of Disconnecting Customers' Water Service Without Considering Their Indigency Is Irrational .......................... 46

4.  Detroit's Arguments Concerning the Implementation of a Water Affordability Program Are Irrelevant and Not Fatal to Plaintiffs' Claim ................................................................................................ 48

CONCLUSION ............................................................................................... 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Express Travel Related Servs. Co. v. Kentucky*,
 641 F.3d 685 (6th Cir. 2011) ...............................................................33

*Boddie v. Connecticut*,
 401 U.S. 371 (1971)...........................................................................42

*Bolt v. City of Lansing*,
 459 Mich. 152 (1998) .....................................................................48, 49

*In re City of Detroit, Lyda v. City of Detroit*,
 No. 13-53846, 2014 WL 6474081 (Bankr. E.D. Mich. Nov. 19,
 2014) ...............................................................................................34

*In re City of Detroit, Mich.*,
 841 F.3d 684 (6th Cir. 2016) .........................................................34, 35

*Comm. Concerning Cmty. Improvement ("CCCI") v. City of Modesto*,
 583 F.3d 690 (9th Cir. 2009) ....................................................11, 12, 13, 14

*Concerned Tenants Ass'n of Indian Trails Apartments v. Indian Trails Apartments*,
 496 F. Supp. 522 (N.D. Ill. 1980).........................................................12

*County of Cook v. Wells Fargo & Co.*,
 314 F. Supp. 3d 975 (N.D. Ill. 2018)....................................................26

*County of Sacramento v. Lewis*,
 523 U.S. 833 (1998).............................................................................35

*Davis v. City of New York*,
 902 F. Supp. 2d 405 (S.D.N.Y. 2012) ..................................................12

*Directv, Inc. v. Treesh*,
 487 F.3d 471 (6th Cir. 2007) .................................................................9

*Doe v. BlueCross BlueShield of Tennessee*,
 926 F.3d 235 (6th Cir. 2019) ...............................................................19

*Does v. Munoz*,
    507 F.3d 961 (6th Cir. 2007) .............................................................................45

*Ewolski v. City of Brunswick*,
    287 F.3d 492 (6th Cir. 2002) .............................................................................36

*Fair Hous. Ctr. of Metro. Detroit v. Jewish Senior Life of Metro.*
    *Detroit, Inc.*,
    No. 16-cv-10672, 2017 WL 2132073 (E.D. Mich. 2017) .....................29, 34, 35

*In re Flint Water Cases*,
    960 F.3d 303 (6th Cir. 2020) .............................................................................36

*Fofana v. Albence*,
    No. 20-10869, 2020 WL 1873307 (E.D. Mich. Apr. 15, 2020) .........................40

*Fowler v. Benson*,
    924 F.3d 247 (6th Cir. 2019) .....................................................................43, 44

*Georgia State Conf. of the NAACP v. City of LaGrange*,
    940 F.3d 627 (11th Cir. 2019) ...................................................................*passim*

*Georgia State Conf. of the NAACP v. City of LaGrange*,
    No. 3:17-cv-067, 2017 WL 8777467 (N.D. Ga. Dec. 7, 2017) ..........................15

*Golden v. City of Columbus*,
    404 F.3d 950 (6th Cir. 2005) .............................................................................47

*Graoch Assocs. #33 LP v. Louisville/Jefferson Cty. Metro. Human*
    *Relations Comm'n*,
    508 F.3d 366 (6th Cir. 2007) ....................................................................*passim*

*Griffin v. Illinois*,
    351 U.S. 12 (1956) ....................................................................................*passim*

*Guertin v. Michigan*,
    912 F.3d 907 (6th Cir. 2019) ........................................................30, 31, 34, 44

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ...................................................................................16, 41

*Heartwood, Inc. v. Agpaoa*,
    628 F.3d 261 (6th Cir. 2010) .....................................................................41, 42

*Hidden Village, LLC v. City of Lakewood*,
   867 F. Supp. 2d 920 (N.D. Ohio 2012), *aff'd in part, rev'd in part
   on other grounds*, 734 F.3d 519 (6th Cir. 2013)................................12

*Hollis v. Chestnut Bend Homeowners Ass'n*,
   760 F.3d 531 (6th Cir. 2014) ...............................................17

*Horne v. Harbour Portfolio VI, LP*,
   304 F. Supp. 3d 1332 (N.D. Ga. 2018)........................................26, 28

*Johnson v. Bredesen*,
   624 F.3d 742 (6th Cir. 2010) ...............................................45

*Kallstrom v. City of Columbus*,
   136 F.3d 1055 (6th Cir. 1998) ..............................................32

*Kennedy v. City of Zanesville*,
   505 F. Supp. 2d 456 (S.D. Ohio 2007) .......................................10

*Larkin v. Mich. Dep't of Soc. Servs.*,
   89 F.3d 285 (6th Cir. 1996) ................................................21

*Lillard v. Shelby Cty. Bd. of Educ.*,
   76 F.3d 716 (6th Cir. 1996) ................................................34

*Linkletter v. W. & S. Fin. Grp., Inc.*,
   851 F.3d 632 (6th Cir. 2017) ...............................................9

*Lipman v. Budish*,
   No. 19-3914, 2020 WL 5269826 (6th Cir. Sept. 4, 2020)......................31

*Love v. Johnson*,
   146 F.Supp. 3d 848 (E.D. Mich. 2015) .......................................31, 32

*M.L.B. v. S.L.J.*,
   519 U.S. 102 (1996).........................................................43, 44

*Mencer v. Princeton Square Apartments*,
   228 F.3d 631 (6th Cir. 2000) ...............................................29, 30

*Miller v. Countrywide Bank, N.A.*,
   571 F. Supp. 2d 251 (D. Mass. 2008)........................................26

*Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*,
    658 F.3d 375 (3d Cir. 2011) ...............................................................22

*Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*,
    294 F. Supp. 3d 940 (N.D. Cal. 2018) ..............................................25

*Nat'l Fair Hous. All. v. Travelers Indem. Co.*,
    261 F. Supp. 3d 20 (D.D.C. 2017) .....................................................25

*Nishiyama v. Dickson Cty.*,
    814 F.2d 277 (6th Cir. 1987) ..............................................................36

*Pilchen v. City of Auburn*,
    728 F. Supp. 2d 192 (N.D.N.Y. 2010).................................................47

*Prieto Refunjol v. Adducci*,
    No. 2:20-cv-2099, 2020 WL 2487119 (S.D. Ohio May 14, 2020) ...................40

*Reeves v. Rose*,
    108 F. Supp. 2d 720 (E.D. Mich. 2000) .............................................30

*Reyes v. Waples Mobile Home Park Ltd. P'ship*,
    903 F.3d 415 (4th Cir. 2018) ..............................................20, 25, 27

*Salmi v. Sec'y of Health & Human Servs.*,
    774 F.2d 685 (6th Cir. 1985) ..............................................................20

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014).............................................................................41

*Texas Department of Housing and Community Affairs v. Inclusive*
    *Communities Project, Inc.*,
    576 U.S. 519 (2015)....................................................................*passim*

*Trafficante v. Metro. Life Ins. Co.*,
    409 U.S. 205 (1972).............................................................................16

*Troxel v. Granville*,
    530 U.S. 57 (2000)...............................................................................44

*U.S. Dep't of Hous. & Urban Dev. v. Murphy*,
    No. 02-89-0202-1, 1990 WL 456962 (HUDALJ July 13, 1990) ....................12

*U.S. Dep't of Hous. & Urban Dev. v. Paradise Gardens, Section II,
Homeowners Ass'n*,
No. 04-90-0321-1, 1992 WL 406531 (HUDALJ Oct. 15, 1992),
*aff'd*, 8 F.3d 36 (11th Cir. 1993) .........................................................................12

*United Farmworkers of Fla. Hous. Project, Inc. v. City of Delray
Beach*,
493 F.2d 799 (5th Cir. 1974) .............................................................................10

*United States v. Koch*,
352 F. Supp. 2d 970 (D. Neb. 2004) ............................................................16, 17

*United States v. Morgan*,
No. CV 407-125, 2010 WL 11537561 (S.D. Ga. Mar. 30, 2010) ......................13

*Wards Cove Packing Co. v. Atonio*,
490 U.S. 642 (1988) ...........................................................................................22

## Statutes

42 U.S.C. § 3601 *et seq.*(Fair Housing Act) .....................................................*passim*

42 U.S.C. § 3604(a) ............................................................................11, 13, 17, 18

42 U.S.C. § 3604(b) ..........................................................................................*passim*

42 U.S.C. § 3605 ...............................................................................................18, 19

42 U.S.C. § 3615 ......................................................................................................21

Md. Code art. 24, § 2-6 to § 2-15 (2019) ...............................................................48

Mich. Comp. Laws Ann. § 37.2502 (Elliott-Larsen Civil Rights Act) ...........*passim*

Mich. Comp. Laws Ann. § 37.2502(1)(b) ...............................................................29

Mich. Comp. Laws Ann. § 722.622(k)(i) ...............................................................44

Mich. Comp. Laws Ann. § 750.383(a) ...................................................................38

## Other Authorities

24 C.F.R. § 100.500 ................................................................................................19

*Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15, 2013) ..................................................19

Mich. Exec. Order 2020-144 (July 8, 2020), https://www.legislature.mi.gov/documents/2019-2020/executiveorder/pdf/2020-EO-144.pdf. EO 2020-144 ................................8

Mich. Exec. Order 2020-28 (COVID-19) (Mar. 28, 2020), http://www.legislature.mi.gov/documents/2019-2020/executiveorder/pdf/2020-EO-28.pdf..........................................................7

Rigel C. Oliveri, *Is Acquisition Everything? Protecting the Rights of Occupants Under the Fair Housing Act*, 43 Harv. C.R.-C.L. L. Rev. 1 (2008) ...................................................................11

Robert G. Schwemm, *Housing Discrimination Law and Litigation* § 10:4 (July 2020) ...................................................19

Sharmila L. Murthy, *A New Constitutive Commitment to Water*, 36 B.C. J.L. & Soc. Just. 159 (2016) ........................................................49

## QUESTIONS PRESENTED

(1) Whether Plaintiffs have properly stated their fair housing claims against Defendant the City of Detroit in their Complaint.

    (a) Whether Plaintiffs have properly alleged that Defendant the City of Detroit's water shutoff policy violates the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, because it has a disproportionate and unjustified impact on Black residents.

