## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| JACQUELINE TAYLOR, LISA BROOKS, MICHELE COWAN, TUANA HENRY, MATTIE MCCORKLE, and RENEE WILSON, on behalf of themselves and all others similarly situated, | Case No. 2:20-cv-11860 <br><br> Hon. Denise Page Hood <br><br> Mag. Anthony P. Patti |
| Plaintiffs, | |
| v. | |
| CITY OF DETROIT, a Municipal Corporation, through the Detroit Water and Sewerage Department, its Agent; GOVERNOR GRETCHEN WHITMER, in her official capacity; MAYOR MICHAEL DUGGAN, in his official capacity; and GARY BROWN, in his official capacity. | |
| Defendants. | |

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

By this motion, Plaintiffs respectfully request that the Court enter a preliminary injunction prohibiting Defendants City of Detroit, Mayor Michael Duggan, and Gary Brown (hereinafter the "Detroit Defendants" or "Detroit")[1] from terminating water service for purposes of debt collection or otherwise as a response to non-payment of water bills.

In support thereof, Plaintiffs state as follows:

1. Plaintiffs represent a putative class of residential customers of the Detroit Water and Sewerage Department (DWSD). Historically, when residential customers' water bills have gone unpaid, DWSD has disconnected their service.

2. Between 2014 and 2019, more than 141,000 households in Detroit had their water service disconnected for non-payment. Some families lived for years without water service in their homes after a disconnection by DWSD. Others have been trapped in a cycle of water insecurity with repeated disconnections and reconnections. These water insecure families lived in fear of loss of service at any time because of their inability to pay DWSD's rates. Black families in Detroit are disproportionately impacted by the City's water shutoff policy.

---

[1] At this time, Plaintiffs are not asking the Court to enter a preliminary injunction against Defendant Governor Whitmer.

3. Families without water service in their homes are susceptible to infection. Through the years, Detroit's water shutoff policy has resulted in outbreaks of various forms of infectious diseases, including shigellosis (an acute dysentery); giardiasis (a protozoan infection); and campylobacter (an acute intestinal disease). Detroit's policy has also resulted in threats to the health of affected families resulting from such things as the inability of people with diabetes to prepare medically necessary meals, the inability of parents to prepare infant formula, dehydration, and various other health consequences.

4. In many cases, individuals who live without water service in their homes have become carriers of disease, infecting others within their physical proximity. Communities with a significant number of households without water service are particularly susceptible to COVID-19 infection, creating a public health emergency that prompted repeated, consistent demands for remedial action by affected communities and their advocates.

5. The pending litigation was filed for the specific purpose of permanently ending water shutoffs, and to bring that into effect in a specific way—namely by making water rates affordable for all residential water customers.

6. During the pendency of this action, Defendants have maintained a moratorium on water shutoffs in Detroit as a reaction to the COVID-19 pandemic. They have not, however, modified water rates or excused water customers from charges that continue to accrue during the moratorium. Water customers will be expected to pay the full amount of accrued water bills, which means that low-income customers are to likely yet again face the prospect of water shutoffs once the moratorium is lifted.

7. In or about December 2020, Defendant Michael Duggan announced that Detroit will refrain from engaging in water shutoffs until December 31, 2022. He was quoted as stating: "My goal now is stop water shutoffs to low-income Detroiters once and for all . . . We have secured the funding necessary to continue this effort through 2022 and we are building a coalition to make this permanent."[2]

8. Notwithstanding the launch of what Defendants call the "Lifeline" program that purports to provide water service at affordable rates, and that has been presented to enrollees in the program as a guarantee against shutoffs, reasonable, legitimate and concerning questions have been raised

---

[2] Press Release, Detroit Water & Sewerage Dep't, *Mayor, DWSD extend moratorium on residential water shutoffs through 2022 and announce intention to permanently end shutoffs* (Dec. 8, 2020), available at https://detroitmi.gov/news/mayor-dwsd-extend-moratorium-residential-water-shutoffs-through-2022-and-announce-intention.

about, among other things, the efficacy of the program, the financial viability of the program, accessibility of the program, and the high probability, if not certainty, that large numbers of Detroit residents will, for various reasons, fail to enroll in the program and thereby render themselves susceptible to shutoffs.

9. This motion for a preliminary injunction requests that the Detroit Defendants be enjoined from changing the status quo until there has been an opportunity for a full adjudication of Plaintiffs' claims, or until such time as it has been satisfactorily established that Plaintiffs will not be at risk of irreparable harm during the pendency of this action.

10. Plaintiffs seek a preliminary injunction enjoining the Detroit Defendants from further water shutoffs and other actions harmful to Plaintiffs. In determining whether to grant the requested relief, a court must balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction.

11. Plaintiffs assert claims against Defendants for violation of their substantive due process rights to be free from violation of their bodily

integrity; racial discrimination in violation of the Fair Housing Act and the Elliott-Larsen Civil Rights Act; and violation of their rights to equal protection under the law.

12. There is substantial evidence supporting Plaintiffs' claims and they have a high likelihood of success on the merits.

13. In the absence of injunctive relief, Plaintiffs are at risk of substantial harm due to their heightened susceptibility to infectious diseases and other irreparable harm. Because of the potential for a public health emergency if injunctive relief is not granted, a preliminary injunction will best serve the public interest.

14. In support of this motion, Plaintiffs submit the appended brief and supporting declarations that address all elements necessary for the entry of an order granting the requested relief.

15. Plaintiffs seek leave to present oral argument in support of this Motion.

16. Pursuant to Local Rule 7.1(a), before filing this motion Plaintiffs' counsel attempted to ascertain whether this motion would be opposed. Plaintiffs' counsel conferred with Defendants' counsel, explained the nature of the motion and the relief sought, and requested but did not obtain concurrence.