    (b) Whether Plaintiffs have properly alleged that Defendant the City of Detroit's water shutoff policy violates the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws Ann. § 37.2502, because it has a disproportionate and unjustified impact on Black residents.

(2) Whether Plaintiffs have properly stated their constitutional claims in their Complaint.

    (a) Whether Plaintiffs have properly alleged that Defendants the City of Detroit, Mayor Michael Duggan, and Gary Brown have violated their right to bodily integrity in violation of the Due Process Clause of the 14th Amendment to the U.S. Constitution and the Michigan Constitution of 1963 by exhibiting deliberate indifference to the known risks of living without water service that could, did, and will cause harm to Plaintiffs.

    (b) Whether Plaintiffs have properly alleged that Defendant the City of Detroit has violated the equal protection guarantees of the 14th Amendment and the Michigan Constitution of 1963 by disconnecting their water service without first determining whether they had the ability to pay.

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

*Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015)

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)

*M.L.B. v. S.L.J.*, 519 U.S. 102 (1996)

*Griffin v. Illinois*, 351 U.S. 12 (1956)

*Robinson v. Long*, 814 F. App'x 991 (6th Cir. 2020)

*Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019)

*Fowler v. Benson*, 924 F.3d 247 (6th Cir. 2019)

*Johnson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010)

*Does v. Munoz*, 507 F.3d 961 (6th Cir. 2007)

*Graoch Assoc. #33 LP v. Louisville/Jefferson Cty. Metro. Human Relations Comm'n*, 508 F.3d 366 (6th Cir. 2007)

*Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998)

*Georgia State Conf. of the NAACP v. City of LaGrange*, 940 F.3d 627 (11th Cir. 2019)

*Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415 (4th Cir. 2018)

*Committee Concerning Community Improvement v. City of Modesto*, 583 F.3d 690 (9th Cir. 2009)

*Fofana v. Albence*, No. 20-10869, 2020 WL 1873307 (E.D. Mich. Apr. 15, 2020)

*Love v. Johnson*, 146 F. Supp. 3d 848 (E.D. Mich. 2015)

*Prieto Refunjol v. Adducci*, No. 2:20-cv-2099, 2020 WL 2487119 (S.D. Ohio May 14, 2020)

## INTRODUCTION

Plaintiffs file this brief in opposition to Defendants the City of Detroit ("Detroit" or "the City"), Mayor Michael Duggan, and Gary Brown's (collectively, the "Detroit Defendants") Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion to Dismiss") and supporting brief ("Defs' Br."). The Court should deny the Detroit Defendants' Motion to Dismiss.

Through this lawsuit, Plaintiffs challenge the Detroit Defendants' water shutoff policy under three causes of action. First, Plaintiffs allege that Detroit's water shutoff policy violates the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA"), and the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws Ann. § 37.2502 ("ELCRA"), because it has a disproportionate and unjustified impact on Black residents. Second, Plaintiffs allege that the Detroit Defendants have violated their bodily integrity in violation of the Due Process Clause of the 14th Amendment to the U.S. Constitution and the Michigan Constitution of 1963 by exhibiting deliberate indifference to the known risks of living without water service that could, did, and will cause harm to Plaintiffs. Third, Plaintiffs allege that Detroit has violated the equal protection guarantees of the 14th Amendment to the U.S. Constitution and the Michigan Constitution of 1963 by disconnecting their water service without first determining whether they had the ability to pay. Plaintiffs' claims are all properly stated in their Class Action Complaint ("Compl.").

1

Detroit contends that Plaintiffs fail to state a claim under the FHA because (1) the statute does not apply to actions that occur after the initial sale or rental of housing, (2) disparate impact claims are not authorized under the relevant provision of the FHA, and (3) Plaintiffs have failed to show a robust causal connection between Detroit's water shutoff policy and the resulting disparities. Defs' Br. at 25-41.

These arguments must be rejected. Plaintiffs' FHA claim is brought under 42 U.S.C. § 3604(b) ("Section 3604(b)"), which prohibits discrimination in municipal services, including water, on the basis of race. Numerous courts have held that claims arising after the initial sale or rental of housing are cognizable under Section 3604(b), particularly because most municipal services—including water—are associated with continued occupancy, rather than the initial sale or rental of a home; the statutory provision has no temporal limitation; and the FHA is intended to be interpreted broadly. Additionally, disparate impact claims are permitted under Section 3604(b) in accordance with Supreme Court and Sixth Circuit precedent. Plaintiffs have properly pleaded a disparate impact claim under the FHA, including the required element of robust causality. Plaintiffs allege that Detroit's water shutoff policy causes a disparate impact on Black residents and have demonstrated in their Complaint the disproportionate impact of the policy on Black residents.

The City also argues that Plaintiffs have not properly stated a claim under ELCRA. Defs' Br. at 41-45. ELCRA must be interpreted the same way as the FHA and Plaintiffs have properly stated a claim under the statute.

With respect to their bodily integrity claim, the Detroit Defendants contend that Plaintiffs have failed to state a claim because (1) Plaintiffs have not properly pleaded a fundamental right at issue, (2) the Detroit Defendants' actions do not shock the conscience, and (3) Plaintiffs lack standing. Defs' Br. at 6-16.

These arguments have no merit. First, Plaintiffs have adequately pleaded facts alleging that the well-established fundamental right to preserve their bodily integrity has been violated by the Detroit Defendants' water shutoff policy, which creates a heightened risk of infectious disease. Plaintiffs have also properly pleaded that the Detroit Defendants' actions—which span decades, far before the current pandemic—shock the conscience and reflect deliberate indifference to the threat to Plaintiffs' bodily integrity. Plaintiffs have standing to raise their bodily integrity claim, as they are not required to plead that they have been infected by COVID-19 or other infectious diseases in order to protect their constitutional rights. They also have standing given the risk of infection that they face once shutoffs resume.

Finally, Detroit argues that Plaintiffs fail to state a claim under the Equal Protection Clauses of the U.S. and Michigan Constitutions because this case merely involves property rights, so the heightened scrutiny established by *Griffin v. Illinois*,

351 U.S. 12 (1956), for wealth-based restrictions governing certain fundamental rights is inapplicable, and the disputed policy is rationally related to a legitimate government interest. Defs' Br. at 16-24. This argument must be rejected because this case involves more than property rights: access to water is necessary for bodily integrity and, under Michigan law, directly implicates parental rights as well. *Griffin* is therefore applicable to the present case. As a result, this Court should apply a heightened standard in reviewing the constitutionality of Detroit's water shutoff policy. Detroit cannot meet this standard as its policy of disconnecting water service without first considering whether a customer is genuinely unable to pay is not narrowly tailored and serves no compelling government interest. Moreover, Detroit's water shutoff policy fails even under rational basis review, as it is irrational to disconnect water service to customers who truly cannot afford their water bills.

## COUNTER-STATEMENT OF FACTS[1]

### I.    DETROIT'S WATER AFFORDABILITY CRISIS

Detroit has had a water affordability crisis for decades. Compl. ¶ 2. Low-income Detroit residents pay an average of 10% of their household incomes on water (and some pay much more), even though water is generally considered "affordable" when families spend no more than 2% to 2.5% of their median household incomes

---

[1] These facts are adapted from Plaintiffs' well-pleaded Complaint, which must be taken as true at the motion to dismiss stage.

for such service. *Id.*; *see also id.* ¶ 45. As a result, many families in Detroit struggle to pay their water bills. *Id.* ¶¶ 2, 45, 172-74.

The Detroit Water and Sewerage Department ("DWSD") currently offers two water assistance plans, the "10-30-50" program and the Water Residential Assistance Program ("WRAP"), both of which have proven to be ineffective in addressing the chronic lack of access to water for low-income customers. *Id.* ¶¶ 46, 49. For example, the 10-30-50 program requires customers to make a down payment of up to 50% of the past due balance prior to enrolling. *Id.* ¶ 47. In addition, WRAP provides qualifying customers who are at or below 150% of the federal poverty threshold with a $25 monthly credit toward current bills with any past-due or arrearages frozen for 12 months. *Id.* ¶ 48. Customers are eligible to receive a credit toward their past-due bill of up to $700 if they successfully make their payments for a year. *Id.* Customers must, however, pay the full amount of any future bills. *Id.*

When residential customers' water bills go unpaid, DWSD disconnects their service, without first determining if they have the ability to pay. *Id.* ¶¶ 3, 62. Between 2014 and 2019, more than 141,000 households in Detroit had their water service disconnected for non-payment. *Id.* ¶¶ 4, 63. Some families live for years without water service in their homes after a disconnection by DWSD. *Id.* Others are trapped in a cycle of water insecurity with repeated disconnections and reconnections. *Id.*

These water insecure families risk losing service at any time because of their inability to pay DWSD's rates. *Id.*

Families without water service in their homes are susceptible to infection. *Id.* ¶ 6. Through the years, Detroit's water shutoff policy has resulted in outbreaks of various forms of infectious diseases, including shigellosis, giardiasis, and campylobacter. *Id.* ¶ 105. Detroit's policy has also resulted in threats to the health of affected families resulting from, among other things, the inability of people with diabetes to prepare medically necessary meals, the inability of parents to prepare infant formula, and dehydration. *Id.* ¶ 6. Several Plaintiffs have medical conditions impacted by the lack of running water in their homes. *Id.* ¶¶ 6, 135, 160. Detroit's water shutoff policy has created a public health emergency that has been deliberately ignored by the Detroit Defendants, notwithstanding repeated, consistent demands for remedial action by affected communities and their advocates. *Id.* ¶¶ 3, 6-8, 231.

## II.   WATER SERVICE RECONNECTIONS DURING THE COVID-19 PANDEMIC

On March 10, 2020, Michigan confirmed its first two cases of COVID-19. *Id.* ¶ 76. The day before, recognizing "the importance of handwashing," Defendant Governor Whitmer and Defendant Duggan proclaimed that "no resident of the city of Detroit [should have] their water shut off for lack of funds." *Id.* ¶ 75. To that end, Governor Whitmer and Mayor Duggan announced the Water Restart Plan, which provided for a moratorium on shutoffs and, purportedly, reconnection of all water

service in Detroit during the pandemic. *Id*. On March 28, 2020, Defendant Whitmer issued Executive Order ("EO") 2020-28, which required public water supplies to restore water service to all occupied residences where such service had been terminated due to non-payment. *Id.* ¶ 77.