Respectfully submitted,

By: /s/ Mark P. Fancher
Mark P. Fancher (P56223)

6

Daniel S. Korobkin (P72842)
Bonsitu Kitaba-Gaviglio (P78822)
**AMERICAN CIVIL LIBERTIES UNION**
  **FUND OF MICHIGAN**
2966 Woodward Avenue
Detroit, Michigan 48201
Tel.: (313) 578-6800
mfancher@aclumich.org
dkorobkin@aclumich.org
bkitaba@aclumich.org

**NAACP LEGAL DEFENSE**
**AND EDUCATIONAL FUND, INC.**
Jason Bailey
700 14th Street NW, Suite 600
Washington, DC 20005
Tel.: (202) 682-1300
jbailey@naacpldf.org

**EDWARDS & JENNINGS, P.C.**
Alice B. Jennings (P29064)
Cadillac Tower Building
65 Cadillac Square, Suite 2710
Detroit, Michigan 48226
Tel.: (313) 961-5000
ajennings@edwardsjennings.com

**MICHIGAN POVERTY**
**LAW PROGRAM**
Lorray S. C. Brown (P60753)
15 South Washington Street, Suite 202
Ypsilanti, Michigan 48197
Tel.: (734) 998-6100 ext. 613
Fax.: (734) 998-9125
lorrayb@mplp.org

**THORNBLADH LEGAL GROUP PLLC**
Kurt Thornbladh (P25858)
7301 Schaefer
Dearborn, Michigan 48126
Tel: (313) 943 2678
kthornbladh@gmail.com

**MELISSA Z. EL, P.C.**
Melissa Z. El Johnson (P29865)
500 Griswold Suite 2410
Detroit, Michigan 48226
Tel.: (313) 963-1049
Fax: (313) 963-3342
eljohnsonlaw@gmail.com

*Attorneys for Plaintiffs and the Putative Classes*

Date: December 12, 2022

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| JACQUELINE TAYLOR, LISA BROOKS, MICHELE COWAN, TUANA HENRY, MATTIE MCCORKLE, and RENEE WILSON, on behalf of themselves and all others similarly situated, | Case No. 2:20-cv-11860 <br><br> Hon. Denise Page Hood <br><br> Mag. Anthony P. Patti |
| Plaintiffs, | |
| v. | |
| CITY OF DETROIT, a Municipal Corporation, through the Detroit Water and Sewerage Department, its Agent; GOVERNOR GRETCHEN WHITMER, in her official capacity; MAYOR MICHAEL DUGGAN, in his official capacity; and GARY BROWN, in his official capacity. | |
| Defendants. | |

## BRIEF IN SUPPORT OF PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INDEX OF AUTHORITIES....................................................................... iii

INTRODUCTION ........................................................................................1

STATEMENT OF THE ISSUE....................................................................3

STATEMENT OF FACTS ...........................................................................3

    Impending Harm from Renewal of Shutoffs .............................................4

    The Inadequacies in the Lifeline Program.................................................6

STANDARD FOR GRANTING PRELIMINARY INJUNCTIVE RELIEF ..........8

ARGUMENT .................................................................................................8

   I.   Plaintiffs Have a Strong Likelihood of Success on the Merits. ...................8

      A.   Plaintiffs Are Likely to Succeed on the Merits of Their
           Substantive Due Process Claim ........................................................8

      B.   Plaintiffs Are Likely to Succeed on the Merits of their FHA
           and ELCRA Claims............................................................................12

          1.   Plaintiffs Have Established a Prima Facie Case of
              Disparate Impact Discrimination Under the FHA and
              ELCRA.............................................................................................12

          2.   Defendant Detroit Cannot Demonstrate Its Water
              Shutoff Policy Is Necessary to Achieve a Substantial,
              Legitimate, Nondiscriminatory Interest.....................................16

          3.   Defendant Detroit's Interests Can be Served by a
              Less Discriminatory Alternative..................................................16

   II.  Plaintiffs Will Suffer Irreparable Harm Without an Injunction. .................19

   III. The Prospective Harm to Plaintiffs in Losing Their Water Service
      Outweighs Any Fiscal Harm to Defendants.................................................23

   IV. An Injunction to Maintain Plaintiffs' Water Service Is in the Public
      Interest. .........................................................................................................24

CONCLUSION ..............................................................................................25

# INDEX OF AUTHORITIES

## Cases

*Abney v. Amgen, Inc.*, 443 F.3d 540 (6th Cir. 2006) ................................... 20, 23, 24

*Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685 (6th Cir. 2011) ................................................................................................. 10

*Burgess v. Fischer*, 735 F.3d 462 (6th Cir. 2013) .................................................. 11

*Cameron v. Bouchard*, No. 20-10949, 2020 WL 1929876 (E.D. Mich. Apr. 17, 2020), *modified on reconsideration*, No. 20-10949, 2020 WL 1952836 (E.D. Mich. Apr. 23, 2020) ...................................................... 21, 24

*Connection Distributing Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998) ..................... 25

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ............................................ 11

*Cousins v. Bray*, 297 F. Supp. 2d 1027 (S.D. Ohio 2003) ...................................... 25

*Diamond House of Se. Idaho, LLC v. City of Ammon*, 381 F. Supp. 3d 1262 (D. Idaho 2019) ................................................................................. 25

*EJS Props. v. City of Toledo*, 698 F.3d 845 (6th Cir. 2012) ................................... 10

*Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002) ................................. 11

*Georgia State Conf. of the NAACP v. City of LaGrange*, 940 F.3d 627 (11th Cir. 2019) .......................................................................................... 13

*Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n*, 508 F.3d 366 (6th Cir. 2007) ......................................... 15

*Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417 (11th Cir. 1984) .................. 20

*Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019) ................................................. 9

*Ingraham v. Wright*, 430 U.S. 651 (1977) .............................................................. 10

*Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998) ............................. 10

*Kennedy v. City of Zanesville*, 505 F. Supp. 2d 456 (S.D. Ohio 2007) .................. 14

*Lieberman v. Husted*, 900 F. Supp. 2d 767 (S.D. Ohio 2012) ................................. 9

*Lillard v. Shelby Cty. Bd. Of Educ.*, 76 F.3d 716 (6th Cir. 1996) .......................... 10