EO 2020-28 required public water supplies to submit a report to the State Emergency Operations Center by April 12, 2020 regarding access to water in their service areas. *Id*. It specified that the report must include: (1) an account of the efforts made to determine which occupied residences within the public water supply's service area do not have water service; (2) the number of occupied residences within the public water supply's service area that do not have water service as a result of a shutoff due to non-payment; (3) the number of occupied residences within the water supply's service area that do not have water service for reasons other than non-payment; and (4) a certification about the efforts expended to restore water service to occupied residences.[2] DWSD submitted its initial report on April 10, 2020. *Id.* ¶ 78. The order further specified that if a public water supply submits a report that does not meet these requirements, it must submit a supplemental report every 30 days until it submits a report meeting all requirements.[3]

---

[2]  Mich. Exec. Order 2020-28 (COVID-19), at 2 (Mar. 28, 2020), http://www.legislature.mi.gov/documents/2019-2020/executiveorder/pdf/2020-EO-28.pdf.
[3] *Id.*

On July 8, 2020, Defendant Whitmer rescinded EO 2020-28 and replaced it with EO 2020-144, which requires the restoration of water service to customers who have been disconnected for non-payment until December 31, 2020. *Id.* ¶ 84. EO 2020-144 specifies that it does not relieve a customer of the obligation to pay for water, prevent a public water supply from charging any customer for water service, or reduce the amount a resident may owe to a public water supply. *Id.* Like EO 2020-28, it requires public water supplies to continue to submit reports every 30 days if they have not met the requirements as described in the order.[4] Pursuant to EOs 2020-28 and 2020-144, DWSD has submitted monthly reports to the State.[5] Plaintiffs allege that the Detroit Defendants have failed to comply with both orders and that some families in Detroit still lack water service, while the pandemic continues to threaten the health of residents. *Id.* ¶¶16, 82, 218, 237.

In April 2020, Defendant Duggan announced plans to resume water shutoffs for customers who cannot keep up with their bill payments after the coronavirus crisis has passed. *Id.* ¶¶ 16, 92, 219. Plaintiffs allege that shutoffs will resume in Detroit when the immediate threat of the pandemic has passed, *id.* ¶¶ 240, 270, 275,

---

[4]     Mich. Exec. Order 2020-144 (July 8, 2020), https://www.legislature.mi.gov/documents/2019-2020/executiveorder/pdf/2020-EO-144.pdf. EO 2020-144 sets forth the same reporting requirements as EO 2020-28. *Id.* at 3.

[5] *See* Exhibits 2 to 5 to Brief in Support of Defendant Gretchen Whitmer's Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (ECF Nos. 17-3 to 17-6).

285, which could occur as early as January 2021 when EO 2020-144 expires. In other words, Plaintiffs believe that the City will resume shutoffs when it is not barred from doing so by the Governor, even if the threat of COVID-19 has not been fully eradicated. Detroit's impending resumption of water shutoffs will exacerbate a public health emergency in the city. *Id.* ¶ 3. Further, all named Plaintiffs are at immediate risk of losing their water service once shutoffs resume. *Id.* ¶¶ 133, 144, 155, 165, 178, 187.

## STANDARD OF REVIEW

In evaluating a motion to dismiss, the court must construe the complaint in the light most favorable to the plaintiff, accept its factual allegations as true, and draw reasonable inferences in favor of the plaintiff. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). A plaintiff is only required to plead sufficient facts to state a claim to relief that is plausible on its face. *Linkletter v. W. & S. Fin. Grp., Inc.*, 851 F.3d 632, 637 (6th Cir. 2017) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A plausible claim 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Defendants bear the burden of proving a complaint fails to state a claim as a matter of law. *Directv*, 487 F.3d at 476.

# ARGUMENT

## I.  PLAINTIFFS' FAIR HOUSING CLAIMS AGAINST THE CITY OF DETROIT ARE SUFFICIENTLY PLEADED.

### A.  Plaintiffs Have Stated a Claim Under the Fair Housing Act.

#### 1.  Section 3604(b) of the FHA Covers Post-Acquisition Conduct.

Plaintiffs allege that Detroit's policy of disconnecting residents' water service for non-payment violates the FHA because it has a disparate impact on the City's Black residents. Compl. ¶¶ 22, 269. Enacted more than 50 years ago, the FHA broadly prohibits housing discrimination of all types on the basis of race and other protected categories. 42 U.S.C. §§ 3601-3631. Plaintiffs' claim is brought under Section 3604(b) of the statute, which bars discrimination in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith" because of membership in a protected class. 42 U.S.C. § 3604(b). Section 3604(b) protects current housing residents (and individuals acquiring housing) from racial discrimination in the provision of municipal services related to housing, such as water. *See, e.g.*, *Georgia State Conf. of the NAACP v. City of LaGrange*, 940 F.3d 627, 634 (11th Cir. 2019) (municipal water services are covered by Section 3604(b)); *Kennedy v. City of Zanesville*, 505 F. Supp. 2d 456, 499 (S.D. Ohio 2007) (the FHA "clearly" covers discrimination in the "procurement of water, a vital resource"); *United Farmworkers of Fla. Hous. Project, Inc. v. City*

*of Delray Beach*, 493 F.2d 799, 808 (5th Cir. 1974) (city's refusal to allow a proposed low-income housing development to connect to municipal water and sewer lines established a prima facie case of discrimination under the FHA). Unlike 42 U.S.C. § 3604(a) ("Section 3604(a)"), the provision of the FHA prohibiting practices that "otherwise make unavailable or deny" a dwelling to any person on the basis of race or other protected characteristic, Section 3604(b) does not require a plaintiff to show that they have been actually or constructively evicted from their home. *See, e.g.*, *Comm. Concerning Cmty. Improvement* ("*CCCI*") *v. City of Modesto*, 583 F.3d 690, 714 (9th Cir. 2009) (Section 3604(b) does not require a showing of eviction); Rigel C. Oliveri, *Is Acquisition Everything? Protecting the Rights of Occupants Under the Fair Housing Act*, 43 Harv. C.R.-C.L. L. Rev. 1, 24 (2008) (constructive eviction is not the foundation for most Section 3604(b) claims).

Nonetheless, Detroit contends that Plaintiffs' claim falls outside the scope of Section 3604(b) because the provision does not cover "post-acquisition" conduct, meaning practices that transpire once a home is acquired or occupied. Defs' Br. at 25-30. Detroit argues that courts have allowed claims under Section 3604(b) only when a plaintiff alleges that they have been actually or constructively evicted from their home or when their claim is tied to the initial sale or rental of the property. *Id.*

Detroit misconstrues the applicable case law on post-acquisition conduct under Section 3604(b) of the FHA. While the City is correct that the Sixth Circuit

has not explicitly weighed in on this issue, numerous courts have held that Section 3604(b) covers post-acquisition conduct not tied to the initial sale or rental of a home, even when the plaintiff does not allege actual or constructive eviction.[6] *See, e.g.*, *LaGrange*, 940 F.3d at 631-32; *CCCI*, 583 F.3d at 713; *Hidden Village, LLC v. City of Lakewood*, 867 F. Supp. 2d 920, 938-39 (N.D. Ohio 2012) (agreeing with expansive reading of Section 3604(b) to encompass post-acquisition claims in case involving police services), *aff'd in part, rev'd in part on other grounds*, 734 F.3d 519 (6th Cir. 2013); *Davis v. City of New York*, 902 F. Supp. 2d 405, 436 (S.D.N.Y. 2012) (finding that Section 3604(b) prohibits post- and pre-acquisition discrimination in the provision of housing-related services in case challenging police department's stop and frisk practices in public housing); *Concerned Tenants Ass'n of Indian Trails Apartments v. Indian Trails Apartments*, 496 F. Supp. 522, 525 (N.D. Ill. 1980) (in case challenging services and facilities available to existing tenants, rejecting the defendant apartment complex's "tortured interpretation" that

---

[6] Additionally, the U.S. Department of Housing and Urban Development ("HUD"), has repeatedly taken the position that Section 3604(b) applies to post-acquisition conduct in its enforcement actions. *See, e.g.*, *U.S. Dep't of Hous. & Urban Dev. v. Paradise Gardens, Section II, Homeowners Ass'n*, No. 04-90-0321-1, 1992 WL 406531, at *10 (HUDALJ Oct. 15, 1992), *aff'd*, 8 F.3d 36 (11th Cir. 1993); *U.S. Dep't of Hous. & Urban Dev. v. Murphy*, No. 02-89-0202-1, 1990 WL 456962, at *43 (HUDALJ July 13, 1990). Courts have repeatedly deferred to HUD's interpretation of Section 3604(b) to include post-acquisition conduct. *See, e.g.*, *CCCI*, 583 F.3d at 713-714 (noting that HUD's regulations support permitting post-acquisition claims under Section 3604(b)).

Section 3604(b) applies only to activities related to the availability of housing, finding it "ludicrous" and "counter to the plain and unequivocal language of the statute"); *United States v. Morgan*, No. CV 407-125, 2010 WL 11537561, at *4 (S.D. Ga. Mar. 30, 2010) (recognizing post-acquisition claim).[7] Additionally, the Sixth Circuit has at least impliedly agreed that post-acquisition claims are authorized under Section 3604(b). *Graoch Assocs. #33 LP v. Louisville/Jefferson Cty. Metro. Human Relations Comm'n*, 508 F.3d 366, 371-73 (6th Cir. 2007) (in case involving existing tenants, rejecting a categorical rule that Section 3604(b) does not allow challenges to a defendant's withdrawal from the federal Section 8 rent assistance program).

Detroit attempts to distinguish two key appellate decisions authorizing post-acquisition claims under Section 3604(b), *CCCI*, 583 F.3d 690, and *LaGrange*, 940 F.3d 627, asserting that both cases involved claims tied to the initial sale or rental of a home, rather than post-acquisition conduct. Defs' Br. at 28-29. But the City fails to read these cases properly: both involved claims by existing residents, which is why whether Section 3604(b) covered the plaintiffs' claims was even at issue.

In *CCCI*, existing residents of a predominantly Latinx neighborhood just outside the City of Modesto filed a lawsuit under Section 3604(b), alleging that the

---

[7] In *Morgan*, the court distinguished between the plaintiffs' FHA claim under Section 3604(a), which involved constructive eviction, and their claim under Section 3604(b), which did not. 2010 WL 11537561, at *3-4.

city and county had failed to provide them with adequate municipal services, including sewer access and police services. 583 F.3d at 696-98. There is nothing to indicate that the residents' claims were tied to the initial sale or rental of their property; in fact, it is clear that the issues the plaintiffs experienced spanned many years. *Id.* at 707 (detailing the long history of the provision of sewer services in the neighborhood over a period of years); *id.* at 707-08 (describing law enforcement response times between 2002 and 2006). In fact, the plaintiffs' case was dismissed because the district court determined that Section 3604(b) does not permit claims by existing homeowners or renters. *Id.* at 711.