*Love v. Johnson*, 146 F. Supp. 3d 848 (E.D. Mich. 2015) ...................................... 10

*Mays v. Snyder*, 916 N.W.2d 227 (Mich. App. 2018) ...............................................9

*Mencer v. Princeton Square Apartments*, 228 F.3d 631 (6th Cir. 2000).................13

*Nishiyama v. Dickson Cty.*, 814 F.2d 277 (6th Cir. 1987)......................................11

*Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566 (6th Cir. 2002) ...................................................................................................................19

*Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415 (4th Cir. 2018) ............................................................................................................. 13, 15

*Stein v. Thomas*, 222 F. Supp. 3d 539 (E.D. Mich. 2016) ........................................8

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507 (2015) ..................................................................................... passim

*Valenti v. Snyder*, 853 F. Supp. 2d 691 (E.D. Mich. 2012) ......................................8

**Statutes**

42 U.S.C. § 3601 ....................................................................................................25

42 U.S.C. § 3604 ............................................................................................. 12, 13

Executive Order 2020-28 .......................................................................................1, 4

Mich. Comp. Laws Ann. § 37.2502 .......................................................................12

**Regulations**

24 C.F.R. § 100.500 ...................................................................................... 13, 16, 17

**Other Authorities**

Brett Walton, *Millions of Americans are in Water Debt*, Circle of Blue (Aug. 5, 2020) ..............................................................................................................17

Roger Colton, *Baltimore's Conundrum: Charging for Water/Wastewater Services that Community Residents Cannot Afford to Pay*, Food & Water Watch (2018) ....................................................................................18

Sarah Rahal and Christine Ferretti, Detroit Extends Water Shutoff Moratorium through 2022, The Detroit News, Dec. 8, 2020 .........................4

## INTRODUCTION

To ensure the continuation of water service to all Detroit water customers after December 31, 2022, Plaintiffs file this brief in support of their motion for a preliminary injunction.

Plaintiffs have filed a civil rights class action against Defendants City of Detroit ("Detroit"), Governor Gretchen Whitmer, Mayor Michael Duggan, and Director of the Detroit Water and Sewerage Department ("DWSD") Gary Brown under the U.S. and Michigan Constitutions, alleging that Defendants have breached the constitutionally protected bodily integrity of Plaintiffs through their deliberate indifference to the known risks of living without water service that has harmed and will harm Plaintiffs. Plaintiffs also allege that Defendant Detroit's policy of disconnecting water service to customers for non-payment has violated the Fair Housing Act ("FHA") and the Elliott-Larsen Civil Rights Act ("ELCRA"), because it has a disproportionate and unjustified impact on Black residents.

After March 2020, Defendant Detroit was barred from disconnecting water customers for non-payment because of a state of emergency, and Defendant Whitmer's Executive Order ("EO") 2020-28, all in response to the COVID-19 pandemic. Thereafter, a voluntary moratorium on water shutoffs was established by Defendant Duggan in the closing weeks of 2020. It is set to expire on December 31, 2022.

Defendants Detroit, Duggan, and Brown (the "City Defendants") claim they have developed a water affordability plan, known as Lifeline, that will end water shutoffs and render the moratorium unnecessary. However, the effectiveness of the plan has not yet been established, and even if it is implemented according to the design, the plan expressly applies only to water customers who enroll in it and remain enrolled and in good standing.

There are significant numbers of individuals who will be unable to enroll in or benefit from the program. This includes persons who remain unaware of the program; persons who lack mobility or access to technology needed for enrollment, or who are otherwise unable to navigate the enrollment process; large families who exceed the Lifeline program's three-member family water allotment; persons with insecure immigration status or persons concerned about privacy (the program requires enrollees to provide a Social Security number; and many other persons cannot enroll and will not benefit).

Many Detroit residents who will likely be unable to enroll in the new program, and who are also members of the putative Plaintiff class (which is predominantly and disproportionately Black) will lose access to water. Without water in their homes, those residents will be unable to practice handwashing, increasing their risk and their communities' risk of contracting infectious diseases, including, but not limited to, COVID-19.

Plaintiffs seek a preliminary injunction prohibiting the City Defendants from resuming water service disconnections for non-payment. The injunction requested would not prevent Defendants from proceeding with their normal operations – including implementation of their water affordability plan – but it would preserve the status quo pending resolution of the sharply contested issues in this lawsuit.

## STATEMENT OF THE ISSUE

Whether the water service disconnections challenged by this lawsuit and that Defendants acknowledge are on track to resume in 2023 should be enjoined during the pendency of the litigation to prevent irreparable harm to members of the putative Plaintiff class who are likely to succeed in claims brought under the U.S. and Michigan Constitutions, the Fair Housing Act, and the Elliott-Larsen Civil Rights Act.

## STATEMENT OF FACTS

Detroit has had a water affordability crisis for decades. Class Action Complaint ("Compl."), ¶2. Detroit residents pay an average of 10% of their household incomes on water (and some pay much more), even though water is generally considered "affordable" when families spend no more than 2% to 2.5% of their median household incomes for such service. *Id.* As a result, many families in Detroit struggle to pay their water bills. Compl., ¶s 2 and 45.

3

Historically, when customers' water bills have been unpaid, DWSD has disconnected their service. Compl., ¶3. It took the COVID-19 pandemic to interrupt this practice. Defendant Whitmer issued an emergency order on March 28, 2020 that required public water suppliers to restore water service to all occupied residences where such service had been terminated due to non-payment. Compl., ¶77.