The Ninth Circuit reversed the lower court's ruling, holding that post-acquisition claims not tied to the initial sale or rental of a dwelling are permitted under Section 3604(b). *Id.* at 713. In so ruling, the court relied on the plain text of the statutory provision, reasoning that "[t]here are few 'services or facilities' provided at the moment of sale, but there are many 'services or facilities' provided to the dwelling associated with the occupancy of the dwelling." *Id.* The court also made clear that a showing of actual or constructive eviction is not required for the FHA to reach post-acquisition conduct: "limiting the FHA to claims brought at the point of acquisition would limit the act from reaching a whole host of situations that, *while perhaps not amounting to constructive eviction*, would constitute discrimination in the enjoyment of residence in a dwelling or in the provision of

14

services associated with that dwelling." *Id.* at 714 (emphasis added). Detroit is simply wrong that the Ninth Circuit's ruling in *CCCI* supports their position.

The Eleventh Circuit's ruling in *LaGrange* also strongly weighs in Plaintiffs' favor. In that case, the plaintiffs challenged the City of LaGrange's utility policy, which required both new applicants and existing customers to pay all debts they owed to the city to either initiate or maintain utilities, including water. 940 F.3d at 630-31. Pursuant to the policy, new customers could not obtain utility services without first satisfying outstanding municipal debts, and current utility customers who owed an unpaid debt to the city could have their services disconnected without advance notice. *Id.* at 630. The district court dismissed plaintiffs' Section 3604(b) claim, holding that a "proper reading" of that provision extends it only to conduct occurring at the time of acquisition. *Georgia State Conf. of the NAACP v. City of LaGrange*, No. 3:17-cv-067, 2017 WL 8777467, at *2-3 (N.D. Ga. Dec. 7, 2017) (noting that only one plaintiff alleged discriminatory conduct before acquisition).

The Eleventh Circuit reversed the district court's ruling, holding that a current owner or renter can bring a claim for discriminatory conduct related to the provision of services (including water) for a dwelling. *LaGrange*, 940 F.3d at 632-33. The court found that Section 3604(b) must be interpreted broadly and has no language limiting its application to discriminatory conduct that occurs prior to or at the moment of the sale or rental. *Id.* at 631-32. The court refused to "read an otherwise

15

absent temporal limitation" into the language of this statutory provision. *Id.* at 632. Accordingly, the court determined that Section 3604(b) may encompass claims by current owners or renters. *Id.*

These court holdings, finding that Section 3604(b) applies to post-acquisition municipal services that do not result in actual or constructive eviction, are consistent with the broad remedial purposes of the FHA. Detroit errs in contending that the FHA's express purpose is only "fair *access* to housing." Defs' Br. at 29 (emphasis in original). The United States Supreme Court has recognized that the FHA's terms are "broad and inclusive" and must be subjected to "generous construction." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209, 212 (1972); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982). Far from being concerned only with the acquisition of housing, Congress sought to create "truly integrated and balanced living patterns" and ameliorate the effects of discrimination on the "whole community" through passage of the statute. *Trafficante*, 409 U.S. at 211 (quoting 114 Cong. Rec. 2706, 3422); *see also United States v. Koch*, 352 F. Supp. 2d 970, 978 (D. Neb. 2004) ("[A] broad interpretation of the FHA that encompasses post-possession acts of discrimination is consistent with the Act's language, its legislative history, and the policy to 'provide . . . for fair housing throughout the United States.'"). As the court in *Koch* recognized, by enacting the FHA, "Congress was 'committed to the principle of living together,' and sought to promote integrated

16

neighborhoods where residents of different races would live together in 'harmony.'" 352 F. Supp. 2d at 978 (quoting 114 Cong. Rec. 2275-76, 2279). In order to fulfill the broad goals of the FHA, Section 3604(b) must be interpreted to cover the discriminatory provision of municipal services to existing residents. Accordingly, Section 3604(b) applies to Detroit's water shutoff policy.

### 2.     Disparate Impact Claims Are Authorized Under Section 3604(b).

Detroit also attempts to evade liability by contending that disparate impact claims are not authorized under Section 3604(b).[8] Defs' Br. at 30-34. This is incorrect. Under binding Sixth Circuit law, a plaintiff may challenge facially neutral policies that have a discriminatory effect on members of a protected class under Section 3604(b). *Graoch*, 508 F.3d at 371-74; *see also Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 537 (6th Cir. 2014) (acknowledging disparate impact claims can be brought under Sections 3604(a) or (b)).

Detroit contends that the Supreme Court's decision in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015), "rules out" disparate impact liability under Section 3604(b) and suggests that the Court's decision overruled *Graoch*. Defs' Br. at 32. This is wrong. In its

---

[8] Detroit also argues that Plaintiffs have failed to state a claim for discrimination under the FHA under a disparate treatment theory of liability. Defs' Br. at 34-35. Plaintiffs do not allege a disparate treatment claim.

*Inclusive Communities* decision, the Court unequivocally reaffirmed that the FHA permits claims challenging government policies that have an unjustified disparate impact on people of color, without any showing of intentional discrimination. 576 U.S. at 545-46. In its decision, the Court made clear that recognizing disparate impact claims is consistent with the FHA's central purpose in providing a national policy against housing discrimination. *Id.* at 539. This broad ruling extends to Section 3604(b).

At issue in *Inclusive Communities* was Texas's allocation of low-income housing tax credits, which the plaintiff alleged had a disparate impact on Black residents in violation of Section 3604(a) and 42 U.S.C. § 3605 ("Section 3605") of the FHA. 576 U.S. at 533-34. The plaintiff did not bring a Section 3604(b) claim, and the Court therefore did not address this provision in its ruling. Detroit is correct that the Court found the "otherwise make unavailable" language of 3604(a) (a phrase not included in Section 3604(b)) was compelling support for recognizing impact claims under that provision, as the Court noted that the phrase "refers to the consequences of an action rather than the actor's intent." *Id.* at 534. But the Court's analysis did not stop there. It also found that disparate impact claims are cognizable under Section 3605, which prohibits discrimination in real estate-related transactions, because of the provision's inclusion of the word "discriminate." *Id.* at 534 (citing *Bd. of Educ. of City Sch. Dist. of New York v. Harris*, 444 U.S. 130, 140-

18

41 (1979), which held that the term "discriminate" encompassed disparate impact liability in the context of a statute's text, history, purpose, and structure). Section 3604(b) also contains this word, and thus the Court's ruling as to Section 3605 equally applies to this provision.[9] *See* Robert G. Schwemm, *Housing Discrimination Law and Litigation* § 10:4 (July 2020) (disparate impact claims cognizable under Section 3604(b) because it has the word "discriminate" like Section 3605). Indeed, since the *Inclusive Communities* decision, *no* court has found that Section 3604(b) prohibits disparate impact claims.[10]

---

[9] Detroit asserts that the Sixth Circuit's recent decision in *Doe v. BlueCross BlueShield of Tennessee*, 926 F.3d 235 (6th Cir. 2019), supports its argument that a statutory provision must have the "otherwise make unavailable" language in order for disparate impact claims to be cognizable. Defs' Br. at 32-33. Detroit is incorrect. At issue in *Doe* was whether a plaintiff may bring a disparate impact claim under the Affordable Care Act, not the FHA. 926 F.3d at 238. In determining that such claims are not authorized, the Sixth Circuit did refer to the "otherwise make unavailable" language as one way that courts have authorized impact claims under various statutes. *Id.* at 242. But that phrasing is not the *sole* determinant as to whether a statute permits claims of disparate impact, and the Court's decision in *Inclusive Communities*, finding that Section 3605 allows impact claims because of the word "discriminate," controls here with respect to Plaintiffs' claim under Section 3604(b).
[10] HUD's disparate impact regulation, promulgated in 2013, further makes clear that Section 3604(b) permits disparate impact claims due to its inclusion of the word "discriminate." 24 C.F.R. § 100.500. HUD's commentary to the regulation notes that the word "discriminate" may encompass actions that have a discriminatory effect and that the FHA's provisions using this term (including Section 3604(b)) must be interpreted to authorize impact claims. *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460, 11466 (Feb. 15, 2013).

*Graoch* remains good law[11] and Plaintiffs may allege a claim of disparate impact under Section 3604(b). Detroit's argument must be rejected.

### 3. Plaintiffs Have Pleaded a Prima Facie Case of Disparate Impact Discrimination Under the FHA.

At the pleading stage, a plaintiff may establish a prima facie case of disparate impact discrimination under the FHA by alleging facts demonstrating: (1) the specific policy that is being challenged; (2) a disparity on a protected class; and (3) a causal connection between the challenged policy and the disparity. *Inclusive Cmtys.*, 576 U.S. at 542-43; *see also Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 425-26, 428-30 (4th Cir. 2018); *Graoch*, 508 F.3d at 374. Plaintiffs have alleged more than enough facts in their Complaint to support each element of a prima facie case.

#### a. *Plaintiffs Have Alleged Facts Challenging Detroit's Water Shutoff Policy.*

First, a plaintiff must point to a specific policy of the defendant that has a significant disparate effect on a protected group. The enforcement of a facially neutral state or local law can provide the basis for a challenged policy under the

---

[11] The Sixth Circuit has repeatedly held that prior decisions remain controlling authority unless an inconsistent decision of the Supreme Court requires modification of the decision or the en banc Sixth Circuit overrules the prior decision. *See, e.g.*, *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985). No modification of *Graoch*'s holding that Section 3604(b) authorizes disparate impact claims is required following the Supreme Court's *Inclusive Communities* decision.

FHA. *See, e.g.*, *Larkin v. Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 292 (6th Cir. 1996) (Michigan's statutory scheme for adult foster care violated the FHA by discriminating against persons with disabilities).