At the time she declared: "Now more than ever, the provision of clean water to residences is essential to human health and hygiene and to the public health and safety of this state." (Emergency Order 2020-28). In December 2020, because of the COVID-19 pandemic and pressure brought by this lawsuit and community advocacy, Defendant Duggan imposed a voluntary moratorium on water shutoffs. That moratorium, however, will expire on December 31, 2022.[3]

**Impending Harm from Renewal of Shutoffs**

If water shutoffs are allowed to resume in 2023, history portends the inevitability of crisis. Between 2014 and 2021, more than 141,000 households in Detroit had their water service disconnected for non-payment. Compl., ¶63. Some families lived for years without water service in their homes after a disconnection by DWSD. *Id.* Others are trapped in a cycle of water insecurity with repeated disconnections and reconnections. *Id.* During periods when Defendants engage in

---

[3] Sarah Rahal and Christine Ferretti, <u>Detroit Extends Water Shutoff Moratorium through 2022</u>, The Detroit News, Dec. 8, 2020.

shutoffs, these families are perpetually at risk of losing water service at any time because of their inability to pay DWSD's rates for water services.

Families without water service in their homes are susceptible to infection. Compl., ¶94. (See Gaber Declaration, Exhibit 1). Through the years, Detroit's water shutoff policy has resulted in outbreaks of various forms of infectious diseases, as well as other threats to the health of affected families resulting from such things as the inability of people with diabetes to prepare medically necessary meals, the inability of parents to prepare infant formula, dehydration, and various other health consequences associated with the lack of water. Compl., ¶s 98 -100. (See Gaber Declaration, Exhibit 1).

In many cases, individuals who live without water service in their homes have become carriers of disease, infecting others within their physical proximity. In addition, there is substantial emotional and psychological injury that results from mass water shutoffs. (See Exhibit 1 – Declaration of Dr. Nadia Gaber.) This has created a public health emergency that has been deliberately ignored by Defendants, notwithstanding repeated, consistent demands for remedial action by affected communities and their advocates. Compl., ¶s 68-74.[4]  As the end of the voluntary

---

[4] The links below document ongoing advocacy from the early 2000s:
file:///C:/Users/mfancher/Downloads/MWRO_UPR22_USA_E_Main.pdf

moratorium on December 31, 2022 approaches, these severe harms caused by the water disconnections will reappear unless shutoffs are enjoined.

### The Inadequacies in the Lifeline Program

Within recent months, Defendants launched a water affordability program called "Lifeline." Although it has encouraging features, the Lifeline Program is not adequate to address the risks of serious harm to Plaintiffs from water shutoffs. For example, in her declaration [Exhibit 2] Plaintiff Tuana Henry states:

> Irreparable harm can be predicted to occur to my family and me, on December 31, 2022, if DWSD does not have a permanent plan in place to protect Detroiters from shutoffs. For my family and thousands of others, the DWSD Lifeline 4,500 [gallon] cap of water, under the $18.00 tier will cause my bill to go up to unaffordable levels, causing my water to be cut off in the future.

Also, as a practical matter, there are water customers who wish to enroll in the program, but face challenges. Plaintiff Jacqueline Taylor is one such individual. In her declaration [Exhibit 3], she states:

> I have been trying for months to get enrolled in the Lifeline Plan, but I have not succeeded. I do not utilize a computer and when my son tried to assist me he could not enroll me either. I also tried to get an appointment with Wayne Metro, the non-profit enrolling residents. I could not get through the phone system to enroll in the Lifeline program, and would wait for long periods without getting an

---

https://www.fsconline.com/downloads/Papers/2005%2001%20Detroit%20Water.pdf;https://www.aclumich.org/sites/default/files/field_documents/mdhhs_declaratory_ruling_request-final.pdf
https://www.aclumich.org/sites/default/files/field_documents/mdhhs_declaratory_ruling_request-final.pdf

answer. Even though the DWSD Lifeline is supposed to apply to customers like me with low income, I can't get through. In April 2022 I had a stroke and was hospitalized for several days. I have problems now with my sight and movement. I cannot obtain acceptance.

With respect to Ms. Taylor's dilemma, Sylvia Orduño, whose declaration is attached [Exhibit 4], and who is directly engaged with families impacted by water shutoffs, points out that DWSD relies heavily on the use of social media when many vulnerable water customers do not receive or follow social media.

In fact, many people do not own a computer or other device that gives them adequate access to the internet. This impacts them in multiple ways, and Orduño explains that whenever such persons are required to complete online forms, many will attempt to use their phones. Often, because of the phone's limited capacity and interrupting telephone calls, there are data entry problems, particularly when there is a need to upload rental agreements, deeds, Social Security cards, DHHS benefits forms, etc. When such operations cause phones to crash, the person must begin the process again, assuming they don't become frustrated and give up.

Ms. Orduño is also concerned that persons whose immigration status is not secure will be unwilling to come forward and provide the personal information that is demanded for enrollment in the Lifeline program. This is particularly problematic when applicants are asked to provide a Social Security number. Ms. Orduño explained that she has encountered undocumented persons who do not have Social Security numbers, and others who use the names of their children.

7

In addition to the inadequacies of the Lifeline Program, even if fully implemented, Plaintiffs have questions and concerns about the sustainability of the program because of their understanding that the amount of available funding can sustain the program for only a year. If needed funding is not obtained and the program collapses, whatever continuing shutoffs problems there may already have been will be severely exacerbated.

## STANDARD FOR GRANTING PRELIMINARY INJUNCTIVE RELIEF

To determine whether to grant a preliminary injunction, a court must balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *Stein v. Thomas*, 222 F. Supp. 3d 539, 542 (E.D. Mich. 2016); *Valenti v. Snyder*, 853 F. Supp. 2d 691, 694 (E.D. Mich. 2012).

## ARGUMENT

This Court should grant Plaintiffs' request for a preliminary injunction, as each factor weighs strongly in their favor.

### I.   Plaintiffs Have a Strong Likelihood of Success on the Merits.

#### A. Plaintiffs Are Likely to Succeed on the Merits of Their Substantive Due Process Claim.

Plaintiffs are likely to succeed on their claims under the U.S. and Michigan Constitutions that Defendants have violated their rights to substantive due process. In particular, Plaintiffs assert that Defendants deliberately and knowingly breached the constitutionally protected bodily integrity of Plaintiffs through their deliberate indifference to the known risks of living without water service that could, did, and will cause harm to Plaintiffs.