Here, Plaintiffs challenge Defendant Detroit's facially neutral[12] policy of disconnecting water service to customers for non-payment. Compl. ¶¶ 3, 269. In addition to specifically identifying the policy, Plaintiffs allege that it is an "artificial, arbitrary, and unnecessary" barrier to housing.[13] *Id.* ¶ 277; *see also id.* ¶ 66 (alleging that Detroit has a reported history of disconnecting service to residential water customers with relatively low unpaid bills while failing to disconnect service to commercial and governmental customers with much larger outstanding balances); *id.* ¶ 67 (alleging that water shutoffs are an ineffective method of incentivizing

_____

[12] Detroit confuses "facially neutral" and "lawful," contending that Plaintiffs find its water shutoff policy to be lawful. Defs' Br. at 41. This is incorrect. Detroit's policy is facially neutral in that it does not explicitly discriminate on the basis of race, but it is unlawful because it disparately impacts Black residents in violation of Section 3604(b) of the FHA. *See* 42 U.S.C. § 3615 (state or local law that requires or permits a discriminatory practice is invalid under FHA). Additionally, through this lawsuit, Plaintiffs do not seek to enact shutoff quotas based on race, Defs' Br. at 41, but rather a permanent change to Detroit's policy (such as an affordability program) to ensure further discrimination will not occur.

[13] In its *Inclusive Communities* decision, the Supreme Court noted that "[d]isparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies." 576 U.S. at 540 (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). Detroit suggests that this language created an additional pleading requirement for Plaintiffs. Defs' Br. at 35, 41 n.14. Plaintiffs are not required to show at the pleading stage that Detroit's policy is artificial, arbitrary, and unnecessary, but have met this requirement as described above.

customers to pay). Plaintiffs thus allege sufficient facts to satisfy the first element of their prima facie case.[14]

> b.   *Plaintiffs Have Alleged Facts Demonstrating the Disparate Impact of Detroit's Water Shutoff Policy on Black Residents.*

Second, the plaintiff must allege facts to demonstrate that the challenged policy has a disparate impact (in other words, a disproportionate effect) on the protected class. Various statistical methods may be used to demonstrate impact. *See, e.g.*, *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 382 (3d Cir. 2011) (a prima facie case of disparate impact was established by Census data showing that a greater percentage of Black households than white households would be affected by the challenged policy). Detroit cites *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1988), to suggest that Plaintiffs' statistical analyses are flawed. Defs' Br. at 36. But Plaintiffs' analyses are proper, not simply comparing the general population (which was at issue in *Wards Cove*), but rather the specific geographic areas (at the Census tract and zip code level) where shutoffs

---

[14] Detroit repeatedly tries to draw a parallel between the provision of municipal water services and the provision of broadband internet service. Defs' Br. at 40, 44. According to Detroit, if Plaintiffs can allege an FHA or ELCRA violation challenging its water shutoff policy, so too could a plaintiff challenge a private internet provider's disconnection policy. *Id.* Courts have found that Section 3604(b) covers municipal water services because water is essential to the habitability of dwelling. *See, e.g.*, *LaGrange*, 940 F.3d at 634. While internet service may also be covered by Section 3604(b), that question is simply not at issue here.

occurred. *See Graoch*, 508 F.3d at 378 ("The correct inquiry is whether the policy in question had a disproportionate impact on the minorities in the total group *to which the policy was applied.*") (emphasis in original).

Through these analyses, Plaintiffs have sufficiently demonstrated the disparate impact of Detroit's water shutoff policy on Black residents. As described in the Complaint, Plaintiffs analyzed publicly available data on water shutoffs in Detroit from January 2017 to July 2018 and from January 2019 to January 2020. Compl. ¶¶ 112-120. For the 2017 to 2018 data, Plaintiffs determined that 95% of residential water shutoffs occurred in Census tracts with a population that was greater than 50% Black. *Id.* ¶ 114. For the same time period, Plaintiffs also determined that Detroit Census tracts with a less than 50% Black population had, on average, 21.7 (or 64%) fewer shutoffs per 1,000 people than tracts with a greater than 50% Black population. *Id.* ¶ 115. These results are all statistically significant. *Id.* ¶¶ 114-115. Plaintiffs also found statistically significant results for this time period when comparing Census tracts with a population greater and less than 75% Black. *Id.* ¶¶ 112-113. Plaintiffs' Complaint also details the analyses for the 2019 to 2020 data, which were also statistically significant. *Id.* ¶¶ 117-120.

Plaintiffs also compared the rate of shutoffs in majority-Black versus majority-white Census tracts. *Id.* ¶ 116. From January 2017 to July 2018, Detroit Census tracts with a greater than 50% white population had, on average, 16.4 (or

48%) fewer shutoffs per 1,000 people than majority-Black tracts. *Id*. Majority-Black tracts had 34.1 shutoffs per 1,000 people, while majority-white tracts had 17.7 shutoffs per 1,000 people. *Id*. These results are statistically significant. *Id.*

The results described above and alleged in the Complaint are not only statistically significant, but they remain statistically significant even when accounting for differences in income and counts of unoccupied homes. *Id.* ¶¶ 113, 115-116, 120. Plaintiffs have more than sufficiently alleged facts demonstrating the disparate impact of Detroit's water shutoff policy on Black residents.

Detroit contends that Plaintiffs' claim must fail because they do not allege that the policy prevents Black people from accessing housing or that it perpetuates segregation. Defs' Br. at 41, n.14. But Plaintiffs have not brought a perpetuation of segregation claim, a different type of disparate impact claim under the FHA. *See Graoch*, 508 F.3d at 378 (distinguishing between typical disparate impact claims and perpetuation of segregation claims). Plaintiffs do not allege that Detroit's water shutoff policy perpetuated segregation in the City, and thus are not required to allege anything regarding the pre-policy racial composition of Detroit's neighborhoods or that housing demographics in Detroit have been affected by the policy, as Detroit contends. *Id.* at 379 (finding no segregative effect claim because the plaintiff did not provide any information about the racial makeup of the community surrounding the

24

apartment complex at issue or about the likely effect of withdrawal on the racial makeup of the complex).

        c.     *Plaintiffs Have Alleged Facts Supporting a Robust Causal Connection Between Detroit's Policy and the Disparate Impact on Black Residents.*

Third, after demonstrating that a policy has a disproportionate impact on a protected class, the plaintiff must adequately allege a robust causal connection between the policy and the disparate impact on the protected class. A plaintiff can meet this burden at the pleading stage by alleging facts that (1) identify the specific policy being challenged, and (2) demonstrate that the alleged disparity is the result of the challenged policy. *See Reyes*, 903 F.3d at 425 (at pleading stage, plaintiff can defeat a motion to dismiss by alleging statistical evidence "of a kind and degree sufficient" to show that the policy caused the disparity); *Nat'l Fair Hous. All. v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 33-34 (D.D.C. 2017) (concluding that the plaintiff sufficiently alleged a disparate impact caused by defendant's policy of refusing to insure properties that accepted Section 8 vouchers by pleading facts showing that "voucher recipients are significantly more likely to be members of a protected class than is true for the D.C. population as a whole" and including statistical analysis that focused on the relevant geographic area). At the pleading stage, a complaint must simply give rise to a fair inference of causation—the question of proof is addressed later in the proceedings. *Nat'l Fair Hous. All. v. Fed.*

*Nat'l Mortg. Ass'n*, 294 F. Supp. 3d 940, 948 (N.D. Cal. 2018); *see also Miller v. Countrywide Bank, N.A.*, 571 F. Supp. 2d 251, 259 (D. Mass. 2008) (proof of causation must be held for a later stage of the proceeding).

Plaintiffs have more than met their burden at the pleading stage by alleging a robust causal connection between Detroit's water shutoff policy and the resulting impact on Black residents by "present[ing] the following plausible, coherent narrative." *County of Cook v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 993 (N.D. Ill. 2018). First, Plaintiffs identify the specific policy they challenge through their lawsuit: Detroit's policy of disconnecting water service to customers for non-payment. Compl. ¶¶ 3, 269. Second, Plaintiffs adequately allege that Detroit's water shutoff policy has a disproportionate and unjustified impact on Black residents of the City. *Id.* ¶¶ 106-120, 269, 273. Third, Plaintiffs make a clear causal connection between the policy and disparity: they allege that Detroit's policy causes Black residents to disproportionately experience water shutoffs, forcing them to live without water service in their homes. *Id.* ¶¶ 22, 269. *See also County of Cook*, 314 F. Supp. 3d at 994 ("[T]he County alleges that minority borrowers were disproportionately more likely, given their baseline rates of homeownership, to be subject to equity stripping than nonminority borrowers."); *Horne v. Harbour Portfolio VI, LP*, 304 F. Supp. 3d 1332, 1341 (N.D. Ga. 2018) (in case challenging predatory land contracts, finding that plaintiffs had met the robust causality pleading

requirement by alleging that because defendants had purchased more homes in predominantly Black areas, Black people were more likely to be home buyers in the area and thus impacted by the defendants' practices).

Here, the magnitude of the disparities alleged by Plaintiffs is more than "sufficiently substantial." *Reyes*, 903 F.3d at 425. Not only are all disparities in the Complaint statistically significant, but Plaintiffs analyzed the data in a number of ways, including looking at two time periods; comparing the rate of shutoffs in Census tracts and zip codes with a greater and less than 75% and 50% Black population; and comparing shutoffs in majority-Black and majority-white tracts. Compl. ¶¶ 112-120. In simple terms, Plaintiffs have adequately pleaded that Black Detroit residents are substantially and disproportionately more likely than white residents to have their water disconnected and live without water in their homes as a direct result of Detroit's water shutoff policy.

Detroit argues that Plaintiffs have failed to allege a robust causal connection because it cannot be inferred from their Complaint that its water shutoff policy caused the alleged disparities on account of race rather than a reason outside of its control. Defs' Br. at 37-38. For example, Detroit attempts to attribute the disparities to the large percentage of impoverished residents of Detroit and the racial wealth gap. *Id.* at 39. Detroit's argument should be rejected. As discussed above, Plaintiffs controlled for differences in income (as well as counts of unoccupied homes) at

every step of their analyses, and the disparities remained statistically significant after adding these controls. Compl. ¶¶ 113, 115-116, 120. This demonstrates that the poverty experienced by a large percentage of the City's population—at least with respect to income differences—is not driving the statistical disparities. Discovery on these analyses will allow the parties to further explore the causal connection between Detroit's policy and the alleged disparities.