"The Substantive Due Process Clause protects against 'government interference with certain fundamental rights and liberty interests.'" *Lieberman v. Husted*, 900 F. Supp. 2d 767, 776 (S.D. Ohio 2012). These interests include "the specific freedoms protected by the Bill of Rights" as well as other unenumerated rights, including the right to bodily integrity. *Id.*; *see also Mays v. Snyder*, 916 N.W.2d 227 (Mich. App. 2018) (finding that the Michigan Constitution's due process clause encompasses a substantive right to bodily integrity).

Bodily integrity can be violated in different ways. "The central tenet of the Supreme Court's bodily integrity jurisprudence is balancing the individual's common law right to informed consent with tenable state interests, *regardless of the manner in which the government intrudes upon an individual's body*." *Guertin v. Michigan*, 912 F.3d 907, 919 (6th Cir. 2019) (emphasis added). For example, in *Love v. Johnson*, this Court found that Michigan's policy requiring transgender individuals to carry identification that did not comport with their gender identity

9

placed them at risk of bodily harm, even though no actual physical intrusion was at issue. 146 F. Supp. 3d 848, 854 (E.D. Mich. 2015).

Courts have described the right to bodily integrity as "encompassing freedom from bodily restraint and punishment." *Ingraham v. Wright*, 430 U.S. 651, 673-74 (1977). "This right is fundamental where 'the magnitude of the liberty deprivation that the abuse inflicts upon the victim…strips the very essence of personhood.'" *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1063 (6th Cir. 1998). The right is implicated when an individual faces a "substantial risk of bodily harm . . . from a perceived likely threat[.]" *Love*, 146 F. Supp. 3d at 854.

To prove a bodily integrity substantive due process claim, Plaintiffs must (1) show a deprivation of a constitutionally protected liberty interest, and (2) demonstrate how the government's discretionary conduct that deprived that interest was constitutionally repugnant. *See Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 688 (6th Cir. 2011). Courts use the "shocks the conscience" rubric to evaluate intrusions into a person's right to bodily integrity. *Lillard v. Shelby Cty. Bd. Of Educ.*, 76 F.3d 716, 725 (6th Cir. 1996). Thus, a "plaintiff must show as a predicate the deprivation of ª liberty or property interest" and conscience-shocking conduct. *EJS Props. v. City of Toledo*, 698 F.3d 845, 861 (6th Cir. 2012). There is no specific test to determine when conduct shocks the conscience, but courts generally look to the state actor's intent as one factor. *County of Sacramento v.*

10

*Lewis*, 523 U.S. 833, 853 (1998). Generally, the actor must have demonstrated either "reckless indifference" or "deliberate indifference" to the harm. *Nishiyama v. Dickson Cty.*, 814 F.2d 277, 281 (6th Cir. 1987). Courts also weigh the amount of time for deliberate consideration, meaning whether the circumstances allowed the actor time to fully consider the potential consequences of their conduct. *Burgess v. Fischer*, 735 F.3d 462, 473 (6th Cir. 2013); *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002).

Here, the threat of contracting COVID-19 and other diseases due to the almost certain deprivation of water service in their homes is a violation of Plaintiffs' bodily integrity. Just as the Sixth Circuit in *Kallstrom* ruled that the release of private information created a "threat to . . . personal security and bodily integrity and possibly the lives" that implicated a fundamental liberty interest, Plaintiffs here suffer the same threat to their bodily integrity if they are returned to a situation where they cannot effectively protect themselves from the spread of diseases that may lead to sickness and, in some cases, death.

Additionally, there is ample support for a finding that Defendants have demonstrated "reckless indifference" or "deliberate indifference" to the harm. *See, e.g.*, *Nishiyama*, 814 F.2d at 287. As the COVID-19 pandemic progressed, Defendants Whitmer and Duggan pointed to the substantial risk of serious illness or even death from the failure to wash hands. Compl., ¶75. But if Detroit's self-imposed

voluntary moratorium on water shutoffs expires on December 31, 2022, and Detroit resumes its water shutoff policy, residents who are unable to pay Detroit's high water rates will lose service and be unable to comply with life-saving health practices.

Water shutoffs in Detroit have been the focus of local and state deliberation for two decades, and advocates have repeatedly petitioned Defendants to impose a moratorium on shutoffs due to the health risks. Compl., ¶s 68-74.[5] Accordingly, Plaintiffs can demonstrate a substantial likelihood of success on the merits of their constitutional claims.

### B. Plaintiffs Are Likely to Succeed on the Merits of their FHA and ELCRA Claims.

#### 1. Plaintiffs Have Established a Prima Facie Case of Disparate Impact Discrimination Under the FHA and ELCRA.

Plaintiffs are also likely to succeed on the merits of their claims under the FHA and ELCRA, because of the unjustified disparate impact that Detroit's policy of disconnecting residents' water service for non-payment has on Detroit's Black residents. Compl., ¶s 106-120. The FHA makes it unlawful to discriminate on the basis of race in the terms, conditions, or privileges of the provision of services or facilities of a dwelling. *See* 42 U.S.C. § 3604(b) ("Section 3604(b)"). ELCRA has a similar provision. Mich. Comp. Laws Ann. § 37.2502. Because the Sixth Circuit applies the same test in evaluating FHA and ELCRA claims, the analysis below

---

[5] See links at footnote 4 supra.

pertains to both statutes. *Mencer v. Princeton Square Apartments*, 228 F.3d 631, 634 (6th Cir. 2000).

The FHA permits claims challenging government policies that have an unjustified disparate impact on Black people, without any showing of intentional discrimination. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2525 (2015). Plaintiffs may establish a prima facie case of disparate impact by alleging facts demonstrating: (1) the specific policy that is being challenged; (2) a disparate impact on a protected class; and (3) a causal connection between the challenged policy and the disparity. *Inclusive Cmtys.*, 135 S. Ct. at 2523-24; 24 C.F.R. § 100.500(c)(1); *see also Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 426, 428-30 (4th Cir. 2018).