Further, Detroit misconstrues what is required to show robust causality, particularly at the pleading stage. Contrary to the City's assertion, the FHA does not require Plaintiffs to address and rebut in their Complaint every possible factor that may contribute to a DWSD customer's inability to pay their bill and to isolate race as the sole cause of the disparities. Detroit's overly restrictive interpretation of robust causality would essentially foreclose *any* type of disparate impact claim because any outside factor at play could break the causal chain.[15] But robust causality does not mean sole or but-for causality, and in virtually any disparate impact case, other factors could have led to the ultimate harm at issue in the suit. *See Horne*, 304 F. Supp. 3d at 1341 (rejecting defendant's argument that the plaintiffs did not sufficiently plead robust causality because the racial imbalances pre-dated the

---

[15] The City's interpretation would prevent, for example, a Black prospective tenant from challenging a landlord's restrictive criminal background check policy as discriminatory under the FHA, since the fact that the applicant had previously been convicted of a crime would break the causal connection. This is not what robust causality requires, particularly given the broad remedial purposes of the FHA.

challenged policy). Regardless, if Detroit did not implement and carry out its water shutoff policy, then Plaintiffs would not be disconnected for non-payment, forcing them to live without water in their homes. Detroit is the sole entity responsible for the alleged disparities on Black residents caused by its policy.

Plaintiffs have alleged more than enough facts to establish a robust causal connection between Detroit's policy and the disparate impact on Black residents. This Court should deny Detroit's motion to dismiss Plaintiffs' FHA claim.

**B.**   **Plaintiffs Have Stated a Claim Under ELCRA.**

**1.**   **Detroit Is Liable for Its Water Shutoff Policy Under ELCRA.**

ELCRA has a provision that corresponds to Section 3604(b) of the FHA. Mich. Comp. Laws Ann. § 37.2502(1)(b). Detroit contends that this provision does not cover discrimination in municipal water services. Defs' Br. at 41-43.

Detroit's interpretation of ELCRA is incorrect. The Sixth Circuit and this Court have consistently held that ELCRA's fair housing provision is "analogous" to the FHA and should be interpreted the same way. *See, e.g.*, *Mencer v. Princeton Square Apartments*, 228 F.3d 631, 634 (6th Cir. 2000); *Fair Hous. Ctr. of Metro. Detroit v. Jewish Senior Life of Metro. Detroit, Inc.*, No. 16-cv-10672, 2017 WL 2132073, at *3 (E.D. Mich. 2017). For the reasons set forth above, *supra* Section I.A.1, ELCRA applies to Detroit's water shutoff policy.

29

### 2.   Plaintiffs Have Sufficiently Pleaded an ELCRA Claim.

Detroit also argues that Plaintiffs' ELCRA claim must fail for the same reasons that their FHA claim is insufficient: it contends that disparate impact claims are not authorized under ELCRA and that Plaintiffs have not pleaded sufficient facts to demonstrate causation. Defs' Br. at 44.

Detroit is wrong. Disparate impact claims are permitted under ELCRA. *Reeves v. Rose*, 108 F. Supp. 2d 720, 725-26 (E.D. Mich. 2000) (FHA and ELCRA claims require the same analysis, and disparate impact claims are permitted). Further, for the same reasons described above, *supra* Section I.A.3.c, Plaintiffs have sufficiently pleaded a robust causal connection between Detroit's water shutoff policy and the resulting disparate impact on Black residents. Compl. ¶¶ 279-288; *see also Mencer*, 228 F.3d at 634 (applying same analysis to FHA and ELCRA claims).

## II.   PLAINTIFFS' CONSTITUTIONAL CLAIMS ARE PROPERLY STATED.

### A.   Plaintiffs Have Adequately Pleaded a Substantive Due Process Violation Against the Detroit Defendants.

### 1.   Defendants' Actions Implicate a Fundamental Right.

The well-established fundamental right to preserve Plaintiffs' bodily integrity has been violated by the Detroit Defendants' actions. Compl. ¶ 226. Defendants rely on *Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019), to argue that Plaintiffs are foreclosed from asserting this claim because they do not allege that Defendants

engaged in direct physical intrusion or deception. Defs' Br. 6-8. Nothing in *Guertin* supports that assertion. In that case, the Sixth Circuit held that the actions of city and state government actors related to water contamination violated Flint residents' substantive due process right to bodily integrity. 912 F.3d at 922. While the court's ruling in *Guertin* is helpful in recognizing that actions related to municipal water systems can lead to a bodily integrity violation, the case does not establish that direct intrusion is the only way to prove this type of claim.

Importantly, Plaintiffs are not required to allege that the Detroit Defendants directly introduced disease into their bodies without their consent to successfully plead a bodily integrity claim. The right to bodily integrity can be violated in different ways and without physical intrusion into the body. As this Court recognized in *Love v. Johnson*, "there is a long line of cases dating back to the nineteenth century recognizing that 'individuals have a constitutional right to avoid the kind of physical invasions or abuse that 'strip the very essence of personhood.'" 146 F. Supp. 3d 848, 854 (E.D. Mich. 2015) (emphasis omitted). Liability for a substantive due process violation "can attach when the state's affirmative acts increase the plaintiff's risk of harm." *See Lipman v. Budish*, No. 19-3914, 2020 WL 5269826, at *13 (6th Cir. Sept. 4, 2020).

In *Love*, this Court found that Michigan's policy requiring transgender individuals to carry identification that did not comport with their gender identity

placed them at risk of bodily harm, even though no actual physical intrusion by the state was at issue. 146 F. Supp. 3d at 854. In reaching this conclusion, the court noted the plaintiffs' allegations "cut at the 'very essence of personhood' protected under the substantive component of the Due Process Clause," and cited general statistics regarding the high incidence of hate crimes targeting transgender individuals and the plaintiffs' firsthand experiences of harassing conduct when forced to produce identification that failed to match their lived gender. *Id.* at 855. In *Love*, as here, neither direct physical violation nor deception were required to implicate the fundamental interest in bodily integrity.

Rather than requiring a direct physical intrusion, substantive due process is implicated when government action creates a "threat to . . . personal security and bodily integrity and possibly [individuals'] lives." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1063 (6th Cir. 1998) (finding that the release of police officers' private information to gang members, placing the officers and their families at risk, was a substantive due process violation). Here, Plaintiffs suffer precisely such a threat to their bodily integrity from the City's actions—dating back far before the pandemic—impacting their ability to protect themselves from the spread of disease that guarantees sickness and in some cases death. This is more than a municipal policy with unintended negative consequences: this is a water shutoff policy with

32

well-known consequences that has been consciously, purposely, and deliberately pursued without concern for those affected.

Additionally, contrary to the Detroit Defendants' assertion, Defs' Br. at 9, Plaintiffs do not assert a right to affordable water or a right to live in a contaminant-free environment. Plaintiffs instead allege that their well-established right to bodily integrity is threatened by Defendants' acts that place Plaintiffs at unreasonable risk of disease. The Detroit Defendants' disconnection and collection practices perpetually leave Plaintiffs, who do not have the ability to pay DWSD's ever-increasing rates, without water and the means to protect themselves from disease.

Plaintiffs have sufficiently alleged that they have a fundamental liberty interest in personal security, which includes the right to be free of disease from the lack of water service. Compl. ¶ 220. Without water service, Plaintiffs are without the means to protect themselves from viral or bacterial infection, therefore placing their lives at risk. This threat is a violation of their substantive due process rights.

### 2. Plaintiffs Have Sufficiently Pleaded Conscience-Shocking Behavior.

In addition to showing a deprivation of a constitutionally protected liberty interest, Plaintiffs allege that the government's discretionary conduct that deprived the interest was constitutionally repugnant. *See Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 688 (6th Cir. 2011). Courts use the "shocks the conscience" standard to evaluate intrusions into a person's right to bodily integrity.

*Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 725 (6th Cir. 1996). Conduct that reflects deliberate indifference has been held to shock the conscience. *See, e.g.*, *Guertin*, 912 F.3d at 923.

Plaintiffs have sufficiently pleaded that the Detroit Defendants' conduct shocks the conscience. *See, e.g.*, Compl. ¶ 223. Nevertheless, Defendants argue that the Sixth Circuit previously rejected the notion that water shutoffs constitute conscience-shocking behavior. Defs' Br. at 14 (citing *In re City of Detroit, Mich.*, 841 F.3d 684, 699 (6th Cir. 2016)). According to Defendants, since the COVID-19 pandemic is the only different factor from *Detroit*, which also challenged water shutoffs, this Court may distinguish Plaintiffs' case only by finding that their COVID-19 response shocks the conscience. *Id.*

Defendants' arguments must be rejected. The claims and allegations here are different from those addressed in *Detroit*. The plaintiffs in *Detroit* did not plead or brief a substantive due process bodily integrity violation, but instead alleged that Detroit's water shutoff policy violated their procedural due process rights.[16] *In re*

---

[16] The plaintiffs' claims in *Detroit* were first evaluated by the bankruptcy court, which concluded that their *procedural* due process claim was actually a *substantive* due process claim asserting a "constitutional right to water service at a price they could afford to pay," even though the plaintiffs had not raised this claim in their Complaint. 2014 WL 6474081, at *8. And while the Sixth Circuit stated that there is no fundamental right to water, *see* 841 F.3d at 700, the dicta in that case is not controlling here because it did not address the fundamental right that is at issue in this case: Plaintiffs' right to bodily integrity.

34

*City of Detroit*, *Lyda v. City of Detroit*, No. 13-53846, 2014 WL 6474081, at *2 (Bankr. E.D. Mich. Nov. 19, 2014). While the Sixth Circuit in *Detroit* made a passing remark that the "withholding of water on condition of payment for delinquent charges does" not shock the conscience, it did not analyze or base its holding on this statement. 841 F.3d at 699. Instead, it upheld the bankruptcy court's decision that a claim for "continued affordable water service" did not implicate a fundamental right. *Id*. at 700.

Here, Plaintiffs' bodily integrity claim can be distinguished from the claims raised in *Detroit*. Plaintiffs allege that Defendants' violation of their bodily integrity began years ago, well before the current pandemic. *See, e.g.*, Compl. ¶¶ 5, 7, 50. This Court is not limited in evaluating the Detroit Defendants' conduct during the pandemic, although it is certainly true that Defendants' unconstitutional acts have been exacerbated by the spread of COVID-19. Instead, this Court must undertake a thorough and case-specific review of Defendants' actions, as the Supreme Court has cautioned. *See County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) ("Rules of due process are not, however, subject to mechanical application in unfamiliar territory. Deliberate indifference that shocks in one environment may not be so patently egregious in another.").

There are three elements to a showing of deliberate indifference: "[P]laintiffs must show the government officials 'knew of facts from which they could infer a

substantial risk of serious harm, that they did infer it, and that they acted with indifference toward the individual's rights.'" *In re Flint Water Cases*, 960 F.3d 303, 324 (6th Cir. 2020) (quoting *Guertin*, 912 F.3d at 926).