Plaintiffs have conclusively established a prima facie disparate impact claim. First, Plaintiffs have identified a specific policy of the defendant that has a significant disparate effect on a protected group: they challenge Defendant Detroit's policy of disconnecting water service to customers for non-payment. Plaintiffs allege that Detroit's shutoff policy violates Section 3604(b) of the FHA, which prohibits discrimination in the provision of services or facilities (including water) in connection with the sale or rental of a dwelling. *See, e.g.*, *Georgia State Conf. of the NAACP v. City of LaGrange*, 940 F.3d 627, 634 (11th Cir. 2019) (municipal water services are covered by section 3604(b)); *Kennedy v. City of Zanesville*, 505 F. Supp.

2d 456, 499 (S.D. Ohio 2007) (the FHA "clearly" covers discrimination in the "procurement of water, a vital resource").

Second, Plaintiffs have sufficiently demonstrated the disparate impact of Detroit's water shutoff policy on Black residents. Plaintiffs' expert, Dr. Samuel Stolper, analyzed publicly available data on water shutoffs in Detroit from January 2017 to July 2018 and from January 2019 to January 2020. Declaration of Samuel Stolper, PhD ("Stolper Decl."), [Exhibit 5]. For the 2017 to 2018 data, Dr. Stolper determined that 95% of residential water shutoffs occurred in Census tracts with a population that was greater than 50% Black. *Id*. Only 5% of shutoffs occurred in Census tracts with a population that was less than 50% Black. *Id*. This difference is statistically significant. *Id.* For the same time period, he also determined that Detroit Census tracts with a less than 50% Black population had, on average, 21.7 (or 64%) fewer shutoffs per 1,000 people than tracts with a greater than 50% Black population. *Id.* This difference is statistically significant and remained statistically significant even when accounting for differences in income and counts of unoccupied homes. *Id.* Dr. Stolper also found statistically significant results for this time period when comparing Census tracts with a population greater and less than 75% Black. *Id.*

For the 2019 to 2020 data, Dr. Stolper determined that 96% of residential water shutoffs occurred in zip codes with a population that was greater than 50% Black. *Id.* Only 4% of shutoffs occurred in zip codes with a less than 50% Black

14

population. *Id.* This difference is statistically significant. *Id.* During this same time period, Detroit zip codes with a less than 50% Black population had, on average, 30.6 (or 68%) fewer shutoffs per 1,000 people than tracts with a greater than 50% Black population. *Id.* This difference is statistically significant and remained statistically significant even when accounting for differences in income and counts of unoccupied homes. *Id.* Dr. Stolper also found statistically significant results for this time period when comparing zip codes with a population greater and less than 75% Black.[6] *Id.*

Third, Plaintiffs can show a causal nexus between the challenged practice or policy and the disparate impact on the protected class. Statistical evidence, including "sufficiently substantial" disparities, may be used to demonstrate causation. *See, e.g.*, *Inclusive Cmtys.*, 135 S. Ct. at 2523; *Reyes*, 903 F.3d at 425; *Graoch Assocs. # 33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n*, 508 F.3d 366, 374 (6th Cir. 2007). Plaintiffs allege that Defendant Detroit's policy causes Black Detroit residents to disproportionately experience water shutoffs, forcing them to live without water service in their homes. Compl., ¶110. These allegations are supported by "sufficiently substantial" disparities, as described above. Plaintiffs have more than met their burden to establish a robust causal connection between

---

[6] Notwithstanding the passage of time, Dr. Stolper's declaration states his belief in the likelihood that: "…those shutoffs that continue to occur will exhibit similar patterns related to race as shown in this declaration for the years 2017-2019."

Detroit's water shutoff policy and the resulting impact on Black residents. Accordingly, this Court should find that Plaintiffs have established a prima facie case of disparate impact discrimination under the FHA and ELCRA.

> **2. Defendant Detroit Cannot Demonstrate Its Water Shutoff Policy Is Necessary to Achieve a Substantial, Legitimate, Nondiscriminatory Interest.**

Because Plaintiffs can establish a prima facie case of disparate impact discrimination, the burden will shift to Defendant Detroit to demonstrate that its water shutoff policy is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." 24 C.F.R. § 100.500(c)(2); *Inclusive Cmtys.*, 135 S. Ct. at 2514-15.

Defendant Detroit cannot satisfy this standard. Plaintiffs anticipate that Detroit will argue that it is entitled to collect payment for services provided, and that it is appropriate to disconnect the service of those customers who do not pay their bills. However, this argument is unavailing in light of the City's reported history of disconnecting service to residential water customers with relatively low unpaid bills while failing to disconnect service to commercial customers with much larger outstanding balances.  In addition, there are compelling reasons to question whether water shutoffs are even effective as a collection strategy. See Exhibits 7 [Click on Detroit News Article and 8 [Circle of Blue Podcast].

> **3. Defendant Detroit's Interests Can be Served by a Less Discriminatory Alternative.**

16

Even if the court finds that Defendant Detroit satisfies its burden of articulating a substantial, legitimate, nondiscriminatory interest, Plaintiffs may still prevail upon proving that the interests supporting the challenged practice can be served by another practice that has a less discriminatory effect. 24 C.F.R. § 100.500(c)(3); *Inclusive Cmtys.*, 135 S. Ct. at 2515. Here, there are alternative collection measures the City could employ that would have a less discriminatory impact.

Of primary and greatest significance is the fact that Detroit itself has unveiled its "Lifeline" program that states explicitly that water customers enrolled in the program are exempt from shutoffs. (Exhibit 6 – Lifeline Policy Plan) Logically, if it is possible to exempt those in the program from shutoffs, it is possible to exempt those who are not enrolled – if the City is so inclined.

From the outset, Plaintiffs have insisted that the most responsible and effective alternative to water shutoffs is a water affordability program indexed to the actual income of the water customers. Studies have found that cities with affordability programs experience a dramatic improvement in bill coverage payment ratios (the percentage of billed revenue actually paid) of their low-income customers. Roger Colton, *Baltimore's Conundrum: Charging for Water/Wastewater Services that Community Residents Cannot Afford to Pay*, Food & Water Watch, 45-46 (2018) [Exhibit 9 – Excerpt from Food & Water Watch].