The Detroit Defendants do not dispute that Plaintiffs have properly alleged the first two elements with respect to the COVID-19 pandemic specifically. Defendants concede that Plaintiffs allege that the "City knew of facts from which they could infer a risk of serious harm due to the coronavirus" and that "the City did in fact infer it by early March." Defs' Br. at 14. This leaves only the third element in dispute: whether Defendants acted or failed to act in a manner demonstrating reckless or callous indifference to Plaintiffs' rights. *Ewolski v. City of Brunswick*, 287 F.3d 492, 513 (6th Cir. 2002).

Plaintiffs have properly pleaded that the Detroit Defendants have demonstrated deliberate indifference to the harm of water shutoffs, which extends far beyond the current pandemic. *See, e.g.*, *Nishiyama v. Dickson Cty.*, 814 F.2d 277, 287 (6th Cir. 1987). Defendants have had time for deliberate consideration of their actions: as Plaintiffs allege, water shutoffs in Detroit have been the focus of local and state deliberation for two decades, and advocates have repeatedly petitioned Defendants to impose a moratorium on shutoffs specifically due to the health risks. Compl. ¶¶ 2, 50, 68-69, 190. Nonetheless, Defendants have purposely and flagrantly ignored well-established science and continued to put forward solutions to the water

affordability crisis that they know are insufficient, likely to harm residents, and do not achieve their ostensible goal of fiscal solvency. *See, e.g.*, *id.* at ¶¶ 46, 67, 94, 214.

Although Detroit established the 10-30-50 program and WRAP, these water assistance programs do nothing to alleviate the risk of illness and death caused by living without water. These programs provide no long-term relief for Detroit's water insecure population, which faces cycles of repeated disconnections and reconnections. *Id.* ¶¶ 4, 7, 63. Given how indisputably necessary water is, it is inconceivable that residents would choose to go without water if they had the means to pay. If Defendants' water assistance programs were effective, disconnections would be rare. Instead, as Plaintiffs allege, Detroit disconnects thousands of households per year, placing residents at significant risk of disease. *Id.* ¶¶ 4, 63.

Defendants further assert that EOs 2020-28 and 2020-144 and the Water Restart program demonstrate that they have not been deliberately indifferent. Defs' Br. at 13-16. The opposite is true.

First, EOs 2020-28 and 2020-144 were acts of the Governor, not the Detroit Defendants. Further, EO 2020-144 is set to expire at the end of 2020, and Defendant Duggan has explicitly stated that Detroit will resume shutoffs as a collection method. Compl. ¶¶ 16, 92, 219. Plaintiffs allege that this will occur as soon as the immediate threat of the pandemic has passed, *id.* ¶¶ 219, 240, 270, 275, 285, meaning that the

City will resume shutoffs once it is not barred from doing so by the Governor, even if the threat of COVID-19 has not been fully eradicated. Every household that has had their water service reconnected as a result of EOs 2020-28 and 2020-144 will likely have it disconnected once the moratorium ends and their risk of disease will resume. *Id.* This more than demonstrates deliberate indifference.

Plaintiffs also allege that the Detroit Defendants have failed to fully comply with EOs 2020-28 and 2020-144 and the Water Restart Plan. They allege that some households in Detroit still lack water service, Compl. ¶¶ 16, 237, and DWSD's reports to the State indicate the same. *See* ECF Nos. 17-3 to 17-6. For example, in its April report, DWSD admitted that it had disconnected at least 9,000 households in 2019, but that it only restored 1,200 households at the start of the Water Restart Plan. ECF No. 17-3 at 1-2. In addition, in this report (and others), DWSD identified hundreds of homes that appeared occupied, but no one came to the door the one time they visited the home.[17] *Id.* Furthermore, while the City contends that there are no occupied homes without water, it reports to have reconnected additional homes each

---

[17] There are disincentives for Detroit residents to disclose that they do not have water or have access to water without an active account. Lack of water service is evidence of child neglect and can lead to the removal of children from the home. Compl. ¶ 6. Residents can face criminal charges for reconnecting their water without permission from the utility. Mich. Comp. Laws Ann. § 750.383(a). Therefore, an admission by a resident that they have had their water turned on by other means would be self-incriminating. The Detroit Defendants have not provided amnesty or another avenue for those households to reinstate their account legally without risk of legal consequences.

month during the moratorium.[18] *See* ECF Nos. 17-3 to 17-6. While these inconsistencies should be investigated through discovery, they demonstrate that the Detroit Defendants' conduct shows a deliberate disregard for the harm to Plaintiffs.

Accordingly, Plaintiffs have properly alleged facts sufficient to show that the Detroit Defendants' actions shock the conscience and show a deliberate indifference to the risks posed to Plaintiffs.

### 3. Plaintiffs Have Standing.

The Detroit Defendants also wrongly assert that Plaintiffs lack standing for their bodily integrity claim because they did not plead that they were infected by a disease due to a lack of water. Defs' Br. at 11. Plaintiffs do not have to stand idly by and wait to be infected by COVID-19 or other infectious diseases in order to protect their constitutional rights. Plaintiffs allege that they risk infection as a result of not

---

[18] In each of its compliance reports sent to the State of Michigan, DWSD reports a smaller number of households without water than are reconnected the following month. For instance, in its June 12, 2020 compliance report, DWSD stated that "sixteen homes remain without water," ECF No. 17-5 at 2, however in the July 13, 2020 report it stated that "34 homes were restored" in the month since the previous report. ECF No. 17-6 at 2. Additionally, in each compliance report, DWSD states that it hired an organization that conducted door-to-door outreach to notify the 9,000 homes it believes could be without water service about the Water Restart Plan. *See* ECF Nos. 17-3 to 17-6. By its own admission, "12 percent [of households without water service] appeared to have occupants who did not answer the door." ECF No. 17-3 at 2; ECF No. 17-4 at 2; ECF No. 17-5 at 2; ECF No. 17-6 at 2. DWSD states that it called the last known phone numbers associated with those accounts, however, it is not clear how many of those numbers were still active or how many of those households were confirmed to have water service.

having access to water for disease prevention, as well as by residing in neighborhoods where there are high disease infection rates caused by significant numbers of water shutoffs. *See* Compl. ¶ 105. As they allege, Plaintiffs face an unreasonable risk of contracting COVID-19 and other infectious diseases due to Detroit's water shutoff policy. *See Prieto Refunjol v. Adducci*, No. 2:20-cv-2099, 2020 WL 2487119, at *18 (S.D. Ohio May 14, 2020) (noting that the risk of contracting COVID-19 "is itself the harm"); *see also Fofana v. Albence*, No. 20-10869, 2020 WL 1873307, at *8 (E.D. Mich. Apr. 15, 2020) ("The Constitution does not require that [plaintiffs] be seriously ill from COVID-19 . . . before they may assert their" constitutional rights.).

This Court must also reject the Detroit Defendants' argument that Plaintiffs do not have standing to seek prospective relief because Plaintiffs currently have water service. Defs' Br. at 12. Although Plaintiffs currently have water service, Defendant Duggan has explicitly stated that Detroit will resume shutoffs as a collection method. Compl. ¶ 219. Plaintiffs allege that this will occur as soon as the immediate threat of the pandemic has passed. *Id.* ¶¶ 240, 270, 275, 285. Due to their low incomes and previously accrued water debt, this places the named Plaintiffs at significant risk of losing their water service once Detroit resumes shutoffs. They are thus at a heightened risk of contracting infectious diseases that can occur from the lack of access to water. *Id.* ¶ 105. Such infectious diseases were connected to

Defendants' water shutoff policy even before the COVID-19 pandemic. *Id*. Thus, Plaintiffs have standing to sue given the risk of infection that they face once shutoffs resume. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."). As stated above, Plaintiffs also allege that Defendants have failed to fully comply with EOs 2020-28 and 2020-144, which has resulted in some residents still lacking water service. *See* Compl. ¶¶ 16, 237. These residents presently face a substantial risk of contracting COVID-19 and other infectious diseases.

The Detroit Defendants further assert that Plaintiffs lack standing because the Complaint details the "general risk faced by residents living in neighborhoods with higher rates of service interruptions, but not the risk they themselves face." Defs' Br. at 12-13. Defendants' argument misrepresents the allegations in the Complaint. Plaintiffs have offered more than generalized allegations by alleging that they live in zip codes with some of the highest levels of COVID-19 infections in Detroit. Compl. ¶¶ 104, 146, 157, 167, 179, 188. Additionally, when water shutoffs within a neighborhood threaten the spread of infectious disease, all residents are at risk. This is a personal injury, not a generalized grievance. *See Havens*, 455 U.S. at 375-78.[19]

---

[19] Defendants cite *Heartwood, Inc. v. Agpaoa*, 628 F.3d 261 (6th Cir. 2010), to support their standing argument. But that case involved a challenge under the

**B.    Plaintiffs Have Adequately Pleaded an Equal Protection Claim Against Detroit.**

**1.    *Griffin v. Illinois* Is Applicable to Detroit's Water Shutoff Policy.**

Plaintiffs allege that Detroit has violated the equal protection guarantees of the 14th Amendment to the U.S. Constitution and the Michigan Constitution by disconnecting the water service of predominantly Black impoverished customers without first determining whether they have the ability to pay. Compl. ¶¶ 19, 250-267. *Griffin v. Illinois*, 351 U.S. 12 (1956), and its progeny establish the principle that government policies run afoul of the Equal Protection Clause when they punish those who are genuinely unable to pay certain expenses. *Griffin*, 351 U.S. at 19; *see also Boddie v. Connecticut*, 401 U.S. 371, 383 (1971) (a state could not prohibit a married couple from divorcing because they could not afford to pay court costs).