17

For example, in Colorado, participants in a low-income affordability pilot program had an average payment ratio of 83% by the end of the pilot in 2011, while other low-income customers in the state had an average payment ratio of 55%. *Id.* at 46. This study found that affordability programs increased the total revenue collected by utilities and can decrease costs associated with collection efforts. *Id.* at 47-50.

Defendants, to their credit, have, with the initiation of the Lifeline program, taken steps toward an income-based affordability program, but at the same time they have failed to use it to accomplish what should be its primary objective – eliminating shutoffs. Instead, they have replicated aspects of a paradigm that prompted this lawsuit, to wit, requiring enrollment in a program to avoid shutoffs, and also creating barriers to full participation in that program. No household should be subject to discontinuation of water service, whether enrolled in a program or not.

To the extent that Defendants insist that shutoffs are an essential tool for collections, there are other approaches used in the industry. They include the following, among others:

1. Payment plans that allow customers to pay down debts without interruption of water service;

2. Establishment of a non-profit organization or other entity to serve as a guarantor for delinquent customers;

18

Accordingly, Plaintiffs can establish less discriminatory alternatives that could achieve any legitimate interest articulated by Detroit. In sum, Plaintiffs are likely to succeed on the merits of their claims. This factor strongly weighs in favor of granting Plaintiffs' request for a preliminary injunction.

## II.  Plaintiffs Will Suffer Irreparable Harm Without an Injunction.

The court must next consider whether Plaintiffs will suffer irreparable harm in the absence of an injunction. As a matter of law, Plaintiffs' claims give rise to a presumption of irreparable harm because Plaintiffs' due process claim is based on a violation of their constitutional rights. *See Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights.").

Irreparable harm may also be presumed upon a showing of likely success on the merits in housing discrimination cases. *See, e.g.*, *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984) ("a substantial likelihood that a defendant has violated specific fair housing statutes and regulations, that alone, if unrebutted, is sufficient to support an injunction").

Absent a presumption, to demonstrate irreparable harm in the Sixth Circuit, Plaintiffs must show that, unless injunctive relief is granted, they "will suffer actual

and imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).

Plaintiffs will suffer "actual and imminent" harm absent the issuance of an injunction. Specifically, Jacqueline Taylor explains in her declaration [Exhibit 3]: "Because I was hospitalized with serious medical conditions, I am afraid of having my water cut off again because I owe arrearage in the hundreds of dollars, I know I am a candidate for cutoff in 2023. My need for water is very critical to my post-medical care and I will sustain irreparable physical and mental harm without a permanent solution."

Plaintiff Lisa Brooks will also suffer irreparable harm. In her declaration [Exhibit 10] she states: "I have health problems, including Chronic Pulmonary Obstructive Disease (COPD), which requires a nebulizer. I have to be well hydrated at all times."  The circumstances of Plaintiff Tuana Henry are similar. In her declaration [Exhibit 2] she states: "I have a pulmonary medical condition that requires me to stay well hydrated. I receive ongoing treatment."

While there are likely many members of the putative class whose illnesses implicate medical disaster if they lose water, the circumstances of the putative class representatives in this case are representative of their class if for no reason other than water is necessary to fight the spread of infectious disease. [See Gaber Declaration Exhibit 1]

This Court has previously found that irreparable harm is likely to occur without an injunction in circumstances where they face a heightened risk of contracting COVID-19. *See Cameron v. Bouchard*, No. 20-10949, 2020 WL 1929876, at *2 (E.D. Mich. Apr. 17, 2020), *modified on reconsideration*, No. 20-10949, 2020 WL 1952836 (E.D. Mich. Apr. 23, 2020). Specifically, the Court in *Cameron* found that "COVID-19 poses a serious health risk" and, consequently, granted a temporary restraining order requiring the defendants to adopt appropriate measures to improve hygiene in a local jail, including by providing incarcerated persons with access to liquid hand soap and showers, as well as requiring jail staff to wash their hands with soap and water before and after touching persons and common area surfaces. *Id*. Therefore, it follows that Plaintiffs and other residents will similarly face a "serious health risk" if Detroit is not enjoined from its water service shutoff policy.

The potential for harm is real, and the harm is not limited to physical injury. In her declaration [Exhibit 1], Dr. Nadia Gaber explains what she and other researchers learned during a study:

> During the course of our study, in August 2016, the Wayne County Population Health Authority issued a statement advocating a moratorium on water shutoffs against certain vulnerable populations. This included infants and children under the age of 18; seniors 62 and above; persons with mental illness; persons with disabilities; expectant and/or breastfeeding mothers; persons dealing with chronic diseases; and those otherwise in need of critical care. The moratorium was not actually implemented. Our study demonstrated that 82% of households

21

met one or more criteria to warrant protection under the recommended health moratorium.  We used standardized questions from the CDC toolkit to evaluate whether anyone in those households that had been shutoff or received notice became symptomatic as a result. Among this sub-sample (n=24 households, representing 70 residents), the most prevalent symptoms reported as a result of their water shutoff or notice were: Trouble Sleeping/Nightmares (37.5%), Anxiety or stress (29%), Agitated behavior (25%), Loss of appetite (25%), Difficulty concentrating (21%), Severe headache with dizziness (16.7%), Cough (16.7%), Depressed Mood (16.7%), and Nausea/stomach ache/diarrhea (12.5%). These symptoms are components of the biomedical definitions of Major Depressive Disorder as well as Adjustment Disorder and its more enduring cousin, Post-Traumatic Stress Disorder.