Detroit argues that Plaintiffs fail to state an equal protection claim because the principles set forth in *Griffin* are limited to cases involving a deprivation of a

---

Administrative Procedure Act to the U.S. Forest Service's compliance with the National Environmental Policy Act and the National Forest Management Act—statutes that require a heightened showing of standing when a plaintiff's only interest in the case is a general desire to enjoy the use of "unspecified portions of an immense tract of territory." *Id.* at 267-68. *See also id.* at 268 (stating that "environmental plaintiffs seeking to establish standing must identify particular segments of a river, sections and sub-sections of a forest, or passes in a mountain range that they use and will continue to use, and that agency action will detrimentally affect"). Plaintiffs, who live in the specific neighborhoods impacted by Defendants' policy, are not required to meet the stringent, hyper-technical standing requirements that govern the environmental claims at issue in *Heartwood*.

fundamental liberty interest associated with the criminal justice system. Defs' Br. at 19-20. Not so. In *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996), a case relying on *Griffin*, at issue was whether the state violated the Due Process and Equal Protection Clauses of the 14th Amendment by requiring the petitioner to prepay record preparation fees prior to appealing a court decree terminating her parental rights. Applying *Griffin*, the Supreme Court held that the state could not withhold the transcript the petitioner needed for her appeal simply because she could not afford to pay the preparation fees. *Id*. at 120. The Court noted that such wealth-based sanctions are "are wholly contingent on one's ability to pay, and thus visit different consequences on two categories of persons; they apply to all indigents and do not reach anyone outside that class." *Id*. at 127 (citation omitted). And the Court specifically rejected the state's argument to "rigidly restrict *Griffin* to cases typed 'criminal.'" *Id*.

Detroit relies heavily on *Fowler v. Benson*, 924 F.3d 247 (6th Cir. 2019), claiming that it limits *Griffin* to cases that implicate the "types of fundamental liberty interests associated with the criminal justice system, like imprisonment and probation." Defs' Br. at 19-20. But *Fowler* did not depart from (and could not have departed from) the Supreme Court's decision in *M.L.B.* In *Fowler*, which involved a challenge to a driver's license suspension statute, the court distinguished *Griffin* and subsequent cases because they concerned fundamental liberty interests rather than property interests such as driver's licenses. 924 F.3d at 260. Contrary to

Detroit's assertion, *Fowler* did not foreclose the application of *Griffin* to cases outside of the criminal justice context but clarified that it applies to cases implicating fundamental interests.

*Griffin* is applicable to the present case because, like *M.L.B.* but unlike *Fowler*, it involves fundamental liberty interests implicated by the lack of water service. Indeed, water shutoffs implicate the fundamental liberty interests in family integrity and parental rights because, under Michigan law, Detroit residents risk the removal of their children when they lose access to water. *See* Compl. ¶ 6; Mich. Comp. Laws Ann. § 722.622(k)(i) (noting that negligent treatment of children includes the failure to "provide adequate food, clothing, shelter, or medical care," which includes access to water); *see also Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court."). Further, as argued above, Detroit's water shutoff policy implicates the right to bodily integrity, which is also a fundamental liberty interest. *See Guertin*, 912 F.3d at 919.

Thus, the *Griffin* framework should apply given that the loss of water service directly implicates fundamental liberty interests in parental rights and bodily integrity, and because Detroit's water shutoff policy deprives many residents of this vital resource simply because they cannot afford it.

44

### 2.      The Court Must Evaluate Detroit's Shutoff Policy Under the Strict Scrutiny Standard.

Because Plaintiffs have alleged that Detroit's water shutoff policy implicates fundamental liberty interests, the court must apply strict scrutiny to the policy's constitutionality. *See Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010) (courts must apply strict scrutiny when reviewing laws that implicate a fundamental interest). "Government actions that burden the exercise of . . . fundamental . . . liberty interests are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest." *Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007). Detroit's policy of disconnecting water service without first considering whether a customer is genuinely unable to pay is not narrowly tailored and serves no compelling government interest. As Plaintiffs allege, there are less punitive collection measures that Detroit could utilize, including negotiating individualized payment plans, reducing or forgiving arrearages, or implementing a water affordability program that considers a customer's level of income and ability to pay prior to disconnecting service. Compl. ¶ 265. Detroit's motion to dismiss Plaintiffs' equal protection claim must be denied as its water shutoff policy, as alleged, is not narrowly tailored and fails strict scrutiny analysis.

### 3. Detroit's Policy of Disconnecting Customers' Water Service Without Considering Their Indigency Is Irrational.

Even if this Court does not apply the strict scrutiny standard and instead applies rational basis review, Detroit's water shutoff policy fails to pass constitutional muster. Plaintiffs have sufficiently alleged there is a lack of rational basis for Detroit's policy of disconnecting its customers' water service without first determining if they truly do not have the means to pay. Compl. ¶¶ 260-265. In response, Detroit claims that service interruptions are "sometimes the only way . . . to prevent widespread delinquencies by those who may otherwise *choose* not to pay." Defs' Br. at 22 (emphasis in original). Plaintiffs' equal protection claim, however, concerns those customers who suffer a disconnection from service because they do not have the means to pay their bills. Detroit does not further any legitimate government interest in disconnecting water service to those who cannot, through no fault of their own, afford to make payments. Many customers are elderly, have disabilities, and have very limited incomes that are insufficient to cover their household expenses. Such residents are not willfully refusing to pay their bills. These customers simply do not have the means to do so, and equal protection requires Detroit to take their indigency into consideration prior to disconnecting their service.

Accordingly, Detroit fails to rationalize how disconnecting the water service of a resident who is truly unable to pay will make payment forthcoming. While cities have the "responsibility to effect collection of past due water bills in order to

maintain or improve the municipality's financial position[,]" they must "pursue that objective in a rational manner." *Pilchen v. City of Auburn,* 728 F. Supp. 2d 192, 204 (N.D.N.Y. 2010). Courts have routinely found that water debt collection policies fail to serve any rational basis when they punish customers for circumstances that are not their fault. *See id.* (finding city's policy violated plaintiff's equal protection rights where it required plaintiff to pay her landlord's delinquent water debt prior to connecting plaintiff's water service); *see also Golden v. City of Columbus*, 404 F.3d 950, 961 (6th Cir. 2005). Disconnecting residents from an essential source of survival solely because they cannot afford their water rates, through no fault of their own, is wholly irrational—especially in light of the necessity of water to human life and the health risks associated with a lack of water.

Although Detroit asserts that its water assistance programs—the 10-30-50 program and WRAP—provide support for the City's most vulnerable residents, Defs' Br. at 23, Plaintiffs allege that these programs are woefully inadequate in addressing water insecurity for those in chronic poverty. Compl. ¶¶ 49, 232, 242. As detailed in Plaintiffs' Complaint and described above, thousands of Detroiters are disconnected from their water service each year despite the implementation of these programs. *See id.* ¶¶ 4, 63, 65, 82.

**4.      Detroit's Arguments Concerning the Implementation of a Water Affordability Program Are Irrelevant and Not Fatal to Plaintiffs' Claim.**

Detroit's arguments regarding its inability to implement a water affordability program are also unavailing. Specifically, Detroit argues that "municipalities cannot provide customers with free water." Defs' Br. at 24. Detroit's argument misconstrues the nature of Plaintiffs' equal protection claim.

Equal protection requires Detroit to consider a customer's ability to pay prior to disconnecting water service. Compl. ¶ 266. Detroit previously made a similar determination prior to disconnecting service through its negotiation of payment plan agreements with customers who could not afford their outstanding balances in full. *Id.* ¶¶ 56-57. This does not require Detroit to provide customers with water service at no cost. Detroit would likely satisfy equal protection by adopting a water affordability program that ties billing to a percentage of household income, similar to programs adopted successfully in other major municipalities facing water affordability crises. *See* Baltimore City, Md. Code art. 24, § 2-6 to § 2-15 (2019).

Finally, Detroit makes the misleading assertion that a water affordability program will violate the Michigan Constitution by charging some customers more than others, thus imposing an unconstitutional "tax." Defs' Br. at 24 (citing, e.g., *Bolt v. City of Lansing*, 459 Mich. 152 (1998)). *Bolt* establishes a test for whether a cost is properly regarded as a "fee" or a "tax," and one factor is voluntariness of the

charge. *Id.* at 161-62. Because water service is voluntary, particularly for unoccupied properties, it is more appropriately regarded as a fee than a tax. Further, the Legislative Policy Division of the Detroit City Council previously determined that a water affordability program would not necessarily violate *Bolt*, particularly because DWSD already adjusts rates based on a number of factors. *See* Sharmila L. Murthy, *A New Constitutive Commitment to Water*, 36 B.C. J.L. & Soc. Just. 159, 223-24 (2016) (citing Letter from David Whitaker, Dir. Legislative Policy Div. Staff, to The Honorable Detroit City Council 3 (Oct. 21, 2015), https://perma.cc/AL62-5S2F).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny the Detroit Defendants' motion to dismiss under Rule 12(b)(6).

Dated: September 17, 2020                     Respectfully submitted,

| | By: */s/Coty Montag* |
|---|---|
| **EDWARDS & JENNINGS, P.C.**<br>Alice B. Jennings (P29064)<br>Cadillac Tower Building<br>65 Cadillac Square, Suite 2710<br>Detroit, Michigan 48226<br>Tel.: (313) 961-5000<br>ajennings@edwardsjennings.com<br><br>**MICHIGAN POVERTY LAW PROGRAM**<br>Lorray S. C. Brown (P60753)<br>15 South Washington Street,<br>Suite 202<br>Ypsilanti, Michigan 48197 | Coty Montag<br>Jason Bailey<br>**NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.**<br>700 14th Street NW, Suite 600<br>Washington, DC 20005<br>Tel.: (202) 682-1300<br>cmontag@naacpldf.org<br>jbailey@naacpldf.org<br><br>Monique Lin-Luse<br>40 Rector Street, 5th Floor<br>New York, New York 10006 |

Tel.: (734) 998-6100 ext. 613
Fax.: (734) 998-9125
lorrayb@mplp.org

**THORNBLADH LEGAL
GROUP PLLC**
Kurt Thornbladh (P25858)
7301 Schaefer
Dearborn, Michigan 48126
Tel: (313) 943-2678
kthornbladh@gmail.com

**MELISSA Z. EL, P.C.**
Melissa Z. El Johnson (P29865)
500 Griswold Suite 2410
Detroit, Michigan 48226
Tel.: (313) 963-1049
Fax: (313) 963-3342
eljohnsonlaw@gmail.com

Tel.: (212) 965-2200
mlinluse@naacpldf.org

**AMERICAN CIVIL
LIBERTIES UNION
FUND OF MICHIGAN**
Mark P. Fancher (P56223)
Daniel S. Korobkin (P72842)
Bonsitu       Kitaba-Gaviglio
   (P78822)
2966 Woodward Avenue
Detroit, Michigan 48201
Tel.: (313) 578-6800
mfancher@aclumich.org
dkorobkin@aclumich.org
bkitaba@aclumich.org

*Attorneys for Plaintiffs and the
Putative Classes*

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2020, I electronically filed this document with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

/s/*Coty Montag*
Coty Montag