Finally, the potential for irreparable harm that flows from ending the flow of water is obvious from the living circumstances of those who experience shutoffs. In her declaration [Exhibit 1], Dr. Gaber also recounts her personal observations:

> As a qualitative researcher, I spoke with dozens of residents affected by the shutoffs, whose stories recounted these intersecting harms. One woman, a young mother, described the huge burdens of managing daily needs when their water was disconnected. She described to me the lengthy and cumbersome process of 'recycling' water. First, she took the bus across town, more than 40 minutes each way, to buy bottled water ` – a trip separate from groceries given the weight of carrying water. She would use water first for drinking and cooking food; she often chose pasta over rice, for example, because she could keep the drained water to wash clothes. After wringing them out, she would use that detergent-laden starch water to mop her floors. Whatever was left was used to flush the toilet. Hygiene was reduced to warm sponge baths of sensitive areas, especially difficult during menstruation. After the first few weeks she sent her youngest to school early to use the gym showers, fearing that teachers may report the family to Child Protective Services if they felt that living without water was tantamount to neglect. She had to separate her children: her two older children went to live with a sister and an aunt. The youngest missed several school days. Mom missed school, too, unenrolling from her higher education courses and picking up another job to try to pay off a bill whose

accuracy she contested from the start. She became increasingly embarrassed, depressed, and isolated. She was enrolled in the city's 10/30/50 plan but found her minimum payments soar whenever she fell short of a monthly bill, quickly exceeding her resources. Desperate, she took out credit cards that only deepened her debt. She herself ended up hospitalized for a severe asthma exacerbation, thought to be triggered by dust at home, and pushed further into debt and further from being able to afford her rising bill. These myriad effects are not captured in data and policy regarding water shutoffs and unaffordability.

Accordingly, Plaintiffs will suffer irreparable harm if a preliminary injunction is not granted.

### III. The Prospective Harm to Plaintiffs in Losing Their Water Service Outweighs Any Fiscal Harm to Defendants.

The third factor requires the court to consider "whether substantial harm to others will occur if the injunction is granted." *Abney*, 443 F.3d at 552. If Plaintiffs' request for relief is granted, the harm to the Defendants, if any, will be limited. In fact, it is possible that Detroit's fiscal condition will improve because it will no longer bear the high costs of engaging contractors to disconnect water service.

In any case, a decrease in revenue is insufficient to justify a denial of Plaintiffs' request. *See Cameron*, 2020 WL 1929876, at *2 (finding the balance of equities weighed in favor of a temporary restraining order requiring certain remedial interventions to protect incarcerated people from COVID-19 despite defendants incurring costs to implement measures preventing further spread of COVID-19). Accordingly, the irreparable harm to Plaintiffs in the absence of injunctive relief

greatly outweighs any harm to the Defendants if the preliminary injunction is granted.

## IV. An Injunction to Maintain Plaintiffs' Water Service Is in the Public Interest.

The last factor the court must consider is whether a preliminary injunction serves the public interest. *Abney*, 443 F.3d at 552. Enjoining Defendant Detroit from disconnecting Plaintiffs' water service would further the paramount public interests of safeguarding public health by suppressing community spread of disease; protecting Plaintiffs' constitutional rights; and eliminating a practice that disproportionately harms racial minorities through the enforcement of our nation's fair housing laws.

Further, granting such an injunction is in the public interest because it will prevent the violation of the rights afforded to Plaintiffs under the U.S. and Michigan Constitutions, the FHA, and the ELCRA. It is well established that "it is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). Regarding the enforcement of fair housing laws, "there is a strong public interest in preventing race discrimination in housing." *Cousins v. Bray*, 297 F. Supp. 2d 1027, 1042 (S.D. Ohio 2003). To that end, Congress enacted the FHA, declaring that "it is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601; *see also Inclusive Cmtys.*, 135 S.

Ct. at 2521 ("The FHA, like Title VII and the ADEA, was enacted to eradicate discriminatory practices within a sector of our Nation's economy."). Consequently, "courts have emphatically declared the public interest is served by effective enforcement of the FHA." *Diamond House of Se. Idaho, LLC v. City of Ammon*, 381 F. Supp. 3d 1262, 1279 (D. Idaho 2019) (collecting cases). Because a preliminary injunction in this case will further the public interest, this factor weighs in favor of granting such relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs satisfy the requirements for a preliminary injunction to enjoin Detroit from resuming its water shutoff policy. Accordingly, Plaintiffs respectfully request that this Court grant their motion.

Respectfully submitted,

/s/ Mark P. Fancher
Mark P. Fancher (P56223)
Daniel S. Korobkin (P72842)
Bonsitu Kitaba-Gaviglio (P78822)
**AMERICAN CIVIL LIBERTIES UNION
  FUND OF MICHIGAN**
2966 Woodward Avenue
Detroit, Michigan 48201
Tel.: (313) 578-6800
mfancher@aclumich.org
dkorobkin@aclumich.org
bkitaba@aclumich.org

**NAACP LEGAL DEFENSE**
**AND EDUCATIONAL FUND, INC.**
Jason Bailey
700 14th Street NW, Suite 600
Washington, DC 20005
Tel.: (202) 682-1300
jbailey@naacpldf.org

**EDWARDS & JENNINGS, P.C.**
Alice B. Jennings (P29064)
Cadillac Tower Building
65 Cadillac Square, Suite 2710
Detroit, Michigan 48226
Tel.: (313) 961-5000
ajennings@edwardsjennings.com

**MICHIGAN POVERTY**
**LAW PROGRAM**
Lorray S. C. Brown (P60753)
15 South Washington Street, Suite 202
Ypsilanti, Michigan 48197
Tel.: (734) 998-6100 ext. 613
Fax.: (734) 998-9125
lorrayb@mplp.org

**THORNBLADH LEGAL GROUP PLLC**
Kurt Thornbladh (P25858)
7301 Schaefer
Dearborn, Michigan 48126
Tel: (313) 943 2678
kthornbladh@gmail.com

**MELISSA Z. EL, P.C.**
Melissa Z. El Johnson (P29865)
500 Griswold Suite 2410
Detroit, Michigan 48226
Tel.: (313) 963-1049
Fax: (313) 963-3342
eljohnsonlaw@gmail.com

26

*Attorneys for Plaintiffs and the Putative Classes*

Date:  December 12, 2022